**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CULTIVATE KC, et al., | ) |
| *Plaintiffs*, | ) |
| | ) |
| | ) |
| v. | ) |
| | ) |
| UNITED STATES DEPARTMENT OF | ) |
| AGRICULTURE, et al., | ) |
| *Defendants*. | ) |
| | ) |

Civil Action No. 1:25-cv-00737-RC

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

STATEMENT OF FACTS ................................................................................... 2

I.    Plaintiffs received USDA grants under the Inflation Reduction Act ................................. 2

II.   The *Unleashing American Energy* Executive Order and OMB's Directives order agencies to freeze IRA funds, and USDA does so. ................................................ 4

III.  USDA continued to freeze Plaintiffs' funds after OMB "rescinded" its January 27 memorandum. ......................................................................................... 5

IV.   This Court and others have preliminarily enjoined OMB and agencies from freezing funds ..................................................................................................... 7

STANDARD OF REVIEW .................................................................................. 8

ARGUMENT ........................................................................................................ 9

I.    This Court has jurisdiction over Plaintiffs' claims. ............................................. 9

     A.   This case is properly before this Court. ............................................... 9

          i.    Plaintiffs' constitutional claims can only be heard in district court .......................... 10

          ii.   Plaintiffs' APA claims arise under statutes and the Constitution, and seek equitable injunctive relief unavailable in the Court of Federal Claims. ................................ 12

     B.   Plaintiffs have standing. ................................................................... 16

II.   Defendants violated the Constitution by freezing statutorily obligated funds ................. 17

     A.   The funding freeze violates the separation of powers. ................................ 18

     B.   The funding freeze violates the Take Care Clause. ..................................... 20

III.  Agency Defendants' actions implementing the funding freeze violate the Administrative Procedure Act ....................................................................... 22

     A.   Agency Defendants' actions are final agency actions. ................................ 22

     B.   Agency Defendants' actions are contrary to law. ...................................... 23

     C.   Agency Defendants' actions are arbitrary and capricious. ........................... 25

CONCLUSION ................................................................................................... 29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State,*
770 F. Supp. 3d 121 (D.D.C. 2025) ...................................................................7, 16, 19

*In re Aiken Cnty.,*
725 F.3d 255 (D.C. Cir. 2013) ..........................................................................18, 19, 24

*Am. Bar Ass'n v. U.S. Dep't of Just.,*
No. 25-cv-1263 (CRC), 2025 WL 1388891 (D.D.C. May 14, 2025) ..............................11, 13

*Am. Ctr. for Int'l Lab. Solidarity v. Chavez-Deremer,*
No. 25-cv-1128 (BAH), 2025 WL 1795090 (D.D.C. June 30, 2025) (Howell,
J.).................................................................................................................... *passim*

*Appalachian Power Co. v. EPA,*
208 F.3d 1015 (D.C. Cir. 2000) ...............................................................................22

*Ayissi-Etoh v. Fannie Mae,*
712 F.3d 572 (D.C. Cir. 2013) ..................................................................................8

*Bennett v. Spear,*
520 U.S. 154 (1997).............................................................................................22, 23

*Bowen v. Massachusetts,*
487 U.S. 879 (1988)...............................................................................................15

*Bus. Roundtable v. SEC,*
647 F.3d 1144 (D.C. Cir. 2011) .................................................................................27

*California v. U.S. Dep't of Educ.,*
132 F.4th 92 (1st Cir. 2025)...................................................................................12, 15

*Chamber of Com. of U.S. v. Reich,*
74 F.3d 1322 (D.C. Cir. 1996) ..................................................................................10

*Chenari v. George Washington Univ.,*
847 F.3d 740 (D.C. Cir. 2017) ...................................................................................8

*City & Cnty. of San Francisco v. Trump,*
897 F.3d 1225 (9th Cir. 2018) ...................................................................................18

*Climate United Fund v. Citibank,*
No. 25-cv-698-TSC, 2025 WL 1131412 (D.D.C. Apr. 16, 2025) ...........................................13

iii

*Clinton v. City of New York*,
  524 U.S. 417 (1998)..................................................................................18

*Cmty. Legal Servs. in E. Palo Alto v. U.S. Dep't of Health & Hum. Servs.*,
  137 F.4th 932 (9th Cir. 2025) ..................................................................20

*Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*,
  601 U.S. 416 (2024)..................................................................................18

*Crowley Gov't Servs. v. Gen. Servs. Admin.*,
  38 F.4th 1099 (D.C. Cir. 2022)..................................................................9

*Ctr. for Biological Diversity v. McAleenan*,
  404 F. Supp. 3d 218 (D.D.C. 2019)..........................................................21

*Demore v. Kim*,
  538 U.S. 510 (2003)..................................................................................11

*Dep't of Ed. v. California*,
  145 S. Ct. 966 (2025)..........................................................................12, 15

*Encino Motorcars, LLC v. Navarro*,
  579 U.S. 211 (2016)..................................................................................28

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009)..........................................................................26, 28

*FEC. v. Cruz*,
  596 U.S. 289 (2022)..................................................................................23

*Green & Healthy Home Initiatives, Inc. v. EPA*,
  No. 25-cv-1096-ABA, 2025 WL 1697463 (D. Md. June 17, 2025)...............21, 29

*Int'l Org. of Masters, Mates & Pilots v. NLRB*,
  61 F.4th 169 (D.C. Cir. 2023)..................................................................27

*Kendall v. U.S. ex rel. Stokes*,
  37 U.S. 524 (1838)..................................................................................21

*Larson v. Domestic & Foreign Com. Corp.*,
  337 U.S. 682 (1949)..................................................................................10

*LeBlanc v. United States*,
  50 F.3d 1025 (Fed. Cir. 1995)..................................................................12

*Loper Bright Enters. v. Raimondo*,
  603 U.S. 369 (2024)..................................................................................29

iv

*Louisiana v. Biden*,
    622 F. Supp. 3d 267 (W.D. La. 2022)..................................................................23

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992)..............................................................................................16

*Md. Dep't of Hum. Res. v. Dep't of Health & Hum. Servs.*,
    763 F.2d 1441 (D.C. Cir. 1985).....................................................................13, 15

*Morrison v. Olson*,
    487 U.S. 654 (1988)..............................................................................................20

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983)..........................................................................................25, 26

*Nat. Res. Def. Council v. EPA*,
    822 F.2d 104 (D.C. Cir. 1987)..............................................................................25

*Nat'l Council of Nonprofits v. OMB*,
    775 F. Supp. 3d 100 (D.D.C. 2025).................................................................7, 26

*Nat'l Lifeline Ass'n v. FCC*,
    921 F.3d 1102 (D.C. Cir. 2019)............................................................................27

*New York v. Trump*,
    769 F. Supp. 3d 119 (D.R.I. 2025)..................................................................7, 23

*Off. of Pers. Mgmt. v. Richmond*,
    496 U.S. 414 (1990)..............................................................................................18

*Ohio v. EPA*,
    603 U.S. 279 (2024)..............................................................................................29

*Perry Cap. LLC v. Mnuchin*,
    864 F.3d 591 (D.C. Cir. 2017)..............................................................................12

*PFLAG, Inc. v. Trump*,
    769 F. Supp. 3d 405 (D. Md. 2025)......................................................................22

*Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*,
    324 F.3d 726 (D.C. Cir. 2003)..............................................................................23

*Rochester Pure Waters Dist. v. EPA*,
    960 F. 2d 180 (D.C. Cir. 1992)............................................................................18

*South Dakota v. Dole*,
    483 U.S. 203 (1987)..............................................................................................18

*Spirit Airlines, Inc. v. Dep't of Transp.*,
   997 F.3d 1247 (D.C. Cir. 2021) ................................................................28

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
   255 F. Supp. 3d 101 (D.D.C. 2017) ..............................................................8

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
   985 F.3d 1032 (D.C. Cir. 2021) ....................................................................9

*Sustainability Inst. v. Trump*,
   No. 2:25-cv-2152-RMG, 2025 WL 1486979 (D.S.C. May 20, 2025) ...................21

*Tootle v. Sec'y of Navy*,
   446 F.3d 167 (D.C. Cir. 2006) ....................................................................11

*Vera Inst. of Just. v. U.S. Dep't of Just.*,
   No. 25-cv-1643 (APM), 2025 WL 1865160 (D.D.C. July 7, 2025) ...............11, 16

*Weinberger v. Salfi*,
   422 U.S. 749 (1975) ....................................................................................11

*Widakuswara v. Lake*,
   No. 25-5144, 2025 WL 1288817 (D.C. Cir. May 3, 2025) (Pillard, J.,
   dissenting) ................................................................................. *passim*

*Widakuswara v. Lake*,
   No. 25-5144, 2025 WL 1521355 (D.C. Cir. May 28, 2025) (en banc) ...............11

*Woonasquatucket River Watershed Council v. USDA*,
   No. 1:25-cv-00097, 2025 WL 1116157 (D.R.I. Apr. 15, 2025) .....................7, 13

*Yakima Valley Cablevision, Inc. v. FCC*,
   794 F.2d 737 (D.C. Cir. 1986) ....................................................................28

*Youngstown Sheet & Tube Co. v. Sawyer*,
   343 U.S. 579 (1952) ................................................................................20, 21

**Statutes**

2 U.S.C. § 682(1) ............................................................................................24

2 U.S.C. § 683 ................................................................................................24

2 U.S.C. § 683(a) ............................................................................................24

2 U.S.C. § 683(b) ............................................................................................24

2 U.S.C. § 684(b) ............................................................................................24

5 U.S.C. § 702 ................................................................................................12

5 U.S.C. § 704 ................................................................................................22

5 U.S.C. § 706(2)(A) ..............................................................................9, 23, 24, 25

5 U.S.C. § 706(2)(B) ...................................................................................22, 23

5 U.S.C. § 706(2)(C) ...................................................................................23, 29

5 U.S.C. § 706(2)(D) ........................................................................................9

28 U.S.C. § 1491(a)(1) ..................................................................................9, 12

31 U.S.C. § 6101(3) ........................................................................................10

Inflation Reduction Act, Pub. L. No. 117-169, 136 Stat. 1818 (2022) ............................2, 3, 19, 24

**Other Authorities**

2 C.F.R. § 200.1 (2024) ....................................................................................10

Exec. Order No. 14154, 90 Fed. Reg. 8353 (Jan. 29, 2025) ........................................4, 19

Fed. R. Civ. P. 56(a) ........................................................................................8

Mem. from John G. Roberts, Jr. to Fred F. Fielding (Aug. 15, 1985),
   https://www.levernews.com/content/files/2025/01/1985RobertsMemo-
   Budget.pdf ................................................................................................18

OMB, M-25-13, *Temporary Pause of Agency Grant, Loan, & Other Financial
   Assistance Programs* 2 (Jan. 27, 2025) ............................................................ *passim*

OMB, Memorandum, M-25-11, "Guidance Regarding Section 7 of the Executive
   Order *Unleashing American Energy*," from Matthew Vaeth, Acting Director
   (Jan. 21, 2025) .......................................................................................4, 22

REAP NewERA PACE Notification Form, USDA Rural Development,
   https://www.rd.usda.gov/reap-newera-pace-notification ...........................................6

*Secretary Rollins Releases the First Tranche of Funding Under Review*, USDA
   (Feb. 20, 2025), https://www.usda.gov/about-usda/news/press-
   releases/2025/02/20/secretary-rollins-releases-first-tranche-funding-under-
   review ...............................................................................................5, 6, 20

U.S. Const. art. I, § 1 ......................................................................................18

U.S. Const. art. I, § 8, cl. 1 ................................................................................18

U.S. Const. art. I, § 9, cl. 7..................................................................................................18

U.S. Const. art. II, § 3 .......................................................................................................18

*USDA Delivers on Rural Energy Commitments, Provides Path for Applicants to Support U.S. Energy Independence*, USDA (Mar. 25, 2025), https://www.usda.gov/about-usda/news/press-releases/2025/03/25/usda-delivers-rural-energy-commitments-provides-path-applicants-support-us-energy-independence ..................................................................................................6

## INTRODUCTION

On his first day in office, President Trump issued an Executive Order directing a categorical freeze on disbursements of funds appropriated by Congress in the Inflation Reduction Act (IRA). In response, the Office of Management and Budget (OMB) directed agencies to comply, and the U.S. Department of Agriculture (USDA) did. The resulting freeze of grant funds stopped projects under numerous programs in their tracks, pausing their benefits to communities across the country, leaving invoices unpaid, and causing immediate and ongoing uncertainty. This funding freeze puts the livelihood of farmers at risk, increases debts, and, by delaying spring planting, has caused many grant recipients to lose an entire crop season. It brought projects designed to support new farmers, improve and maintain city parks, and expand tree canopies in communities affected by pollution and climate change to a standstill; and thrust grant recipients into the role of crisis managers, requiring them to jettison trusted staff, rework project plans, and try to salvage their reputations with the partners and communities with whom they work.

Plaintiffs in this case are recipients of IRA-funded USDA grants and subject to this sweeping freeze. They include nonprofit organizations that provide training and support to farmers, work with communities to grow and maintain urban forests, and increase access to land for farmers, ranchers, and forest owners. Plaintiffs also include farmers who received grants for solar and energy efficiency projects to lower their long-term costs. All Plaintiffs have suffered grave harm as a result of Defendants' halt of congressionally mandated funding.

Defendants' funding freeze blatantly disregards constitutional and statutory provisions designed to protect against such arbitrary and illegal action. It violates constitutional separation of powers principles and the duty of the Executive Branch to take care to faithfully execute

1

Congress's laws. Defendants' decision to adopt the funding freeze was also arbitrary and capricious, as Defendants failed to consider reliance interests, provided no reasoned explanation for their action, and offered no indication that they had considered less disruptive alternatives.

For these reasons, and as discussed more fully below, Plaintiffs are entitled to permanent injunctive relief declaring the funding freeze unlawful, vacating the freeze and setting it aside, and enjoining Defendants from reinstating it. Absent such relief, Plaintiffs face the continued threat of disruptions to the disbursement of their obligated funding, continuing and compounding injuries they have experienced as a result of Defendants' unlawful action.

## STATEMENT OF FACTS

### I.    Plaintiffs received USDA grants under the Inflation Reduction Act.

In 2022, Congress passed the IRA, a landmark statute that, among other things, aims to reduce carbon emissions and lower energy costs. Pub. L. No. 117-169, 136 Stat. 1818 (2022). Congress appropriated $433 billion over ten years to support a variety of federal programs, including tens of billions of dollars appropriated for USDA programs in such areas as agricultural conservation, renewable energy for rural communities and farmers, forestry restoration, and fuel reduction. Plaintiffs were awarded grants under four of these IRA-funded USDA programs: the National Resources Conservation Service (NRCS)'s Conservation Technical Assistance, the Increasing Land Access Program, the Urban and Community Forestry Program, and the Rural Energy for America Program (REAP).

Congress appropriated approximately $125 million to NRCS for programs that provide training, support, and technical assistance "to underserved farmers, ranchers, and forest landowners, including veterans, limited resource producers, beginning farmers and ranchers, and farmers, ranchers, and forest landowners living in high poverty areas." IRA § 22007, 136 Stat. at 2022. This includes NRCS's Conservation Technical Assistance, through which USDA awarded

Plaintiff Cultivate KC a grant to support farmers and hold events to connect farmers with government agencies, the public, and customers. Ex. 1, Cultivate KC Decl. ¶ 8.

The Urban and Community Forestry Assistance Program received $1.5 billion through the IRA in appropriated funds for "multiyear, programmatic, competitive grants . . . for tree planting and related activities." IRA § 23003, 136 Stat. at 2026. Plaintiffs Faith in Place and GreenLatinos received $2 million and $25 million, respectively. Both organizations serve as National Pass-Through Partners, and thus subaward eighty percent of the awarded money to municipalities, community organizations, and faith partners for projects to increase tree canopies and provide workforce opportunities in their communities. Ex. 2, Faith in Place Decl. ¶¶ 5–6; Ex. 3, GreenLatinos Decl. ¶¶ 5–6. For example, GreenLatinos awarded 18 municipalities a total of $11.5 million and 15 community-based organizations a total of $8.5 million, which collectively funded over 110 project partners, 155 jobs, and over 115 contractors. *Id*. ¶ 10.

In addition, Congress appropriated $250 million in IRA funding to the Increasing Land Access Program "to provide grants and loans . . . to improve land access . . . for underserved farmers, ranchers, and forest landowners." IRA § 22007, 136 Stat. at 2022. USDA awarded Plaintiffs Hope for SFS and Foodshed Alliance grants to expand their operations, including offering land to new farmers. Ex. 4, Hope for SFS Decl. ¶¶ 6–7; Ex. 5, Foodshed Alliance Decl. ¶¶ 6–7. USDA also awarded Plaintiff Cultivate KC a grant under this program to support the purchase of 20 acres of property to provide new farmers with access to land to farm. Ex. 1, Cultivate KC Decl. ¶¶ 9–10.

Additionally, the IRA appropriated over $300 million to REAP for projects "relating to underutilized renewable energy technologies." IRA § 22002, 136 Stat. at 2019. Plaintiffs Red Fire Farm, Hendrix Farm, and Two Boots Farm (collectively, Plaintiff Farms) each were

awarded REAP grants to support solar installation and energy efficiency projects on their farms. Ex. 6, Red Fire Farm Decl. ¶ 14; Ex. 7, Hendrix Farm Decl. ¶ 8; Ex. 8, Two Boots Farm Decl. ¶ 13.

II.    **The *Unleashing American Energy* Executive Order and OMB's Directives order agencies to freeze IRA funds, and USDA does so.**

On President Trump's first day in office, he signed the Executive Order *Unleashing American Energy*, Exec. Order No. 14154, 90 Fed. Reg. 8353, 8357 (Jan. 29, 2025). Section 7 of the order, titled "Terminating the Green New Deal," directed federal agencies to implement an immediate, categorical, and indefinite freeze on disbursements of IRA funds. *Id*. The order further required agencies to determine whether "financial disbursements of such appropriated funds," *id.*, were consistent with a series of broad "polic[ies] of the United States," such as encouraging energy exploration and production on federal land and waters; establishing a position as a leading producer and processor of non-fuel minerals; ensuring an abundant energy supply; eliminating emissions requirements; and, most relevant to this action, "ensur[ing] that no Federal funding be employed in a manner contrary to the principles outlined in this section, unless required by law," *id*. at 8353–54.

In response to the Executive Order, on January 21, Acting OMB Director Matthew Vaeth issued a memorandum to the heads of departments and agencies stating that the Order required them to halt disbursement of "appropriations for objectives that contravene the [Order's] policies." OMB, Memorandum, M-25-11, "Guidance Regarding Section 7 of the Executive Order *Unleashing American Energy*," from Matthew Vaeth, Acting Director (Jan. 21, 2025).

Shortly after, USDA froze Plaintiffs' IRA-funded grants, ceasing issuance of promised disbursements. *See* Ex. 2, Faith in Place Decl. ¶ 10; Ex. 3, GreenLatinos Decl. ¶¶ 14–15; Ex. 1, Cultivate KC Decl. ¶¶ 13–14; Ex. 5, Foodshed Alliance ¶¶ 9–11; Ex. 4, Hope for SFS Decl. ¶ 11;

Ex. 8, Two Boots Farm Decl. ¶ 18; Ex. 6, Red Fire Farm Decl. ¶¶ 15–16; Ex. 7, Hendrix Farm

Decl. ¶¶ 12–13.

On January 27, OMB issued another memorandum directing departments and agencies to

"**temporarily pause** all activities related to obligation or disbursement of all Federal financial

assistance" and any "other relevant agency activities" that "may be implicated by" the Executive

Order. OMB, M-25-13, *Temporary Pause of Agency Grant, Loan, & Other Financial Assistance*

*Programs* 2 (Jan. 27, 2025) (emphasis in original).

### III.    USDA continued to freeze Plaintiffs' funds after OMB "rescinded" its January 27 memorandum.

Just two days after issuing its January 27 memorandum, OMB rescinded it in response to

a lawsuit and a court order restraining its implementation. OMB, M-25-14, *Rescission of M-25-*

*13* (Jan. 29, 2025). Nevertheless, White House Press Secretary Karoline Leavitt stated the same

day that "[t]his is NOT a rescission of the federal funding freeze. It is simply a rescission of the

OMB memo . . . . The President's EO's [*sic*] on federal funding remain in full force and effect,

and will be rigorously implemented." Ex. 9, Karoline Leavitt X post (Jan. 29, 2025)),

https://x.com/PressSec/status/1884672871944901034?lang=en. The USDA continued to

withhold Plaintiffs' funds and publicly expressed its intent to continue doing so as it reviewed

programs for their connection to equity and climate programs.

On February 20, Secretary Rollins issued a press release announcing "USDA will release

the first tranche of funding that was paused due to the review of funding in the Inflation

Reduction Act (IRA) . . . releasing approximately $20 million in contracts for the Environmental

Quality Incentive Program, the Conservation Stewardship Program, and the Agricultural

Conservation Easement Program." *Secretary Rollins Releases the First Tranche of Funding*

*Under Review*, USDA (Feb. 20, 2025), https://www.usda.gov/about-usda/news/press-

releases/2025/02/20/secretary-rollins-releases-first-tranche-funding-under-review. At the same time, USDA made clear its intention to continue to withhold IRA funding that it deemed supportive of "DEIA programs or far-left climate programs." *Id.*

Shortly after Plaintiffs filed this lawsuit, on March 26, 2025, USDA began individually notifying REAP awardees with paused disbursements that they had 30 calendar days from the day of notice "to tell USDA  if they want to voluntarily propose to change their projects to better address President Trump's January 20 Executive Order."[1] *See e.g.*, Ex. 7, Hendrix Farms Decl. ¶ 18; Ex. 8, Two Boots Farm Decl. ¶ 23; Ex. 8-F. USDA suggested that changes "may include the removal of harmful DEIA project features, using more affordable and effective energy sources, including technologies to increase energy production, storage and improve customer service, or any other change that will help the recipient organization play their part in increasing American identification, leasing, development, production, transportation, refining, and generation capacity of energy and critical minerals, while providing affordable service to their customers." Ex. 8-F. It said that if recipients did not respond via the provided website,[2] "disbursements and other actions will resume" after the 30-day window. *Id*. No other grant recipients in USDA programs at issue in this case were notified of any possible resumption of funding.

---

[1] The email referred to the *Declaring a National Energy Emergency* Executive Order, but USDA's March 25 press release announcing the request to voluntarily revise projects said it was giving recipients an opportunity "to align with President Trump's *Unleashing American Energy* Executive Order." *USDA Delivers on Rural Energy Commitments, Provides Path for Applicants to Support U.S. Energy Independence*, USDA (Mar. 25, 2025), https://www.usda.gov/about-usda/news/press-releases/2025/03/25/usda-delivers-rural-energy-commitments-provides-path-applicants-support-us-energy-independence.
[2] REAP NewERA PACE Notification Form, USDA Rural Development, https://www.rd.usda.gov/reap-newera-pace-notification.

IV.    **This Court and others have preliminarily enjoined OMB and agencies from freezing funds.**

In multiple lawsuits brought by states, cities, nonprofit organizations, researchers, farmers, federal employees, and various other stakeholders, judges in this Court and others throughout the country have preliminarily enjoined OMB, USDA, and other agencies from freezing obligated federal funds authorized by Congress. *See, e.g.*, *Nat'l Council of Nonprofits v. OMB*, 775 F. Supp. 3d 100, 130 (D.D.C. 2025) (enjoining OMB from "implementing, giving effect to, or reinstating under a different name the unilateral, non-individualized directives in OMB Memorandum M-25-13 with respect to the disbursement of Federal funds under all open awards"); *New York v. Trump*, 769 F. Supp. 3d. 119, 146 (D.R.I. 2025) (enjoining numerous agencies, including USDA, from "pausing, freezing, blocking, canceling, suspending, terminating, or otherwise impeding the disbursement of appropriated federal funds" to the Plaintiff states); *AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*, 770 F. Supp. 3d 121, 155 (D.D.C. 2025) (enjoining Defendants from "unlawfully impounding congressionally appropriated foreign aid funds"). Indeed, as a result of a preliminary injunction issued in one case, USDA is currently making disbursements on Plaintiffs' IRA grants. *See Woonasquatucket River Watershed Council v. USDA*, No. 1:25-cv-00097, 2025 WL 1116157, at *26 (D.R.I. Apr. 15, 2025) (enjoining USDA from "freezing, halting, or pausing on a non-individualized basis the processing and payment of funding that (1) was appropriated under the Inflation Reduction Act . . . and (2) has already been awarded").

Despite this judicially ordered preliminary relief, USDA has not renounced the funding freeze or disclaimed an intention to reinstate it if permitted. Plaintiffs accordingly remain plagued by uncertainty—and an inability to plan for the future with any certainty—unless and until the freeze is permanently enjoined. This has devastating impacts on Plaintiffs' program

7

design, staffing, and relationships with subawardees. *See, e.g.*, Ex. 2, Faith in Place Decl. ¶¶ 20, 22–24, 28; Ex. 3, GreenLatinos Decl. ¶ 16, 19–28; Ex. 1, Cultivate KC Decl. ¶ 19–23, 25. Without permanent relief, Plaintiffs have and will continue to suffer multiple forms of irreparable harm, including harm to their reputations, harm to their businesses, harm to project execution, and harm to subawardees who have already invested in projects in reliance on the grant funds.

## STANDARD OF REVIEW

Summary judgment is appropriate where the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute about a material fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Chenari v. George Washington Univ.*, 847 F.3d 740, 744 (D.C. Cir. 2017) (quoting *Johnson v. Perez*, 823 F.3d 701, 705 (D.C. Cir. 2016)). Courts "consider the evidence in the light most favorable to the non-moving party." *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 576 (D.C. Cir. 2013) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

"Summary judgment is the proper mechanism for deciding, as a matter of law, whether an agency action is supported by the administrative record and consistent with the [APA] standard of review."[3] *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 255 F. Supp. 3d 101, 121 (D.D.C. 2017) (quoting *Loma Linda Univ. Med. Ctr. v. Sebelius*, 684 F. Supp. 2d 42, 52 (D.D.C. 2010)). The APA requires courts to "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or that

---

[3] Defendants have not yet produced an Administrative Record in this case. Defendants filed their Answer to the Complaint on June 2, 2025.

was adopted "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D).

Accordingly, "[t]he ordinary practice . . . is to vacate unlawful agency action." *Standing Rock*

*Sioux Tribe v. U.S. Army Corps of Eng'rs*, 985 F.3d 1032, 1050 (D.C. Cir. 2021) (quoting *United*

*Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019).

## ARGUMENT

**I.    This Court has jurisdiction over Plaintiffs' claims.**

### A.  This case is properly before this Court.

Plaintiffs raise constitutional and APA claims against Defendants' across-the-board

policy of indiscriminately freezing all IRA grant funding. In recent litigation challenging similar

policies, the federal government has argued that the Tucker Act deprives federal district courts of

jurisdiction over such claims, contending instead that they must be brought in the Court of

Federal Claims. Several courts in this District, however, have rightly rejected this argument.

The Tucker Act waives the United States' sovereign immunity for actions "founded . . .

upon any express or implied contract with the United States" and authorizes the Court of Federal

Claims to hear such cases. 28 U.S.C. § 1491(a)(1). But the D.C. Circuit has "explicitly rejected

the 'broad' notion 'that any case requiring some reference to or incorporation of a contract is

necessarily on the contract and therefore directly within the Tucker Act.'" *Crowley Gov't Servs.*

*v. Gen. Servs. Admin.*, 38 F.4th 1099, 1107 (D.C. Cir. 2022) (quoting *Megapulse, Inc. v. Lewis*,

672 F.2d 959, 967–68 (D.C. Cir. 1982)). And where, as here, the agreements in question are not

contracts at all, jurisdiction properly sits with the district court. There is a difference between a

contract—which is for the procurement of goods and services and requires consideration that

"must render" a "tangible and direct" "benefit to the government, and not merely a detriment to

the contractor"—and a grant—which "transfer[s] a thing of value to the . . . recipient to carry out

a *public purpose* of support or stimulation authorized by a law of the United States *instead of*

9

acquiring . . . property or services for the direct benefit or use of the United States Government." *Am. Ctr. for Int'l Lab. Solidarity v. Chavez-Deremer*, No. 25-cv-1128 (BAH), 2025 WL 1795090, at *14 (D.D.C. June 30, 2025) ("*ACILS*") (Howell, J.) (cleaned up); *see also* 2 C.F.R. § 200.1 (2024) (defining "grant agreement"); 31 U.S.C. § 6101(3) (defining federal "assistance"). Congress has made clear its intent to "distinguish Federal assistance relationships from Federal procurement relationships." *ACILS*, 2025 WL 1795090, at *14 n.5 (internal citation omitted).

Even if the agreements frozen by Defendants were considered contracts, this Court still has jurisdiction over Plaintiffs' claims. First, the Tucker Act does nothing to diminish district courts' jurisdiction to hear constitutional claims such as Plaintiffs', especially where the Court of Federal Claims cannot hear such claims. Second, the Tucker Act does not displace the APA's waiver of sovereign immunity here given that Plaintiffs' claims derive from the Constitution and statutes, not the terms of their grant agreements.

> **i.** *Plaintiffs' constitutional claims can only be heard in district court.*

Plaintiffs assert that Defendants violated the separation of powers and constitutional requirement that the Executive take care that the laws be faithfully executed by indefinitely withholding funds appropriated by the IRA. Federal district courts have jurisdiction to consider such constitutional claims, and the Court of Federal Claims does not.

Constitutional claims such as those at issue in this case face no sovereign immunity bar because they are acts outside an official's constitutional authority and thus "are considered individual and not sovereign actions," *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949), such that "sovereign immunity does not bar a suit" challenging them, *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1329 (D.C. Cir. 1996); *see also Widakuswara v. Lake*, No. 25-5144, 2025 WL 1288817, at *12 (D.C. Cir. May 3, 2025) (Pillard, J., dissenting) ("the Court

of Claims could not adjudicate plaintiffs' constitutional claims" because "[c]onstitutional claims for injunctive or declaratory relief face no sovereign immunity bar.");[4] *ACILS*, 2025 WL 1795090 (holding that plaintiffs' constitutional and statutory claims are not contract claims and retaining jurisdiction); *Am. Bar Ass'n v. U.S. Dep't of Just.*, No. 25-cv-1263 (CRC), 2025 WL 1388891, at *5 (D.D.C. May 14, 2025); *Vera Inst. of Just. v. U.S. Dep't of Just.*, No. 25-cv-1643 (APM), 2025 WL 1865160, at *7 (D.D.C. July 7, 2025) (finding jurisdiction over plaintiffs' constitutional claims as "the Constitution gives Congress, not the Executive Branch, exclusive power over spending") (quoting *Harris Cnty. v. Kennedy*, No. 25-cv-1275 (CRC), 2025 WL 1707665, at *4 (D.D.C. June 17, 2025)). For that reason, courts "categorically reject the suggestion" that the Tucker Act deprives federal courts of jurisdiction to hear claims the Court of Federal Claims cannot. *Tootle v. Sec'y of Navy*, 446 F.3d 167, 176 (D.C. Cir. 2006); *see also ACILS*, 2025 WL 1795090, at *11 (cleaned up) ("[A] federal district court cannot be deprived of jurisdiction by the Tucker Act when no jurisdiction lies in the Court of Federal Claims, since there cannot be exclusive jurisdiction under the Tucker Act if there is no jurisdiction under the Tucker Act.").

The Tucker Act does not contain the requisite "clear and convincing evidence" that Congress intended to divest this court of jurisdiction over these constitutional claims. *Weinberger v. Salfi*, 422 U.S. 749, 762 (1975) (quoting *Johnson v. Robison*, 415 U.S. 361, 373 (1974)); *see also Demore v. Kim*, 538 U.S. 510, 517 (2003) (same). Rather, under the Tucker Act, the Court of Federal Claims has jurisdiction over constitutional claims only when they are based on constitutional provisions that create "a substantive right enforceable against the federal

---

[4] The D.C. Circuit, sitting en banc, overruled a panel decision granting an emergency stay on Tucker Act grounds, "substantially for the reasons explained by Judge Pillard." *Widakuswara v. Lake*, No. 25-5144, 2025 WL 1521355 (D.C. Cir. May 28, 2025) (en banc).

government for money damages." *LeBlanc v. United States*, 50 F.3d 1025, 1028 (Fed. Cir. 1995). Indeed, the Federal Circuit has held that separation-of-powers claims such as Plaintiffs' do not meet this test and therefore cannot be brought in the Court of Federal Claims. *Id*. The Supreme Court's emergency stay decision in *California v. Department of Education* does not disrupt this analysis as it considered only APA claims; the plaintiffs did not raise constitutional claims. *Dep't of Ed. v. California*, 145 S. Ct. 966, 968 (2025).

### ii. *Plaintiffs' APA claims arise under statutes and the Constitution, and seek equitable injunctive relief unavailable in the Court of Federal Claims.*

This Court likewise has jurisdiction over Plaintiffs' APA claims. First, the APA waives sovereign immunity for those claims. Second, these claims are not, in essence, contractual in nature, and thus the Tucker Act does not displace the APA's sovereign immunity waiver.

First, the APA waives sovereign immunity for actions such as Plaintiffs' that "seek[] relief other than money damages and state[] a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority." 5 U.S.C. § 702. This waiver does not apply "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." *Id.* The Tucker Act does no such thing. To the contrary, the Tucker Act excludes such claims from its coverage, which instead vests the Court of Federal Claims with jurisdiction over "express or implied contract[s] with the United States." 28 U.S.C. § 1491(a)(1). Given that Plaintiffs' claims are not contractual, they fall outside the scope of the Tucker Act.

Whether a claim "in 'its essence'" is contractual turns on (1) "the source of the rights" underlying the claims, and (2) "the type of relief sought (or appropriate)." *Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 619 (D.C. Cir. 2017) (quoting *Megapulse*, 672 F.2d at 968). Under both

prongs, Plaintiffs' APA claims are not contractual in nature—and the Tucker Act thus does not apply.

In all cases, the source of Plaintiffs' rights is statutory and constitutional. When, as here, a plaintiff's "asserted rights . . . arise from statute" and those rights "exist prior to and apart from rights created under the contract," their claims belong in the district court, not the Court of Federal Claims. *Widakuswara*, 2025 WL 1288817, at *11 (Pillard, J., dissenting) (quoting *Crowley Gov't Servs.*, 38 F.4th at 1107 ); *see also ACILS*, 2025 WL 1795090, at *12; *Climate United Fund v. Citibank*, No. 25-cv-698-TSC, 2025 WL 1131412, at *9–12 (D.D.C. Apr. 16, 2025); *Woonasquatucket*, 2025 WL 1116157, at *12–15.

Plaintiffs assert that USDA has acted contrary to the APA, congressional appropriations in the IRA, and the Impoundment Control Act of 1974 (Impoundment Control Act) by adopting a wholesale policy of freezing IRA grant funding. Resolving these claims will require this Court to "address clear regulatory and statutory questions" regarding USDA's actions and, ultimately, whether it violated the statutes that Plaintiffs invoke. *Climate United Fund*, 2025 WL 1131412, at *9. They will not require this Court to look at, let alone interpret, the terms of an "agreement negotiated by the parties" to make a decision. *Md. Dep't of Hum. Res. v. Dep't of Health & Hum. Servs.*, 763 F.2d 1441, 1449 (D.C. Cir. 1985). Thus, the claims here are not "essentially"—or even conceivably—contract claims. *Am. Bar Ass'n,* 2025 WL 1388891, at *5; *see also Woonasquatucket*, 2025 WL 1116157, at *13 (finding district court jurisdiction proper because Plaintiffs' claims "'turn[ed] on federal statute and regulations put in place by Congress' and the agencies" (internal citation omitted)). "Under such circumstances, where plaintiffs' claims do not at all depend on whether the terms of particular awards were breached, it would be quite

extraordinary to find that plaintiffs' claims are contractual." *ACILS*, 2025 WL 1795090, at *13 (cleaned up).

Notably, as a court in this district recently explained,

> The mere fact that a case involves a contract "does not, by triggering some mystical metamorphosis, automatically transform an action . . . into one on the contract and deprive the court of jurisdiction it might otherwise have." *Crowley*, 38 F.4th at 1107 (ellipsis in original) (quoting *Megapulse*, 672 F.2d at 968). To the contrary, the D.C. Circuit has "explicitly rejected the 'broad' notion 'that any case requiring some reference to or incorporation of a contract is necessarily on the contract and therefore directly within the Tucker Act.'" *Id.* (quoting *Megapulse*, 672 F.2d at 967-68).

*Id*. at 12. Where plaintiffs bring APA claims based solely on alleged constitutional and statutory violations, they do not arise in contract. *Id*. The same holds true here.

The type of relief sought here also underscores why these claims must be heard in district court. The "crux of this inquiry . . . boils down to whether the plaintiff effectively seeks to attain money damages." *Widakuswara*, 2025 WL 1288817, at *13 (Pillard, J. dissenting) (quoting *Crowley*, 38 F.4th at 1107). Here, Plaintiffs request an order declaring that the freeze of IRA funds was unlawful, setting aside the Agency Defendants' actions to implement it, imposing an injunction against any future freeze on these funds, and returning to the state of affairs prior to the initiation of the unlawful freeze. This type of relief "resembles neither the explicitly contractual remedy of specific performance nor the prototypical contract remedy of money damages—the two types of relief that are specific to actions that sound in contract." *ACILS*, 2025 WL 1795090, at *18 (cleaned up). And for this reason, this type of relief is not available in the Court of Federal Claims, which "has no power to grant equitable relief." *Id.* at *13 (citing *Bowen v. Massachusetts*, 487 U.S. 879, 905 (1988)). Accordingly, jurisdiction is proper in federal district court.

While the practical effect of this relief could include the disbursement of funds not currently available to Plaintiffs, that "is not a sufficient reason to characterize the relief as 'money damages.'" *Bowen*, 487 U.S. at 893; *see also ACILS*, 2025 WL 1795090, at *18 (same). Instead, like the plaintiffs in *Bowen*, Plaintiffs request relief that preserves their ongoing and prospective agreements with the government. When a private entity funded by federal appropriations has "'a cooperative, ongoing relationship' with the agency 'in the allocation and use of the funds,' a simple money judgment is unlikely to be fitting relief." *Widakuswara*, 2025 WL 1288817, at *13 (Pillard, J. dissenting) (citing *Nat'l Ctr. for Mfg. Scis. v. United States*, 114 F.3d 196, 201 (Fed. Cir. 1997)). Accordingly, these are the sorts of claims the D.C. Circuit has long held belong in district court, not the Court of Federal Claims. *See, e.g.*, *Md. Dep't of Hum. Res.*, 763 F.2d at 1448–51.

In sum,

> [S]o long as an action brought against the United States or an agency thereof is not one that should be classified from the outset as a "contract action" for Tucker Act purposes, the remedies sought are also not contract-related, and the mere fact that an injunction would require the same government restraint that specific (non)performance might require in a contract setting is an insufficient basis to deny a district court the jurisdiction otherwise available and the remedial powers otherwise appropriate.

*ACILS*, 2025 WL 1795090, *19 (quoting *Megapulse*, 672 F.2d at 971) (cleaned up).

Finally, the Supreme Court's four-paragraph, per curiam order in *Department of Education v. California*, does not support a different result. 145 S. Plaintiffs' APA claims differ meaningfully from those at issue in *California*. Indeed, central to the decision in *California* was the fact that the appellate court determined that plaintiffs placed "the terms and conditions of each individual grant award . . . at issue." *California v. U.S. Dep't of Educ.*, 132 F.4th 92, 96–97 (1st Cir. 2025). By contrast, as detailed *supra*, Plaintiffs' claims do not depend on any term or condition of the underlying grants, but rather on whether Defendants violated constitutional,

statutory, and regulatory provisions when they enacted a blanket freeze of all disbursements for grants funded by the IRA in an effort to implement the policy directives of the Energy EO. Am. Compl. (Dkt. No. 15). Plaintiffs' APA claims are likewise distinguishable from those in *Vera Institute* because they do not require that the court "look back to the awards themselves" to determine whether the government violated the law. 2025 WL 1865160, at *13.

For this reason, Plaintiffs' claims, like those in *Widakuswara*, are more analogous to those at issue in *AIDS Vaccine Advocacy Coalition*, where, like here, those plaintiffs "claimed a right to be free from government action—the wholesale termination of the plaintiffs' grant funding—they claimed exceeded the authority conferred by statute and the Constitution," and "their claims did not depend on whether their contracts were breached, but on whether the agency's policy directives were unlawful in the face of federal statutes appropriating funds for specific purposes." *Widakuswara*, 2025 WL 1288817, at *14 (Pillard, J., dissenting). These claims thus properly belong in federal district court.

## B. Plaintiffs have standing.

Plaintiffs satisfy the Article III standing requirements of injury, causation, and redressability. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). As a direct result of Defendants' disrupting promised IRA grant funding on which Plaintiffs had built reliance, Plaintiffs have experienced concrete, particularized, and actual injury. All Plaintiffs have sustained injuries from the categorical freeze of IRA funds. Ex. 1, Cultivate KC ¶¶ 19–24; Ex. 2, Faith in Place Decl. ¶¶ 12–17, 21–27; Ex. 3, GreenLatinos Decl. ¶¶ 20–29; Ex. 4, HOPE for SFS Decl. ¶¶ 12, 14–17, 25; Ex. 5, Foodshed Alliance Decl. ¶¶ 12–16, 24–29; Ex. 6, Red Fire Farm Decl. ¶¶ 20–21; Ex. 7, Hendrix Farm Decl. ¶¶ 9–10, 14–17, 21–22; Ex. 8, Two Boots Decl. ¶¶ 16, 20.

Some Plaintiffs, including HOPE for SFS, Foodshed Alliance, and Faith in Place have had to reduce staff hours or eliminate positions due to the funding freeze. Ex. 4, HOPE for SFS Decl. ¶ 17; Ex. 5, Foodshed Alliance Decl. ¶ 15; Ex. 2, Faith in Place Decl. ¶¶ 12–13. Others have had to delay hiring. Ex. 1, Cultivate KC Decl. ¶¶ 20–21. Plaintiff Foodshed Alliance has had to back out of agreements with community partners, causing reputational and community damage and leading at least one farmer to sever organizational ties. Ex. 5, Foodshed Alliance Decl. ¶ 28. Plaintiff HOPE for SFS expended resources on soil testing and land appraisal for property it intended to purchase pursuant to its grant, but then lost the opportunity to close on these properties, which were critical to their organizational mission to support sustainable farming. Ex. 4, HOPE for SFS Decl. ¶ 12.

The uncertainty caused by the funding freeze has made planning extremely difficult for Plaintiffs. Plaintiff GreenLatinos has implemented a hiring freeze and re-worked project plans with subawardees due to the lack of a guarantee that promised funds will be accessible. Ex. 3, GreenLatinos Decl. ¶ 20, 25–26. For Plaintiff HOPE for SFS, confusion and uncertainty around funds has impacted their messaging to their partners and the broader community, resulting in reputational harm. Ex. 4, HOPE for SFS Decl. ¶ 25.

An order from this Court stating that Defendants' categorical freeze of IRA funds was unlawful and must be vacated and set aside would allow Plaintiffs to move forward with the certainty that, so long as they comply with their grant agreements, the money for their much-needed projects will flow.

## II.    Defendants violated the Constitution by freezing statutorily obligated funds.

USDA's funding freeze oversteps constitutional limits on executive power: it transgresses the separation of powers that are central to American government and flouts the constitutional requirement that the Executive take care that the laws be faithfully executed.

**A.  The funding freeze violates the separation of powers.**

Defendants' refusal to spend funds appropriated by Congress in the IRA violates the separation of powers principles enshrined in the Constitution, which grants the power of the purse to Congress, not the President. U.S. Const. art. I, § 9, cl. 7; art. I, § 8, cl. 1; art. I, § 1; *see also, e.g.*, *Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 420 (2024); *see also* Mem. from John G. Roberts, Jr. to Fred F. Fielding (Aug. 15, 1985), https://www.levernews.com/content/files/2025/01/1985RobertsMemo-Budget.pdf ("[N]o area seems more clearly the province of Congress than the power of the purse."). Through these multiple grants of authority, the Constitution gives Congress broad power to legislate spending and to decide how and when its appropriations are spent. *South Dakota v. Dole*, 483 U.S. 203, 206–07 (1987). This power is "exclusive" to Congress, which "has absolute control of the moneys of the United States" under our Constitution. *Rochester Pure Waters Dist. v. EPA*, 960 F. 2d 180, 185 (D.C. Cir. 1992) (internal citation and quotation marks omitted). "Any exercise of a power granted by the Constitution to one of the other branches of Government is limited by a valid reservation of congressional control over funds in the Treasury." *Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 425 (1990).

In light of those powers, the Executive cannot "unilateral[ly] . . . refuse" to spend money appropriated by Congress. *In re Aiken Cnty.*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013). Rather, the Executive has a duty to spend appropriated funds on the terms set by Congress. *See* U.S. Const. art. II, § 3 (Take Care Clause). Likewise, "[a]bsent congressional authorization, the Administration may not redistribute or withhold properly appropriated funds in order to effectuate its own policy goals." *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1235 (9th Cir. 2018). Nor can the Executive Branch "repeal[] or amend[] parts of duly enacted statutes." *Clinton v. City of New York*, 524 U.S. 417, 439 (1998).

18

Yet that is precisely what Defendants have done here. They have (1) refused to spend funds unambiguously appropriated by the IRA for specific grant programs in which Plaintiffs participate, and (2) done so because they believe these appropriations contravene their policy goals. In doing so, they have attempted to unilaterally repeal or amend the IRA.

In the IRA, Congress appropriated over $2.8 billion to USDA for a grant program for agricultural projects to benefit "underserved farmers" and those who have "experienced discrimination" in USDA funds. IRA § 22007, 136 Stat. at 2021–23. Congress appropriated $3.1 billion that USDA "shall" use to relieve "distressed borrowers" with farm loans. *Id.* § 22006, 136 Stat. at 2021. Congress appropriated over $18 billion to USDA and directed that it "shall" use these funds to support agricultural projects that "directly improve soil carbon, reduce nitrogen losses, or reduce, capture, avoid, or sequester carbon dioxide, methane, or nitrous oxide emissions, associated with agricultural production." *Id.* § 21001, 136 Stat. at 2015–16. The President's directive to "immediately pause the disbursement of funds appropriated" through the IRA, Exec. Order No. 14154, 90 Fed. Reg. at 8357, directly contravenes Congress's directive that the funds be spent and "usurp[ed] Congress's exclusive authority to dictate" that they "*should* be spent." *AIDS Vaccine Advoc. Coal.*, 770 F. Supp. at 127 (emphasis added).

There is no dispute that Defendants engaged in a broad policy of freezing IRA-funded grants. Defendants' stated reasons for freezing these funds—that they contradict the President's policy goals—are impermissible. But the Executive Branch "may not ignore statutory mandates or prohibitions merely because of policy disagreement with Congress," *In re Aiken Cnty.*, 725 F.3d at 260, and yet communications from the President and his appointees have repeatedly pointed to policy differences as justification for freezing Congressionally directed disbursement of funds, characterizing IRA-designated grants as "green new deal social engineering policies"

and "DEIA programs [and] far-left climate programs," OMB Memo M-25-13; *Secretary Rollins Releases the First Tranche of Funding Under Review*, USDA (Feb. 20, 2025), https://www.usda.gov/about-usda/news/press-releases/2025/02/20/secretary-rollins-releases-first-tranche-funding-under-review.

That the freeze purports to be only a temporary pause does not cure the constitutional deficiency of unilaterally and indefinitely withholding broad swaths of Congressionally appropriated funds. A constitutional violation does not become any less unlawful merely because it may be temporary—and, in any event, Defendants have not stated an intention to lift the freeze unless compelled to do so by court order. Defendants' refusal to implement clear congressional directives by freezing IRA-appropriated funds therefore violates the Constitution's separation of powers. *Cmty. Legal Servs. in E. Palo Alto v. U.S. Dep't of Health & Hum. Servs.*, 137 F.4th 932, 941 (9th Cir. 2025) (holding that "the use of 'shall' plainly imposes a mandatory duty" on agencies).

### B. The funding freeze violates the Take Care Clause.

For similar reasons, the funding freeze also violates the Constitution's Take Care Clause. Under Article II, the President has a "constitutionally appointed duty to 'take care that the laws be faithfully executed.'" *Morrison v. Olson*, 487 U.S. 654, 690 (1988) (quoting U.S. Const. art. II, § 3). This duty "refutes the idea that [the President] is to be a lawmaker" and makes clear that "Congress has . . . exclusive constitutional authority to make laws necessary and proper to carry out the powers vested by the Constitution" in the federal government. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 588–89 (1952). And "[t]o contend that the obligation imposed on the President to see the laws faithfully executed, implies a power to forbid their execution, is a novel construction of the constitution, and entirely inadmissible." *Kendall v. U.S. ex rel. Stokes*,

37 U.S. 524, 613 (1838). Holding otherwise "would be clothing the President with a power entirely to control the legislation of congress." *Id*.

Thus, for the same reasons that Defendants' actions violate the separation of powers, they also violate the Take Care Clause. *See Ctr. for Biological Diversity v. McAleenan*, 404 F. Supp. 3d 218, 244 (D.D.C. 2019) (recognizing that "separation-of-powers principles also drive evaluations of claims brought under the Constitution's Take Care Clause"). After all, the EO under which Defendants are operating "does not direct that a congressional policy be executed in a manner prescribed by Congress—it directs that a presidential policy be executed in a manner prescribed by the President." *Youngstown*, 343 U.S. at 588.

That the Executive disagrees with Congress's duly enacted funding decisions does not alter its constitutional obligation to faithfully execute them. Plaintiffs' grants "were funded by legislation that mandated that the funds be expended for a specific purpose and left no discretion to agency heads to disregard the legislative mandates because current officials did not approve of the purposes of the previously appropriated programs." *Sustainability Inst. v. Trump*, No. 2:25-cv-2152-RMG, 2025 WL 1486979, at *3 (D.S.C. May 20, 2025); *see also Green & Healthy Home Initiatives, Inc. v. EPA*, No. 25-cv-1096-ABA, 2025 WL 1697463, at *18 (D. Md. June 17, 2025) (holding that EPA violated its statutory authority when it cancelled environmental and climate justice grants under a program created by the IRA "precisely *because* they are 'environmental justice' programs" (emphasis in original)—contrary to the statutory mandate).

Whether viewed as an encroachment on Congress's exclusive authority to legislate or as a dereliction of the Executive's duty to faithfully take care that congressional mandates will be followed, the result is the same: the funding freeze disrupts the careful balance that the

Constitution strikes between the branches of government and is unlawful and unenforceable as a result.

### III.    Agency Defendants' actions implementing the funding freeze violate the Administrative Procedure Act.

Not only are Defendants' actions constitutionally infirm, but they likewise violate the Administrative Procedure Act, for two reasons. First, the sweeping policy freezing Plaintiffs' grants is contrary to law. Second, Defendants' adoption of this policy was arbitrary and capricious. For these reasons, too, Defendants' actions are unlawful.

### A.    Agency Defendants' actions are final agency actions.

The USDA's freeze of IRA funding is reviewable as "final agency action" under the APA, 5 U.S.C. § 704,[5] because it: (1) "mark[s] the consummation of the agency's decisionmaking process" and (2) determines "rights or obligations . . . from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (citation modified).

First, far from being "of a merely tentative or interlocutory nature," these actions "mark the consummation of the agency's decisionmaking process." *Id*. The OMB Memoranda "command[ed]," "require[d]," and "order[ed]" federal agencies to freeze funds. *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1023 (D.C. Cir. 2000); M-25-11 ("The directive in section 7 of the Executive Order entitled *Unleashing American Energy* requires agencies to immediately pause disbursement of funds appropriated under the Inflation Reduction Act of 2022."); M-25-13 at 2 (Federal agencies "must complete a comprehensive analysis [and] … **must temporarily**

---

[5] Plaintiffs need not show that these actions are final agency actions for their non-APA claims. *See PFLAG, Inc. v. Trump*, 769 F. Supp. 3d 405, 424 n.26 (D. Md. 2025) ("[F]inal agency action is only required for a claim under the APA, not for *ultra vires* claims for equitable relief." (citing *Trudeau v. FTC*, 456 F.3d 178, 187 (D.C. Cir. 2006))). However, the APA provides an additional vehicle for Plaintiffs' constitutional claims as Defendants' actions are "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

**pause** all activities related to obligation or disbursement of all Federal financial assistance.")
(emphasis in original); *Louisiana v. Biden*, 622 F. Supp. 3d 267, 291–92 (W.D. La. 2022)
(collecting over a dozen cases in which courts found final agency action where agencies paused
or delayed particular programs). And USDA's and Secretary Rollins' actions implementing the
freeze marked the "consummation of [the] agency's decisionmaking process to comply with the
President's executive order." *New York v. Trump*, 769 F. Supp. 3d at 136 (quoting *Drs. for Am.
v. Off. of Pers. Mgmt.*, 766 F. Supp. 3d 39, 50 (D.D.C. 2025)). Second, Agency Defendants'
actions determined "rights or obligations . . . from which legal consequences will flow" by
denying Plaintiffs access to legally obligated, open awards. *Bennett*, 520 U.S. at 178 (citation
modified); *see Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*, 324 F.3d
726, 731 (D.C. Cir. 2003).

   **B.  Agency Defendants' actions are contrary to law.**

   The APA requires courts to hold unlawful and set aside agency actions "not in
accordance with law," "contrary to constitutional right, power, privilege, or immunity," or "in
excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(A)–(C). Agency
Defendants' actions substantively violate the APA for at least three reasons.

   ***First***, Agency Defendants' actions are unconstitutional on the grounds set forth in
Section II and are thus "not in accordance with law" and "contrary to constitutional right, power,
privilege, or immunity" under the APA, 5 U.S.C. § 706(2)(A), (B). Neither the Constitution nor
any federal law gives the executive branch the power to unilaterally freeze funding appropriated
by Congress and obligated by executive agencies, as Agency Defendants did here. *See FEC. v.
Cruz*, 596 U.S. 289, 301 (2022).

*Second*, Agency Defendants' actions are "not in accordance with" the Impoundment Control Act. 5 U.S.C. § 706(2)(A); *see* 2 U.S.C. § 683. The Impoundment Control Act expressly prohibits the executive branch from declining to obligate or disburse congressionally appropriated funds, unless the President requests recission and Congress enacts a bill. 2 U.S.C. § 683(a), (b). The Act also requires the spending of funds appropriated by Congress, limiting deferral to three purposes only:[6] "(1) to provide for contingencies; (2) to achieve savings made possible by or through changes in requirements or greater efficiency of operations; or (3) as specifically provided by law." *Id.* § 684(b). "No officer or employee of the United States may defer any budget authority for any other purpose," *id.*, and thus may not defer obligation or expenditure of appropriated funds merely for policy reasons, *see In re Aiken County*, 725 F.3d at 261 n.1.

Here, by freezing grants en masse, Agency Defendants have unlawfully deferred the disbursement of obligated funds, impermissibly deferring them for policy reasons or unilaterally rescinding them without congressional action. 2 U.S.C. § 682(1). Thus, Defendants' actions constitute the unlawful impoundment of appropriated funds, in violation of the Impoundment Control Act and the APA.

*Third*, Agency Defendants' actions violate the IRA, wherein Congress created grant programs and appropriated funds to USDA to operationalize it. The funds were clearly earmarked in the IRA for the specific purposes of funding projects that improve soil health to improve agricultural production and administering grants to farmers who have been discriminated against or who have been heavily burdened by loans. IRA §§ 21001, 22006,

---

[6] "Deferral" under the Impoundment Control Act means any "withholding or delaying the . . . expenditure of [funds] provided for projects or activities," or "any other type of Executive action or inaction which effectively precludes the . . . expenditure of" federal funds. 2 U.S.C. § 682(1).

22007, 136 Stat. at 2015–17, 2021–23. By imposing a blanket hold on disbursements, Agency Defendants violate the IRA's mandate to fund and carry out these programs.

### C.  Agency Defendants' actions are arbitrary and capricious.

Under the APA, a court must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Agency action is arbitrary and capricious if the agency "relie[d] upon improper factors, ignore[d] important arguments or evidence, fail[ed] to articulate a reasoned basis" for its action, *Nat. Res. Def. Council v. EPA*, 822 F.2d 104, 111 (D.C. Cir. 1987), "entirely failed to consider an important aspect of the problem . . . [or] offered an explanation for its decision . . . so implausible that it could not be ascribed to a difference in view or the product of agency expertise," *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). EPA's decision to freeze Plaintiffs' funds was arbitrary and capricious for multiple reasons, any one of which is sufficient to support summary judgment in this case.

As an initial matter, Agency Defendants failed to rationally explain why they needed to command an immediate and indefinite freeze of billions of dollars in federal funds. *See Nat. Res. Def. Council*, 822 F.2d at 111 (citing *State Farm*, 463 U.S. at 43). Indeed, their stated reasons for the funding freeze bear no rational relationship to their actions: OMB Memo M-25-13 states that the freeze will "safeguard valuable taxpayer resources" and "provide the Administration time to review agency programs and determine the best uses of the funding for those programs consistent with the law and the President's priorities." M-25-13 at 1–2. Defendants fail to reasonably explain why either safeguarding taxpayer resources or reviewing program funding requires immediately and indefinitely freezing all federal financial assistance and depriving hundreds of businesses and nonprofits access to promised funds. "Rather than taking a measured

25

approach to identify purportedly wasteful spending, Defendants cut the fuel supply to a vast, complicated, nationwide machine." *Nat'l Council of Nonprofits*, 775 F. Supp. 3d at 124 (quoting Op. Granting TRO 24, Dkt. No. 30).

Defendants' scorched-earth approach was far from reasonable. Defendants "entirely failed to consider" important aspects of immediately and indefinitely freezing billions of dollars in federal funds, such as the harm it would cause grantees and the communities they serve, *see State Farm*, 463 U.S. at 43, and the "serious reliance interests" of hundreds of grantees, including Plaintiffs, their employees, and their subawardees, *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). For example, in response to Defendants' actions, Plaintiff GreenLatinos implemented a hiring freeze, re-worked project plans with subawardees, and both Plaintiff GreenLatinos and some of its subawardees delayed programmatic work. Ex. 3, GreenLatinos Decl. ¶¶ 20, 22–26, 28. The funding frozen for this organization alone impacted over 110 project partners, 155 jobs, and over 115 contractors to subawardees. *Id*. ¶ 10. Plaintiff Faith in Place laid off employees as a direct result of the funding freeze, and took the time-intensive step to re-negotiated contracts with its subawardees to explicitly provide for what will happen in the event of the unavailability of federal funds. Ex. 2, Faith in Place Decl. ¶¶ 12, 21–25. For some Plaintiffs, the funding freeze puts their entire farm or nonprofit at risk. *See* Ex. 8, Two Boots Decl. ¶ 28; Ex. 7, Hendrix Farm Decl. ¶ 22; Ex. 5, Foodshed Alliance Decl. ¶ 31. Other Plaintiffs continue to delay hiring and purchasing land—which is necessary to enact their projects—out of fear of USDA freezing the funds again. *See, e.g.*, Ex. 1, Cultivate KC Decl. ¶¶ 20–21; Ex. 3, GreenLatinos Decl. ¶ 20. The Energy EO, OMB's directives, and Agency Defendants' actions taken pursuant to them failed to address, or even acknowledge, these—or any—consequences of suddenly and indefinitely cutting funding to hundreds of nonprofits and

businesses and their customers and communities. *See Int'l Org. of Masters, Mates & Pilots v. NLRB*, 61 F.4th 169, 180 (D.C. Cir. 2023) (vacating rule where agency "adopted it[] . . . with no regard for the parties' reliance interests"); *see also Bus. Roundtable v. SEC*, 647 F.3d 1144, 1148 (D.C. Cir. 2011) (explaining that an agency's failure to "apprise itself . . . of the economic consequences" of potential action is "arbitrary and capricious and not in accordance with law" (quoting *Chamber of Com. of the U.S. v. SEC*, 412 F.3d 133, 144 (D.C. Cir. 2005))).

There is no evidence that anyone at USDA took steps to assess the consequences of suddenly freezing funding to hundreds of nonprofits, farms, and the communities they serve. And USDA staff have frequently been unable or unavailable to explain how the freeze directives impact grant recipients. *See* Ex. 3, GreenLatinos Decl. ¶¶ 14–15; Ex. 2, Faith in Place Decl. ¶ 11; Ex. 1, Cultivate KC Decl. ¶¶ 14–16; Ex. 5, Foodshed Alliance Decl. ¶ 11; Ex. 4, HOPE for SFS Decl. ¶ 11. At times, USDA staff have been entirely unaware that Plaintiffs were subject to the freeze, further illustrating the implementation challenges and lack of consideration in freezing these funds. *See, e.g.*, Two Boots Decl. ¶ 18; Ex. 3, GreenLatinos Decl. ¶ 14; Ex. 8. These communication and awareness challenges within Defendant USDA itself illustrate the lack of reasoned explanation for Defendants' freeze of grant funds.

USDA also failed to consider how its across-the-board funding freeze would impact the "primary goal[s]" of the IRA. *Nat'l Lifeline Ass'n v. FCC*, 921 F.3d 1102, 1111 (D.C. Cir. 2019) (finding agency action arbitrary and capricious where it failed to "consider the impact of the change on [the agency program's] 'primary purpose' or otherwise explain how it is compatible with that purpose"). USDA failed to consider how its freezing of grant funds in the communities Congress intended to serve through the IRA, via implementation of projects that work to achieve the statue's goals, would affect these important purposes.

Relatedly, Agency Defendants failed to provide the rationale necessary for a change in agency policy. Until this Administration, USDA worked to implement and support the programs created through the IRA. As detailed above in Section II of the Statement of Facts, that approach changed dramatically after January 20, 2025. When agencies change their approach, it must still comply with Congress's statutory directives, and the agency must give "good reasons for the new policy," *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 223 (2016) (citation modified), including "a reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy," *Fox*, 556 U.S. at 515–16. In response to the Energy EO, USDA froze all funds across the board. Neither the Energy EO itself nor the agency provided any explanation as to why this blanket freeze of all USDA programs funded by the IRA was necessary to ensure "consisten[cy]" with "the President's priorities." M-25-13 at 2. With no "good reasons for the new policy," the agency action is arbitrary and capricious. *Navarro*, 579 U.S. at 223.

Finally, Agency Defendants failed "to consider responsible alternatives to its chosen policy and to give a reasoned explanation for its rejection of such alternatives." *Spirit Airlines, Inc. v. Dep't of Transp.*, 997 F.3d 1247, 1255 (D.C. Cir. 2021) (internal citation omitted). "This principle goes to the heart of reasoned decisionmaking; it is not limited to rulemaking." *Id.* "The failure of an agency to consider obvious alternatives has led uniformly to reversal." *Yakima Valley Cablevision, Inc. v. FCC*, 794 F.2d 737, 746 n.36 (D.C. Cir. 1986). Agency Defendants failed to consider, for example, whether to continue making payments while reviewing individual grants for consistency with new priorities, to permit grantees to adjust their projects to better align, or to provide notice that the freeze would go into effect.

When an agency exceeds its statutory power, under the APA, the Court must step in to set

that action aside. *See* 5 U.S.C. § 706(2)(C). The APA "codifies" the "elemental proposition

reflected by judicial practice dating back to *Marbury*," that "courts, not agencies" decide what

the law is. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369*,* 391–92 (2024). Defendants' actions

were outside their statutory authority and "not 'reasonable'" or "reasonably explained," and

therefore were arbitrary and capricious and contrary to the APA, and should be set aside. *Ohio v.*

*EPA*, 603 U.S. 279, 292 (2024) (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423

(2021)); *see also Green & Healthy Home Initiatives*, 2025 WL 1697463, at *19–21.

## CONCLUSION

For the reasons above, this Court should grant Plaintiffs' motion for summary judgment.

DATED: July 18, 2025                     Respectfully submitted,

                                         */s/ Hana V. Vizcarra*
                                         Hana V. Vizcarra (D.C. Bar No. 1011750)
                                         Carrie Apfel (D.C. Bar No. 974342)
                                         Deena Tumeh (D.C. Bar No. 1741543)
                                         Molly Prothero (D.C. Bar No. 1779237)
                                         EARTHJUSTICE
                                         1001 G Street NW, Suite 1000
                                         Washington, D.C. 20001
                                         (202) 667-4500
                                         hvizcarra@earthjustice.org
                                         capfel@earthjustice.org
                                         dtumeh@earthjustice.org
                                         mprothero@earthjustice.org

                                         *Attorneys for Plaintiffs*