UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CULTIVATE KC, et al.,

       Plaintiffs,

   v.

DEPARTMENT OF AGRICULTURE, et al.,

      Defendants.

Civil Action No. 25-0737 (RC)

**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT AND
<u>OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT</u>**

# TABLE OF CONTENTS

BACKGROUND ............................................................................................................... 1

I.      The Unleashing American Energy Executive Order ............................................. 1

II.     Procedural History .............................................................................................. 2

LEGAL STANDARD ...................................................................................................... 3

ARGUMENT .................................................................................................................. 3

I.      Plaintiffs' Claims Fail on Threshold Issues ........................................................ 3

        A.      Sovereign Immunity Bars Plaintiffs' Administrative Procedure Act Claims ......... 3

                1.      Plaintiffs' Suit Seeks "Money Damages" ................................................. 4

                2.      The Tucker Act Impliedly Forbids the Relief that Plaintiffs Seek ........... 10

        B.      Congress Has Foreclosed Plaintiffs' Constitutional Claims ................................ 20

        C.      Congress Has Foreclosed Plaintiffs' Ultra Vires Claims ..................................... 22

II.     The President is an Improper Defendant ............................................................ 24

III.    The Tucker Act Provides An Adequate Remedy, Thus Precluding APA Relief .............. 24

IV.     Plaintiffs Fail to Specify the Agency Action They Seek to Challenge, But Their Claims
        Fail In Any Event Regardless of How They Characterize the Challenged Action(s) ....... 25

        A.      Plaintiffs Cannot Challenge an Amorphous "Freeze" Comprising an Unknown
                and Undefined Set of Agency Actions ............................................................... 25

        B.      Regardless of How Plaintiffs Characterize Their Claims, They Are Not
                Cognizable ..................................................................................................... 26

                1.      Plaintiffs Cannot Seek Relief Against the Order, Which Is Plainly
                        Lawful ........................................................................................... 27

                2.      The APA Permits Challenges Only to Discrete Actions, Not Broad
                        Programmatic Attacks on Overall Agency Programs .............................. 29

V.      Plaintiffs' Challenged Are Meritless ................................................................ 32

        A.      Congress Has Afforded Defendants Broad Discretion Over the Relevant Grant
                Programs, Which Provides Ample Authority to Temporarily Pause Funding ..... 33

1.      Defendants Have Broad Authority to Select Recipients Under the Inflation Reduction Act Grant Programs ...................................................... 33

2.      This Statutory Discretion Allows Defendants to Temporarily Pause Funding for Particular Recipients ............................................................... 36

3.      Temporary Pauses in Funding are Historically Common ........................ 38

B.      A Temporary Pause in Funding Is Not Arbitrary and Capricious ....................... 39

1.      Arbitrary and Capricious Review is Inappropriate ................................... 39

2.      A Pause on Funding Pending a Decision Whether to Continue That Funding or Redirect It Elsewhere Is Rational ............................................ 41

C.      Plaintiffs' Constitutional Claims Are Equally Meritless ...................................... 43

CONCLUSION ................................................................................................................................ 44

Pursuant to Federal Rule of Civil Procedure 56, Defendants Department of Agriculture, Secretary Brooke Rollins, and President Donald J. Trump, by and through the undersigned counsel, respectfully file this memorandum of points and authorities in support of their cross-motion for summary judgment and opposition to Plaintiffs Cultivate KC, Faith in Place, Foodshed Alliance, GreenLatinos, Hendrix Farm, Hope for Small Farm Sustainability, Red Fire Farm, and Two Boots Farm's motion for summary judgment, ECF No. 22.

## BACKGROUND

### I.    The *Unleashing American Energy* Executive Order

On January 20, 2025, the President issued certain Executive Orders directing temporary pauses in certain funding, including *Unleashing American Energy*, Exec. Order No. 14,154, 90 Fed. Reg. 8,353 (Jan. 20, 2025) (the "Order"). In the Order, the President declared that it is "in the national interest to unleash America's affordable and reliable energy and natural resources," and articulated several energy-related goals. *Id.* §§ 1, 2. For example, the President declared that it "is the policy of the United States" to "protect the United States's economic and national security and military preparedness by ensuring that an abundant supply of reliable energy is readily accessible in every State and territory of the Nation," and to "eliminate the 'electric vehicle [ ] mandate' and promote true consumer choice, which is essential for economic growth and innovation, by removing regulatory barriers to motor vehicle access." *Id.* § 2(c), (e). The President also declared that the United States should "ensure that no Federal funding be employed in a manner contrary to the principles outlined in this section, unless required by law." *Id.* § 2(i).

To accomplish these policies, the Order directed (among other things) that, to the extent permissible by law, agencies should pause disbursements for funds appropriated under the Inflation Reduction Act pending a review process:

All agencies shall immediately pause the disbursement of funds appropriated through the Inflation Reduction Act of 2022 (Public Law 117-169) . . . and shall review their processes, policies, and programs for issuing grants, loans, contracts, or any other financial disbursements of such appropriated funds for consistency with the law and the policy outlined in section 2 of this order. Within 90 days of the date of this order, all agency heads shall submit a report to the Director of the [National Economic Council] and Director of OMB [i.e., the Office of Management and Budget] that details the findings of this review, including recommendations to enhance their alignment with the policy set forth in section 2. No funds identified in this subsection (a) shall be disbursed by a given agency until the Director of OMB and Assistant to the President for Economic Policy have determined that such disbursements are consistent with any review recommendations they have chosen to adopt.

*Id.* § 7(a). The Order expressly directed, for all provisions, that they should be "implemented in a manner consistent with applicable law." *Id.* § 10(b).

The next day, the Office of Management and Budget ("OMB") issued guidance regarding the Order. *See* OMB Memorandum M-25-11, *Guidance Regarding Section 7 of the Executive Order Unleashing American Energy* (Jan. 21, 2025), https://www.whitehouse.gov/briefings-statements/2025/01/omb-memo-m-25-11/. In particular, OMB stated that Section 7's pause on disbursement "only applies to funds supporting programs, projects, or activities that may be implicated by the policy established in Section 2 of the order." *Id.* OMB further stated that "[a]gency heads may disburse funds as they deem necessary after consulting with [it]." *Id.*

## II.  **Procedural History**

Plaintiffs are nonprofit organizations that receive grants under the Inflation Reduction Act. *See* Am. Compl. ¶¶ 3, 24, ECF No. 15. They filed this suit on March 13, 2025, *see* Compl., ECF No. 1, and amended their complaint on May 19, 2025, *see* Am. Compl. Plaintiffs moved for summary judgment on July 18, 2025. ECF No. 22. Due to a preliminary injunction in the District of Rhode Island, Defendants presently are processing and paying invoices and advance requests from Inflation Reduction Act grant recipients, including Plaintiffs. *See* Am. Compl. ¶ 32; Pl.'s

Mem. at 7, ECF No. 22-1; *Woonasquatucket River Watershed Council v. Dep't of Agric.*, 778 F. Supp. 3d 440, 479-80 (D.R.I. 2025).

## LEGAL STANDARD

Summary judgment is proper if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The "facts must be viewed in the light most favorable to the nonmoving party," but "only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007). In cases under the Administrative Procedure Act ("APA"), a court will "review the administrative record to determine whether the agency's decision was arbitrary and capricious, and whether its findings were based on substantial evidence." *New LifeCare Hosps. of N.C., LLC v. Becerra*, 7 F.4th 1215, 1222 (D.C. Cir. 2021).

## ARGUMENT

I. **Plaintiffs' Claims Fail on Threshold Issues**

A. **Sovereign Immunity Bars Plaintiffs' Administrative Procedure Act Claims**

"If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3). "The basic rule of federal sovereign immunity is that the United States cannot be sued at all without the consent of Congress." *Block v. North Dakota*, 461 U.S. 273, 287 (1983). "A waiver of the Federal Government's sovereign immunity must be unequivocally expressed in statutory text, and will not be implied." *Lane v. Peña*, 518 U.S. 187, 192 (1996) (citation omitted). Further, "a waiver of the Government's sovereign immunity will be strictly construed, in terms of its scope, in favor of the sovereign." *Id.* "[L]imitations and conditions upon which the Government consents to be sued must be strictly observed and exceptions thereto are not to be implied." *Lehman v. Nakshian*, 453 U.S. 156, 161 (1981). "Because sovereign immunity is jurisdictional in nature, the terms of the government's consent to be sued in any court define that court's jurisdiction to entertain the suit," *Tri-State Hosp. Supply Corp. v. United States*,

341 F.3d 571, 575 (D.C. Cir. 2003), and "the Government may not waive immunity merely by its conduct in a lawsuit," *Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 621-22 (D.C. Cir. 2017).

The Administrative Procedure Act ("APA") provides that "[a]n action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States. . . . Nothing herein . . . confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought" 5 U.S.C. § 702. This provision constitutes a limited "waiver of sovereign immunity." *Perry Cap.*, 864 F.3d at 618.

Two limitations on the APA's waiver of sovereign immunity are relevant here: the APA does not waive sovereign immunity when either (1) a plaintiff seeks money damages or (2) another statute impliedly forbids the relief sought. Both of these limits on the APA's sovereign immunity waiver independently foreclose Plaintiffs' suit. Plaintiffs in substance seek money damages, and the Tucker Act impliedly forbids the relief that they seek because jurisdiction over Plaintiffs' claims lie, if anywhere, in the Court of Federal Claims. For both of these reasons, the APA's limited waiver of sovereign immunity does not extend to Plaintiffs' claims. Accordingly, this Court lacks subject-matter jurisdiction over Plaintiffs' claims. For that reason alone, dismissal is warranted.

1.    Plaintiffs' Suit Seeks "Money Damages"

The APA does not waive sovereign immunity to a suit for "money damages." 5 U.S.C. § 702; *accord Jibril v. Mayorkas*, 101 F.4th 857, 870 (D.C. Cir. 2024) ("the APA does not authorize suits seeking 'money damages' against the Government"). "Almost invariably . . . suits seeking (whether by judgment, injunction, or declaration) to compel the defendant to pay a sum of money to the plaintiff are suits for 'money damages,' as that phrase has traditionally been applied." *Great-W. Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 210 (2002) (quoting *Bowen v. Massachusetts*,

487 U.S. 879, 918-19 (1988) (Scalia, J., dissenting)); *accord Richards v. Delta Air Lines, Inc.*, 453 F.3d 525, 531 (D.C. Cir. 2006) (same). That description fits this suit—in which Plaintiffs seek to compel Defendants to pay them sums of money, whether directly or indirectly—to a T.

Plaintiffs are asking that this Court "[o]rder Agency Defendants to release any currently frozen, obligated funds appropriated under the Inflation Reduction Act." Am. Compl. at 19 (prayer for relief). If anything qualifies as a "suit[ ] seeking . . . to compel the defendant to pay a sum of money to the plaintiff," *Knudson*, 534 U.S. at 210, it is a suit that asks the court to order defendants to give plaintiffs money. *See U.S. Conf. of Catholic Bishops v. Dep't of State*, Civ. A. No. 25-0465 (TNM), 2025 WL 763738, at *5 (D.D.C. Mar. 11, 2025) ("an injunction is the wrong vehicle to recoup withheld funds"). The mere fact that Plaintiffs style this suit as seeking injunctive relief is immaterial. Suits seeking "to compel the defendant to pay a sum of money to the plaintiff are suits for 'money damages'" even when styled as for "injunction[s]." *Knudson*, 534 U.S. at 210. "Though framed in terms of declaratory and injunctive relief," a suit nonetheless can be one that in substance "is for monetary damages." *Richards*, 453 F.3d at 530. "No matter how [Plaintiffs] phrase[ ] it, what [they] wants is a judicial decree directing [Defendants] to pay [them] the damages [they say] each is due." *Id.* at 531. "Yet the rule has long been that a plaintiff cannot transform a claim for damages into an equitable action by asking for an injunction that orders the payment of money." *Id.* (cleaned up). "[A] court must look past the label applied by the plaintiff to determine if the relief is appropriately framed in equity." *Clark v. Feder Semo & Bard, P.C.*, 527 F. Supp. 2d 112, 117 n.1 (D.D.C. 2007). Looking beyond Plaintiffs' artful pleading, what they seek is "to compel the defendant to pay a sum of money," i.e., a "money damages" claim. *Knudson*, 534 U.S. at 210. The APA's sovereign immunity waiver does not apply. *See* 5 U.S.C. § 702; *Jibril*, 101 F.4th at 870.

The remainder of the relief that Plaintiffs seek—declaring Section 7 of the Order unlawful, vacating actions implementing the I Inflation Reduction Act freeze of funds, and "enjoin[ing] Agency Defendants from implementing and maintaining the [Inflation Reduction Act ] freeze, or giving effect to, or reinstating it under a different name, and from delaying future payments to Plaintiffs of funds to which they are entitled"—also seek "money damages" within the APA's meaning, albeit indirectly. *Knudson* requires courts to look to the substance rather than the form of the relief sought to ascertain whether it constitutes "money damages." It recognizes that a plaintiff can seek money damages "whether by judgment, injunction, or declaration," and that "any claim for legal relief can, with lawyerly inventiveness, be phrased in terms of an injunction." *Knudson*, 534 U.S. at 211 & n.1. The relief that Plaintiffs seek fit the bill—after all, they seek this relief solely as a means "to compel [Defendants] to pay [them] a sum of money." *Knudson*, 534 U.S. at 210. To allow them to pursue such relief as a means to achieve their true goal of obtaining grant funds would allow it to evade the APA's prohibition of money damages through "lawyerly inventiveness." *Knudson*, 534 U.S. at 211 n.11. As such, the remaining relief that they seek does not fall within the APA's waiver of sovereign immunity, either.

Plaintiffs rely chiefly on *Bowen* to argue that the relief they seek does not constitute "money damages," but the aspect of *Bowen* that they cite no longer is good law in light of intervening Supreme Court precedent. *Bowen*, 487 U.S. at 895 (cleaned up), laid out the following dichotomy: "Damages are given to the plaintiff to substitute for a suffered loss, whereas specific remedies are not substitute remedies at all, but attempt to give the plaintiff the very thing to which he was entitled." Accordingly, *Bowen* reasoned, when money is the specific thing a plaintiff claims it is owed, rather than a mere substitute for a plaintiff's claimed loss, the plaintiff does not seek "money damages" within the APA's meaning, and the APA's sovereign immunity waiver thus applies. *Id.*

Justice Scalia disagreed. In dissent, he argued that the majority's reason for concluding that the claims at issue did not seek money damages "is simply wrong." *Bowen*, 487 U.S. at 917 (Scalia, J., dissenting). Justice Scalia acknowledged that the claims "fit a general description of a suit for specific relief, since the award of money undoes a loss by giving respondent the very thing (money) to which it was legally entitled," but rejected the relevance of the specific versus substitute relief dichotomy on which the majority relied. *Id.* He explained that "damages" is a term of art has "been used in the common law for centuries" and had a meaning "well established by tradition." *Id.* "Part of that tradition," Justice Scalia wrote, "was that a suit seeking to recover a past due sum of money that does no more than compensate a plaintiff's loss is a suit for damages, not specific relief."

Justice Scalia concluded by setting forth the following rule: "Almost invariably . . . suits seeking (whether by judgment, injunction, or declaration) to compel the defendant to pay a sum of money to the plaintiff are suits for 'money damages,' as that phrase has traditionally been applied." *Bowen*, 487 U.S. at 918-19 (Scalia, J., dissenting). He identified only a single "rare" exception to this general rule, one that plainly does not encompass Plaintiffs' suit: namely, suits "to prevent future losses that were either incalculable or would be greater than the sum awarded." *Id.* at 918.[1]

Fourteen years later, *Knudson* made Justice Scalia's dissenting opinion in *Bowen* the law. Directly quoting Justice Scalia's *Bowen* dissent, the Court held that "[a]lmost invariably . . . suits seeking (whether by judgment, injunction, or declaration) to compel the defendant to pay a sum of money to the plaintiff are suits for 'money damages,' as that phrase has traditionally been applied."

---

[1]    Examples of such suits are suits "to enforce a promise to loan a sum of money when the unavailability of alternative financing would leave the plaintiff with injuries that are difficult to value; or to enforce an obligor's duty to make future monthly payments, after the obligor had consistently refused to make past payments concededly due, and thus threatened the obligee with the burden of bringing multiple damages actions." *Bowen*, 487 U.S. at 918 (Scalia, J., dissenting).

*Knudson*, 534 U.S. at 210 (quoting *Bowen*, 487 U.S. at 918-19 (Scalia, J., dissenting)). That is so because "[t]he 'substance' of a money judgment is a compelled transfer of money." *Id.* at 216.

   *Knudson*, 534 U.S. at 212, distinguished *Bowen* on the ground that there, "the suit was not merely for past due sums, but for an injunction to correct the method of calculating payments going forward." In other words, *Knudson* explained, the APA waived sovereign immunity in *Bowen* not because the plaintiff sought specific rather than substitute monetary relief, but because the plaintiff sought prospective injunctive relief separate and apart from the sums of money it sought to compel the government to pay. *Id.* One can debate whether that is the fairest reading of *Bowen* on its own terms, but that is immaterial; what matters is that it is what *Knudson* said *Bowen* now means.

   In doing so, *Knudson* reformulated and limited *Bowen*. Post-*Knudson*, the test no longer is whether a plaintiff seeks specific or substitute monetary relief. Now, all that matters is whether a suit "seek[s] . . . to compel the defendant to pay a sum of money to the plaintiff." *Knudson*, 543 U.S. at 210 (quoting *Bowen*, 487 U.S. at 918-19 (Scalia, J., dissenting)). If so, the suit is for "money damages," regardless of whether the plaintiff characterizes the sum of money it seeks as specific rather than substitute relief. *Id.* In short, *Knudson* was decided after *Bowen*; it expressly adopted the *Bowen* dissent's position; and it distinguished *Bowen* in a manner that narrowed it considerably. Accordingly, in *Knudson*'s aftermath, a plaintiff seeking to compel an agency to pay it a sum of money is seeking "money damages," and cannot rely on *Bowen* to overcome sovereign immunity.

   Indeed, in April 2025, the Supreme Court reaffirmed *Knudson*'s holding that a suit seeking to compel the federal government to pay a sum of grant funds is a suit for "money damages." *See Dep't of Educ. v. California*, 145 S. Ct. 966, 968 (2025). There, the district court "enjoin[ed] the Government from terminating various [ ] grants" and required "the Government to pay out past-due grant obligations and to continue paying obligations as they accrue." *Id.* The Supreme Court

stayed the order, explaining that the agency was "likely to succeed in showing the District Court lacked jurisdiction to order the payment of money under the APA" because the APA's sovereign immunity waiver does not "apply to claims seeking 'money damages.'" *Id.* (citing 5 U.S.C. § 702). In doing so, the Court distinguished *Bowen* by citing *Knudson*. *Id.* As the Court put it, "the APA's limited waiver of immunity does not extend to orders 'to enforce a contractual obligation to pay money' along the lines of what the District Court ordered here." *Id.* (quoting *Knudson*, 534 U.S. at 212). *California* thus makes clear, were there any lingering doubt on the matter, that a plaintiff seeking to compel an agency to pay it grant funds it claims to be owed seeks "money damages" within the APA's meaning and cannot rely on *Bowen* to overcome sovereign immunity.

For these reasons, Plaintiff's reliance on *Bowen* fails. After *Knudson*, citing *Bowen* to argue that a plaintiff does not seek "money damages" within the APA's meaning because it seeks a sum of money as the specific rather than substitute relief, is akin to citing *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), *overruled by Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024), for the idea that a court must defer to an agency's reasonable interpretation of an ambiguous statute that it administers. Intervening Supreme Court precedent has overtaken this aspect of *Bowen*, rendering it no longer good law. And were there any lingering doubt after *Knudson* that a suit seeking to compel an agency to pay a plaintiff grant funds is a suit for "money damages," *California*, 145 S. Ct. at 968, has now settled it conclusively.

In short, the relief Plaintiffs seek constitutes "money damages" within the APA's meaning. The APA thus does not waive sovereign immunity to Plaintiffs' APA claims. *See* 5 U.S.C. § 702; *Jibril*, 101 F.4th at 870; *see also Sustainability Inst. v. Trump*, No. 25-1575, 2025 WL 1587100, at *2 (4th Cir. June 5, 2025) ("the Supreme Court distinguished *Bowen* in *California*, highlighting the meaningful difference between the relief in that case and an order to enforce a contractual

obligation to pay money along the lines of what the district court entered here." (quotation marks omitted)); *New York v. Nat'l Sci. Found.*, Civ. A. No. 25-4452, 2025 WL 2180478, at \*17 (S.D.N.Y. Aug. 1, 2025) ("Plaintiffs challenge[d] the termination of grants resulting from implementation of the Priority Directive," but the court was "persuaded that the kind of preliminary relief sought by Plaintiffs in this first category of relief is akin to that in *California*, and therefore *Bowen* is likely distinguishable."); *Bd. of Educ. for Silver Consol. Sch. v. McMahon*, Civ. A. No. 25-0586, 2025 WL 2017177, at \*7 (D.N.M. July 18, 2025) ("Lawyers cannot 'craft suits, ultimately seeking money from the Government, as suits for declaratory or injunctive relief without mentioning the money'" (quoting *Suburban Mortg. Assocs., Inc. v. Dep't of Hous. & Urb. Dev.*, 480 F.3d 1116, 1124 (Fed. Cir. 2007))); *Am. Libr. Ass'n v. Sonderling*, Civ. A. No. 25-1050 (RJL), 2025 WL 1615771, at \*9 n.7 (D.D.C. June 6, 2025) (the relief sought constituted money damages because "there is more than a 'possibility' that injunctive relief would result in the disbursement of funds").

### 2.    The Tucker Act Impliedly Forbids the Relief that Plaintiffs Seek

The APA also does not waive sovereign immunity "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." 5 U.S.C. § 702. The Tucker Act vests the Court of Federal Claims with "jurisdiction to render judgment upon any claim against the United States founded . . . upon any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1). The D.C. Circuit has interpreted this statute "to confer exclusive jurisdiction over breach of contract claims against the United States seeking more than $10,000 in damages on the Court of Federal Claims." *Hammer v. United States*, 989 F.3d 1, 2 (D.C. Cir. 2021).[2] "[T]o

---

[2]    While 28 U.S.C. § 1491(a)(1) does not mention this $10,000 figure, another statute gives the Court of Federal Claims and district courts concurrent jurisdiction over a "civil action or claim against the United States, not exceeding $10,000 in amount, founded . . . upon any express or implied contract with the United States," with only limited exceptions. 28 U.S.C. § 1346.

allow suit against the United States under the APA in actions actually based on contract would create such inroads into the restrictions of the Tucker Act that it would ultimately result in the demise of the Court of Claims." *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967 (D.C. Cir. 1982).

Accordingly, the Tucker Act "impliedly forbid[s] contract claims against the Government from being brought in district court under the waiver in the APA." *Perry Cap.*, 864 F.3d at 618-19 (quotation marks omitted); *see also Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 893 (D.C. Cir. 1985) ("section 702's waiver of sovereign immunity may not be used to circumvent the jurisdictional and remedial limitations of the Tucker Act"). That is so even when, as here, a plaintiff seeks an injunction. As the D.C. Circuit has explained, "the Tucker Act impliedly forbids—in APA terms—not only district court awards of money damages, which the Claims Court may grant, but also injunctive relief, which the Claims Court may not." *Albrecht v. Comm. on Emp. Benefits of Fed. Rsrv. Emp. Benefits Sys.*, 357 F.3d 62, 68 (D.C. Cir. 2004) (quotation marks omitted).

A grant can be a contract for Tucker Act purposes. Since our nation's earliest days, grants have been understood to be contracts. *See, e.g.*, *Fletcher v. Peck*, 10 U.S. (6 Cranch) 87, 137 (1810) ("a grant is a contract executed" that "contains obligations binding on the parties" and "implies a contract not to reassert [a] right" to the thing that is granted); *Trs. of Dartmouth Coll. v. Woodward*, 17 U.S. (4 Wheat.) 518, 656 (1819) ("a grant is a contract"); *Providence Bank v. Billings*, 29 U.S. (4 Pet.) 514, 562 (1830) (a "grant is a contract"); *Proprietors of Charles River Bridge v. Proprietors of Warren Bridge*, 36 U.S. (11 Pet.) 420, 650 (1837) ("every grant is a contract"). Accordingly, the D.C. Circuit and Federal Circuit frequently treat federal grants as contracts. *See Henke v. Dep't of Com.*, 83 F.3d 1445, 1450 (D.C. Cir. 1996) (a National Science Foundation "grant agreement includes the essential elements of a contract and establishes what would commonly be regarded as a contractual relationship between the government and the grantee"); *Widakuswara v. Lake*, No.

25-5144, 2025 WL 1288817, at *3 (D.C. Cir. May 3, 2025) (grants that involved "exchanges of promises—reflecting offer, acceptance, consideration, mutuality of intent, and action by an official with authority to bind the government—constitute[d] government contracts for Tucker Act purposes");[3] *Columbus Reg'l Hosp. v. United States*, 990 F.3d 1330, 1338 (Fed. Cir. 2021) (courts will "treat federal grant agreements as contracts when the standard conditions for a contract are satisfied, including that the federal entity agrees to be bound"); *see also id.* at 1338 (collecting cases involving grants that courts determined constituted contracts for purposes of Tucker Act).

The "test for determining whether a claim falls within the exclusive jurisdiction of the Claims Court pursuant to the Tucker Act [is] straightforward." *Crowley Gov't Servs., Inc. v. GSA*, 38 F.4th 1099, 1106 (D.C. Cir. 2022). "[A]n action against the United States which is at its essence a contract claim lies within the Tucker Act," so "a district court has no power to grant injunctive relief in such a case." *Megapulse, Inc.*, 672 F.2d at 967. "The classification of a particular action as one which is or is not 'at its essence' a contract action depends both on the source of the rights upon which the plaintiff bases its claims, and upon the type of relief sought (or appropriate)." *Id.*

---

[3]     On May 28, 2025, the D.C. Circuit granted en banc reconsideration and vacated its May 3, 2025, decision on this issue. The May 28 order said that "the jurisdictional argument advanced by the government . . . raises an important issue, as indicated by its recurrence in a number of recent cases," and did not express a view on the merits—only that "[a]t this initial stage, substantially for the reasons explained [in the dissent to the panel's decision], the government has not made the requisite strong showing of a likelihood of success on the merits of its appeals in these cases." *Widakuswara v. Lake,* Nos. 25-5144, 25-5145, 25-5150, 25-5151 (D.C. Cir. May 28, 2025) (May 28 Order). The referenced dissent, among other things, distinguished the arguments raised by the plaintiffs in *Widakuswara* from the plaintiffs' arguments in *Department of Education* on the basis that the plaintiffs in the latter case "were not entities created by statute and designated by Congress to receive specified sums" and that their "only claim was to sums awarded to them in previously awarded discretionary grants." *Widakuswara*, 2025 WL 1288817, at *13 (Pillard, J. dissenting). The order otherwise left in place the stay granted by the original D.C. Circuit panel. Plaintiffs in this case were not created by statute or designated by Congress. Since then, at least one judge in this District has found "the *Widakuswara* panel's [ ] discussion [to be] persuasive and consider[ed] it accordingly" despite the subsequent en banc reconsideration order. *Ass'n for Educ. Fin. & Pol'y, Inc. v. McMahon*, Civ. A. No. 25-0999 (TNM), 2025 WL 1568301, at *5 (D.D.C. June 3, 2025).

at 968. As explained below, both the source of the rights upon which Plaintiffs base their claims and the type of relief they seek point the same way: Plaintiffs' claims essentially are contractual in nature. Accordingly, the Tucker Act impliedly forbids Plaintiffs from filing suit in this Court, and 5 U.S.C. § 702 does not allow an end-run around that limit through an APA suit.

First, as to "the source of the rights upon which" Plaintiffs base their claims, *Megapulse, Inc.*, 672 F.2d at 968, the source of rights underlying Plaintiffs' claims are their grant agreements, not the statutes themselves. These agreements are paradigmatic contracts: they set out obligations that Plaintiffs must accept and fulfill in exchange for consideration from the government. *See e.g.*, Notice of Grant and Agreement Award, ECF No. 22-2 (pages 11-17) (specifying the terms by which entity must abide in exchange for award of $375,000). And Plaintiffs' claims are effectively based on an alleged right to continued funding under the various grant agreements. Further, the statutes that underline the Department's source of authority to issue these grants simply allow or direct the Secretary to award grants in general. *See* Pub. L. No. 117-169, §§ 21002, 22002, 22007, 23003, 136 Stat. at 2015-19, 2021-23, 2026. They do not require the Secretary to award grants to any specific entities, including Plaintiffs. *Id.* The statutes themselves thus cannot be the source of rights on which Plaintiffs base their claims. In short, the mutual intent to contract, along with other terms outlined in the grant agreement, constitute government contracts for Tucker Act purposes. *See Thermalon Indus., Ltd. v. United States*, 34 Fed. Cl. 411, 414 (1995) ("The party alleging a contract must show a mutual intent to contract including an offer, an acceptance, and consideration passing between the parties.") (citing *Fincke v. United States*, 675 F.2d 289, 295 (1982)).

The Supreme Court's recent *California* decision controls. Plaintiffs seek "to enforce a contractual obligation to pay money," so the source of their asserted rights is contractual in nature. *California.*, 145 S. Ct. at 968 (quoting *Knudson*, 534 U.S. at 212). Plaintiffs' choice to style their

claims as arising under the APA rather than as a contract claim is irrelevant. The D.C. Circuit will reject attempts by a "plaintiff whose claims against the United States are essentially contractual . . . to avoid the jurisdictional . . . restrictions of the Tucker Act by casting its pleadings in terms that would enable a district court to exercise jurisdiction under a separate statute and enlarged waivers of sovereign immunity, as under the APA." *Megapulse, Inc.*, 672 F.2d at 967; *see also, e.g.*, *Kidwell v. Dep't of Army*, 56 F.3d 279, 284 (D.C. Cir. 1995) ("The plain language of a complaint [ ] does not necessarily settle the question of Tucker Act jurisdiction. This is because plaintiffs can bypass Tucker Act jurisdiction by converting complaints which at their essence seek money damages from the government into complaints requesting injunctive relief or declaratory actions. Because this forum shopping circumvents a primary purpose of the Act . . . jurisdiction under the Tucker Act cannot be avoided by disguising a money claim as a claim requesting a form of equitable relief. To enforce this prohibition on the creative drafting of complaints, we look to the complaint's substance, not merely its form." (cleaned up)).[4] Simply put, Plaintiffs cannot make an end-run around the Tucker Act's implied limitations on this Court's subject-matter jurisdiction, which 5 U.S.C. § 702 does not override, through artful pleading.

---

[4]    *See also Crowley Gov't Servs.*, 38 F.4th at 1107 ("this court prohibits the creative drafting of complaints . . . by disguising a claim for money damages as one for equitable relief, to avoid the jurisdictional consequences of the Tucker Act" (cleaned up)); *A & S Council Oil Co. v. Lader*, 56 F.3d 234, 241 (D.C. Cir. 1995) ("It is true that plaintiffs have disavowed the notion that they are making contract claims. Instead, they say, the damages they have suffered flow from unlawful agency action," but "plaintiffs' labelling is of little importance."); *Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 77 (D.C. Cir. 1985) ("Despite [plaintiff's] efforts to cast its complaint otherwise, we conclude that the essential rights at stake here are contractual. . . . a plaintiff may not avoid the [Tucker Act's] jurisdictional bar . . . merely by alleging violations of regulatory or statutory provisions rather than breach of contract. That [a] complaint nowhere mentions breach of contract, therefore, cannot alone suffice to establish jurisdiction in the District Court." (citations omitted)); *Int'l Eng'g Co. v. Richardson*, 512 F.2d 573, 580 (D.C. Cir. 1975) ("it is hard to conceive of a claim falling no matter how squarely within the Tucker Act which could not be urged to involve as well agency error subject to review under the APA. . . . We refuse to believe that Congress intended, in enacting the APA, so to destroy the Court of Claims by implication").

Plaintiffs' attempt to downplay the Supreme Court's recent, squarely on-point *California* decision are unpersuasive. Plaintiffs insist that "central to [that] decision . . . was the fact that the appellate court determined that plaintiffs placed 'the terms and conditions of each individual grant award . . . at issue.'" Pl.'s Mem. at 15 (citing *California v. Dep't of Educ.*, 132 F.4th 92, 96-97 (1st Cir. 2025)). That simply is incorrect—the Supreme Court's decision did not at all turn on the ostensible "fact" that the plaintiffs there had placed the terms and conditions of each individual grant at issue. Indeed, the Supreme Court's decision did not even mention that so-called "fact" at all, so that "fact" plainly was not central to its decision, *see California*, 145 S. Ct. at 968, as Plaintiff incorrectly contends, *see* Pl.'s Mem. at 15. And the Court's decision certainly did not turn on the "fact" that the First Circuit had characterized the plaintiffs' claims in any particular way.[5] Rather, the only "fact" on which the Court's analysis of the nature of the plaintiffs' claims turned, for Tucker Act purposes, was the fact that the plaintiffs had sought "to enforce a contractual obligation to pay money." *Id.* (quoting *Knudson*, 534 U.S. at 212), a fact that is equally true here.

Indeed, a sure sign that Plaintiffs are mischaracterizing the Supreme Court's *California* decision is the fact that they do not cite, quote, or engage with the Court's reasoning. They instead exclusively quote the First Circuit's reasoning, which they erroneously attribute to the Supreme Court—even though the Supreme Court disagreed with the First Circuit's reasoning on the merits and granted a stay that the First Circuit had denied. *See* Pl.'s Mem. at 15-16. If anything, the very fact that the Supreme Court squarely disagreed with the First Circuit is a sound reason to view the First Circuit's reasoning as anti-precedential. *Cf. Students for Fair Admissions, Inc. v. President*

---

[5] Indeed, the proper characterization of a claim is a question of law, not a question of fact, which the Supreme Court reviews de novo with no deference to the First Circuit. *See Google LLC v. Oracle Am., Inc.*, 593 U.S. 1, 24 (2021) ("a legal question [is] for judges to decide de novo"). Accordingly, it is difficult to imagine why the Supreme Court would consider the First Circuit's characterization of the plaintiffs' claims to matter—it would not defer to such characterizations.

*& Fellows of Harvard Coll.*, 600 U.S. 181, 230 (2023) ("A dissenting opinion is generally not the best source of legal advice on how to comply with the majority opinion.").

Second, as to "the type of relief sought (or appropriate)," *Megapulse, Inc.*, 672 F.2d at 968, Plaintiff seek "to compel the defendant[s] to pay a sum of money to the plaintiff[s]," i.e., "'money damages,' as that phrase has traditionally been applied," *Knudson*, 534 U.S. at 210, as explained earlier, *see supra* § I.A.1. "In determining whether [Plaintiffs'] claim[s]" raise "a contract dispute, . . . the type of relief sought [is] revealing. [Plaintiffs'] complaint requested an order declaring that it is entitled to immediate payment of [certain] payments illegally withheld" and "compelling the government to pay money," which is "the classic contractual remedy of specific performance." *Spectrum Leasing*, 764 F.2d at 894-95 (cleaned up); *accord Crowley Gov't Servs.*, 38 F.4th at 1107 ("the explicitly contractual remedy of specific performance and the prototypical contract remedy of money damages [are] types of relief that are specific to actions that sound in contract" (quotation marks omitted)); *Perry Cap.*, 864 F.3d at 619 ("specific performance is an explicitly contractual remedy and [ ] 'damages are a prototypical contract remedy'" (quoting *Lader*, 56 F.3d at 240)). Despite Plaintiffs' characterization of the relief sought as being injunctive in nature, such relief in substance is akin to damages or specific performance—paradigmatically contractual remedies.

Indeed, the D.C. Circuit has set out a test to determine whether, for purposes of determining the Tucker Act's applicability, a claim nominally for injunctive relief is in substance a claim for money damages—a test that Plaintiffs' claims fail. Courts "treat the complaint as . . . an artfully drafted effort to circumvent the jurisdiction of the Court of Federal Claims" unless the plaintiff "requests non-monetary relief that has considerable value independent of any future potential for monetary relief," i.e., "the sole remedy requested is declaratory or injunctive relief that is not negligible in comparison with the potential monetary recovery." *Kidwell*, 56 F.3d at 284 (cleaned

up). Under this "bright line rule," the Tucker Act impliedly denies this Court jurisdiction "if the plaintiff seeks money or the district court grants it." *Id.* at 285 (quotation marks omitted).

Under this test, the Tucker Act plainly precludes Plaintiffs from raising their claims in this Court. As noted earlier, Plaintiffs ask this Court for an order directing Defendants to provide them money. *See supra* § I.A.1. The nominally declaratory and injunctive relief that Plaintiffs seek has no value whatsoever "independent of any future potential for monetary relief." *Kidwell*, 56 F.3d at 284. This is not a lawsuit in which "granting the relief requested would offer a direct non-monetary benefit" in addition to incidental "monetary benefits," such as, for example, when a former service-member sues to amend his service records so as to "lift some of the shame associated with failing to receive an honorable discharge," which incidentally would increase his benefits. *Id.* at 285. To the contrary, the relief that Plaintiffs seek has no non-monetary value at all, and certainly does not have "considerable" value independent of any future potential for monetary relief. *Id.* at 284.

And notably, even accepting Plaintiffs' characterization of the relief they seek as injunctive in nature, the Court of Federal Claims can provide equitable relief in contract cases. "In any case within its jurisdiction, the [Court of Federal Claims] shall have the power to remand appropriate matters to any administrative or executive body or official with such direction as it may deem proper and just." 28 U.S.C. § 1491(a)(2). This statute allows the Court of Federal Claims "to provide equitable relief." *Walters v. Sec'y of Def.*, 725 F.2d 107, 112 n.10 (D.C. Cir. 1983); *accord Nat'l Air Traffic Controllers Ass'n v. United States*, 160 F.3d 714, 716 (Fed. Cir. 1998) (the Tucker Act "permit[s] the Court of Federal Claims to grant equitable relief ancillary to claims for monetary relief over which it has jurisdiction"); *Williams v. Sec'y of Navy*, 787 F.2d 552, 557 n.6 (Fed. Cir. 1986) (Court of Federal Claims has "equity powers" because on remand, it can issue directions to agency). Pursuant to 28 U.S.C. § 1491(a)(2), "the Court of Federal Claims could . . . instruct

[Defendants] in any manner it deems just. This remedy is entirely adequate and not significantly different from a remedy provided by this Court." *Cartwright Int'l Van Lines, Inc. v. Doan*, 525 F. Supp. 2d 187, 197 (D.D.C. 2007). Because the Court of Federal Claims can instruct Defendants under 28 U.S.C. § 1491(a)(2), characterizing the relief that Plaintiffs seek as injunctive would not overcome the Tucker Act's limit on this Court's subject-matter jurisdiction.

Plaintiffs' contrary position is untenable as a matter of law and logic. Under their reasoning, all contract-related actions or terminations could be pleaded as statutory or constitutional claims— not contract claims—and proceed in district court. For example, Plaintiffs' Take Care Clause claim, which alleges that Defendants violated the Constitution by allegedly violating applicable statutes in pausing the flow of grant funds, can seemingly be brought whenever the government terminates a contract. Such artful pleading is insufficient to evade the Tucker Act. Accepting this view would create a complete end-run around the exclusive jurisdiction of the Court of Federal Claims. Both the Supreme Court and the D.C. Circuit unequivocally have rejected such a maneuver as error. *See Dep't of Educ.*, 145 S. Ct. at 968-69; *Megapulse, Inc.*, 672 F.2d at 967. This Court should as well.

For these reasons, the Tucker Act precludes jurisdiction. *See New York*, 2025 WL 2180478, at *17 ("the district court's order on appeal in *California* directed the government to immediately restore Plaintiff States to the pre-existing status quo prior to the termination. The Supreme Court, though, characterized this relief as 'enjoining the Government from terminating various education-related grants' and 'requiring the Government to pay out past-due grant obligations and to continue paying obligations as they accrue.' Therefore, the Supreme Court held the Tucker Act's waiver of sovereign immunity likely applies, which would grant the Court of Federal Claims jurisdiction over the matter" (quoting *Dep't of Educ.*, 145 S. Ct. at 968)); *McMahon*, 2025 WL 2017177, at *7 ("Plaintiff attempts to mount statutory claims and constitutional challenges—but ultimately the

- 18 -

controversy is over a contract"); *Vera Inst. of Just. v. Dep't of Just.*, Civ. A. No. 25-1643 (APM), 2025 WL 1865160, at *11 (D.D.C. July 7, 2025) ("Ultimately, the Supreme Court's ruling . . . forecloses the exercise of jurisdiction over Plaintiffs' arbitrary-and-capricious claim. . . . the Court has spoken in a case substantially the same as this one. This court must listen."); *Sonderling*, 2025 WL 1615771, at *9 ("I find compelling the Supreme Court's . . . reservations about a district court ordering enforcement of a contractual obligation against the Government."); *Sustainability Inst.*, 2025 WL 1587100, at *2 ("The Plaintiffs here assert similar claims. They allege the Government violated the APA by suspending and canceling certain grants funded and authorized by omnibus appropriations statutes like the Inflation Reduction Act and the Infrastructure Investment and Jobs Act, Pub. L. 117-58. Like the plaintiffs in *California*, Plaintiffs here contend that their dispute does not hinge on the terms of a contract between the parties. Yet like the grants in *California*, the grants here were awarded by federal executive agencies to specific grantees from a generalized fund. While the appropriation statutes authorize the agencies to award grants, it is the operative grant agreements which entitle any particular Plaintiff to receive federal funds." (cleaned up)); *Pippenger v. DOGE Serv.*, Civ. A. No. 25-1090 (BAH), 2025 WL 1148345, at *5 (D.D.C. Apr. 17, 2025) (court was "depriv[ed]" of "authority to consider claims sounding in contract or to enjoin further termination of contracts, even if they are styled as APA claims"); *Sols. in Hometown Connections v. Noem*, Civ. A. No. 25-0885, 2025 WL 1530318, at *11 (D. Md. May 29, 2025) (applying *California* to hold that claims similar to Plaintiffs' claims here belong in Court of Federal Claims); *Mass. Fair Hous. Ctr. v. Dep't of Hous. & Urb. Dev.*, Civ. A. No. 25-30041, 2025 WL 1225481 (D. Mass. Apr. 14, 2025) ("Because plaintiffs assert essentially the same claim here—that the agency did not terminate the grant in accordance with statutory or regulatory authority—

it follows that plaintiffs are likewise likely seeking to enforce a contractual obligation to pay money").

### B.    Congress Has Foreclosed Plaintiffs' Constitutional Claims

"The power of federal courts of equity to enjoin unlawful executive action is subject to express and implied statutory limitations." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015). "Courts of equity can no more disregard statutory and constitutional requirements and provisions than can courts of law." *Id.* at 327-28. Moreover, "the express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others." *Id.* at 328 (quotation marks omitted). Congress has imposed "statutory . . . requirements," *id.* at 327, for raising constitutional claims against the federal government through the APA, which, as explained above, Plaintiffs do not satisfy. *See supra* § 1.A. And the Tucker Act is an "express provision of [a different] method of enforcing" the rights that Plaintiffs assert, as explained above. *Id.* at 328. Thus, the APA and the Tucker Act each independently foreclose Plaintiffs' constitutional claims.

*First*, Congress precluded Plaintiffs from raising constitutional claims that do not satisfy the APA's threshold requirements through its enactment of the APA, under which Plaintiffs may raise constitutional claims subject to certain threshold requirements. The APA allows a reviewing court to hold unlawful and set aside agency action that is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B). But as explained, Plaintiffs fail to satisfy the APA's threshold requirements because they seek "money damages" within the APA's meaning and the Tucket Act "impliedly forbids the relief which is sought." *Id.* § 702; *see supra* § I.A. To allow Plaintiffs to maintain their constitutional claims nonetheless, even though they fail to satisfy the APA's threshold requirements, would "disregard [the APA's] statutory . . . . requirements," which courts cannot do in exercising their equitable authority. *See Armstrong*, 575 U.S. at 327. As such, the APA precludes Plaintiffs' constitutional claims. *See Crowe v. Fed. Bureau of Prisons*, Civ. A.

No. 24-3582 (APM), 2025 WL 1635392, at *8-*9 (D.D.C. June 9, 2025) ("Plaintiffs do not explain why the APA is not a detailed and exclusive remedial scheme for purposes of *Armstrong*." (cleaned up)); *New Mexico v. Musk*, Civ. A. No. 25-0429 (TSC), 2025 WL 1502747, at *16 (D.D.C. May 27, 2025) ("The power of federal courts of equity to enjoin unlawful executive action is subject to express and implied statutory limitations. For instance, Congress prescribed the standard manner and scope for judicial review of agency action in the [APA], 5 U.S.C. § 701 *et seq.*" (cleaned up, citing *Armstrong*, 575 U.S. at 327)); *New York*, 2025 WL 2180478, at *31 ("*Armstrong* raise[s] questions about the availability of nonstatutory review in this case. Congress has prescribed a detailed remedial scheme through the APA, which expressly provides a mechanism for judicial review of agency action" (citing, e.g., 5 U.S.C. § 702(2)(C)); *Rogers v. Dep't of Health & Hum. Servs.*, Civ. A. No. 19-1567, 2021 WL 11747919, at *3 n.2 (D.S.C. Mar. 8, 2021) ("[N]umerous courts across the country have restricted review to the administrative record in cases that raise constitutional claims. Indeed, this outcome is a necessary result of Congress's direction in the APA. The Supreme Court has instructed that the power of federal courts of equity to enjoin unlawful executive action is subject to express and implied statutory limitation." (cleaned up)).

*Second*, the Tucker Act is an "express provision of [a different] method of enforcing" the rights that Plaintiffs assert, *Armstrong*, 575 U.S. at 328, as explained earlier, *see supra* § I.A.2. The Tucker Act thus separately precludes Plaintiffs' constitutional claims. *See Widakuswara*, 2025 WL 1288817, at *5 (concluding that "[t]he plaintiffs' non-APA claims regarding grant money," including under Take Care Clause, "are unlikely to fare any better" because "these constitutional claims simply flow from allegations that the Executive Branch has failed to abide by governing congressional statutes," and citing *Ingersoll-Rand*, 780 F.2d at 78, for the proposition that the "Tucker Act governs challenge to contract termination, 'despite plaintiff's allegations of statutory

and constitutional violations'"); *Sustainability Inst.*, 2025 WL 1587100, at *2 (plaintiffs cannot "allege [that] the Government violated the Constitution when it terminated or suspended Plaintiffs' grants" to obtain "a detour around the Tucker Act" (citing *Armstrong*, 575 U.S. at 327-28)); *Tucson Airport Auth. v. Gen. Dynamics Corp.*, 136 F.3d 641, 647 (9th Cir. 1998) ("because [the plaintiff's] constitutional claims are contractually-based, the district court lacks jurisdiction under the Tucker Act"); *Child Trends, Inc. v. Dep't of Educ.*, Civ. A. No. 25-1154, 2025 WL 1651148, at *8 (D. Md. June 11, 2025) ("the government is likely to succeed in showing that the Tucker Act precludes Article III courts from exercising jurisdiction over *any* claims pertaining to individual grant agreements, even if those claims are brought as constitutional . . . actions"); *McMahon*, 2025 WL 2017177, at *10 ("Defendants are likely to succeed in showing that the Tucker Act precludes this Court from exercising jurisdiction over any claims pertaining to individual grant agreements (even if framed as a constitutional action)."); *Kielczynski v. CIA*, 128 F. Supp. 2d 151, 158 (E.D.N.Y. 2001), *aff'd*, 56 F. App'x 540 (2d Cir. 2003) ("If the claims alleged in the Amended Complaint are deemed contractual in nature, despite the fact that they are labeled as constitutional claims, the Tucker Act applies and precludes this court from exercising jurisdiction").

## C.    Congress Has Foreclosed Plaintiffs' *Ultra Vires* Claims

Finally, to the extent that they are distinct from Plaintiffs' constitutional claims, Congress likewise has foreclosed Plaintiffs' *ultra vires* claims. Ultra vires review is "unavailable if . . . a statutory review scheme provides aggrieved persons 'with a meaningful and adequate opportunity for judicial review.'" *Nuclear Regul. Comm'n v. Texas*, 145 S. Ct. 1762, 1776 (2025) (quoting *Bd. of Govs. of Fed. Rsrv. Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 43 (1991)). As explained, the Tucker Act offers Plaintiffs a meaningful and adequate opportunity for judicial review. *See supra* § I.A.2. Accordingly, *ultra vires* review is unavailable. *See Widakuswara*, 2025 WL 1288817, at *5 (*ultra vires* claim unavailable as it "simply flow[ed] from allegations that the Executive Branch has failed

to abide by governing congressional statutes"); *Sustainability Inst.*, 2025 WL 1587100, at *2 (*ultra vires* claim could not "provide a detour around the Tucker Act"); *New York*, 2025 WL 2180478, at *31 ("Plaintiffs here face the more strenuous task of showing that the Tucker Act also does not serve as an implied statutory limitation on their ability to challenge *ultra vires* grant terminations"); *Child Trends*, 2025 WL 1651148, at *8 (government likely to succeed in showing that Tucker Act precluded plaintiffs' "*ultra vires* actions"); *McMahon*, 2025 WL 2017177, at *11 (the Tucker Act provided adequate opportunity for judicial review, so *ultra vires* review was unavailable).

Additionally, a plaintiff may seek *ultra vires* review only when "the agency plainly acts 'in excess of its delegated powers and contrary to a specific prohibition in the' statute that is 'clear and mandatory.'" *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009) (quoting *Leedom v. Kyne*, 358 U.S. 184, 188 (1958). As explained further below, no statute prohibits what Defendants have done, much less clearly and specifically. *See infra* § IV-V. Claims that "simply involve a dispute over statutory interpretation" do not give rise to *ultra vires* review. *Dart v. United States*, 848 F.2d 217, 231 (D.C. Cir. 1988). Rather, an officer may be said to act *ultra vires* "only when he acts 'without any authority whatever.'" *Penhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101-02 n.11 (1984). That is not the case here. *See infra* § IV-V; *see also Nuclear Regul. Comm'n*, 605 U.S. at 682 ("[Petitioners] basically dress up a typical statutory-authority argument as an ultra vires claim. That is a fairly common maneuver when a litigant tries to squeeze its arguments into the [ultra vires] box—and is in large part why those claims rarely succeed"); *Glob. Health Council v. Trump*, No. 25-5097, 2025 WL 2326021, at *12 (D.C. Cir. Aug. 13, 2025) (ultra vires claim failed because "the grantees can point to no specific prohibition the defendants have violated to an extreme and nearly jurisdictional degree").

## II.    **The President is an Improper Defendant**

At a minimum, granting relief against the President himself would be improper. Courts have emphasized "the special status of the President," which raises a concomitant "reluctance to bring judicial power to bear directly on the President." *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1331 n.4 (D.C. Cir. 1996). In *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 501 (1866), for example, the Supreme Court was "fully satisfied that this court has no jurisdiction of a bill to enjoin the President in the performance of his official duties." Dismissing the President as a defendant also would have no practical consequences for Plaintiffs. "In most cases, any conflict between the desire to avoid confronting the elected head of a coequal branch of government and to ensure the rule of law can be successfully bypassed, because the injury at issue can be rectified by injunctive relief against subordinate officials." *Swan v. Clinton*, 100 F.3d 973, 978 (D.C. Cir. 1996); *see also Harlow v. Fitzgerald*, 457 U.S. 800, 811 n.17 (1982) ("Suits against other officials . . . generally do not invoke separation-of-powers considerations to the same extent as suits against the President himself."); *Franklin v. Massachusetts*, 505 U.S. 788, 828 (1992) (Scalia, J., concurring in part and concurring in the judgment) ("Review of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive").

For these reasons, courts reviewing challenges to Executive actions similar to those that Plaintiffs raise have dismissed claims against the President. *See, e.g.*, *Musk*, 2025 WL 1502747, at *19 ("Defendants seek to dismiss President Trump as a defendant because the court may not enjoin the President in the performance of his official duties. The court agrees." (citations omitted)). This Court should follow the same approach and dismiss Plaintiffs' claims against the President.

## III.    **The Tucker Act Provides An Adequate Remedy, Thus Precluding APA Relief**

The APA's "adequate remedy" bar serves to ensure that the APA will not "duplicate existing procedures for review of agency action." *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988). It "is

not a condition of the waiver of immunity in § 702, but instead limits the cause of action created by the APA." *Perry Cap.*, 864 F.3d at 620-21. The D.C. Circuit, "in determining whether an adequate remedy exists, has focused on whether a statute provides an independent cause of action or an alternative review procedure." *El Rio Santa Cruz Neighborhood Health Ctr., Inc. v. Dep't of Health & Hum. Servs.*, 396 F.3d 1265, 1270 (D.C. Cir. 2005). An "alternative remedy need not provide relief identical to relief under the APA, so long as it offers relief of the same genre." *Garcia v. Vilsack*, 563 F.3d 519, 522 (D.C. Cir. 2009) (cleaned up). For the same reasons the Tucker Act "impliedly forbids the relief which is sought," 5 U.S.C. § 702, it likewise is an "other adequate remedy in a court," thus precluding an APA cause of action, *id.* § 704; *see supra* § I.A.2.

## IV. Plaintiffs Fail to Specify the Agency Action They Seek to Challenge, But Their Claims Fail In Any Event Regardless of How They Characterize the Challenged Action(s)

### A. Plaintiffs Cannot Challenge an Amorphous "Freeze" Comprising an Unknown and Undefined Set of Agency Actions

Plaintiffs purport to seek relief from an "unlawful and indefinite freeze of Congressionally mandated grant programs that support farmers, non-profit organizations, and other worthy recipients," Am. Compl. ¶ 1, but fail to specify the specific agency actions they contend comprise this "freeze." In fact, they admit the "freeze" is comprised of many different actions by multiple actors. *See, e.g.*, *id.* ¶¶ 4-5, 8 (identifying issuance of the Order and various Department actions, i.e., "cutting off [Inflation Reduction Act] grant recipients' access to payment portals, refusing to process invoices, canceling check-in meetings upon which grant recipients depended for project guidance, and refusing to provide information about the status of grants," and challenging various unspecified "actions [the Department] has taken to halt the disbursement of obligated funds").

Plaintiffs' failure to define the exact scope of their challenge is an independent reason to deny relief. For APA claims, "Plaintiffs have the burden of identifying specific federal conduct and explaining how it is 'final agency action.'" *Colo. Farm Bureau Fed'n v. United States Forest*

*Serv.*, 220 F.3d 1171, 1173 (10th Cir. 2000); *accord Glob. Tower Assets, LLC v. Town of Rome*, 810 F.3d 77, 88 (1st Cir. 2016) (same). Plaintiffs cannot possibly have met that burden if they fail to identify the full scope of agency actions being challenged. Nor can Defendants realistically be expected to defend the statutory basis for an undefined universe of agency decisions, let alone explain the reasoned decision-making behind each of those unknown decisions.

In similar circumstances where Plaintiffs have sought broad relief that cannot be evaluated without reference to more specific and concrete factual and legal contexts, courts have concluded that Plaintiffs' claims are not ripe. *See, e.g.*, *Reddy v. Foster*, 845 F.3d 493, 505 (1st Cir. 2017) ("Until the dispute ripens, and more facts come to light, we cannot perform the requisite claim-specific analysis as to any claim that may be brought, as we have before us only hypothetical claims, the details of which are not known." (cleaned up)); *Lab. Rels. Div. of Constr. Indus. of Mass., Inc. v. Healey*, 844 F.3d 318, 330 (1st Cir. 2016) (rejecting claims that are "too contingent on as-yet-unknown features of as-yet-unspecified claims to be fit for adjudication at this time"). Equally here, Plaintiffs' claim—that the Executive cannot lawfully pause any funding appropriated by statutes—is too amorphous for resolution and cannot be decided without reference to more specific factual and legal contexts. Thus, this Court should deny Plaintiffs' motion because it does not present a ripe claim, or even identify the full range of agency actions being challenged.

### B.    Regardless of How Plaintiffs Characterize Their Claims, They Are Not Cognizable

Even were the Court willing to overlook Plaintiffs' unwillingness to define the full scope of what they challenge, and instead focus on those agency actions Plaintiffs specifically mention, Plaintiffs' claims would still fail at the outset. First, Plaintiffs cannot directly challenge the Order, which plainly is lawful. Beyond the Order, Plaintiffs' challenges are tantamount to impermissibly

broad, programmatic challenges to entire agency operations—not challenges to discrete agency action, which is what the APA requires. As such, this Court should deny Plaintiffs' motion.

       1.     <u>Plaintiffs Cannot Seek Relief Against the Order, Which Is Plainly Lawful</u>

Plaintiffs assert that the challenged "freeze" of Inflation Reduction Act-appropriated funding began on January 20, 2025, when "President Trump signed" the Order, which "directed agencies . . . to 'immediately pause the disbursement of funds appropriated' through the Inflation Reduction Act and to review their grants for consistency with the President's policy preferences." Am. Compl. ¶ 4 (citing Order, 90 Fed. Reg. at 8,357. They seek to, among other things, "[v]acate Agency Defendants' actions implementing the freeze of Inflation Reduction Act programs," "[p]ermanently enjoin Agency Defendants from implementing and maintaining the Inflation Reduction Act freeze, or giving effect to, or reinstating it under a different name, and from delaying future payments to Plaintiffs of funds to which they are entitled," and "[o]rder Agency Defendants to release any currently frozen, obligated funds appropriated under the Inflation Reduction Act." *Id.* at 19 (prayer for relief). Plaintiffs cannot obtain their requested relief barring the Department from relying on or implementing the Order. To obtain such relief, Plaintiffs would need to show that the Department could never permissibly rely on the Order to pause grant funding under the Inflation Reduction Act. But Plaintiffs make no attempt to make that showing across every grant program that involves Inflation Reduction Act-appropriated funding the Department administers.

Contrary to Plaintiffs' characterization, the Order does not impose a categorical pause on all Inflation Reduction Act -appropriated funding. Plaintiffs ignore that the Order directs agencies to implement the funding pause "in a manner consistent with applicable law." Order § 10(b). And OMB Memo M25-11 acknowledges: "Agency heads may disburse funds as they deem necessary after consulting with the Office of Management and Budget"—a statement at odds with Plaintiffs'

characterization of the Order as commanding a categorical pause on all Inflation Reduction Act-appropriated funding.

Given that Plaintiffs' attacks on the Order rest on a mischaracterization, they cannot show that the Order is unlawful in all its applications. As a Judge on the Fourth Circuit noted in the context of a similar challenge, there are "serious questions about the ripeness of this lawsuit and plaintiffs' standing to bring it" to the extent that Plaintiffs are challenging an overall Order rather than "any particular agency action implementing the Executive Order." Order, *Nat'l Ass'n of Diversity Ofcrs. in Higher Educ. v. Trump*, No. 25-1189, Doc. 29 at 9 (4th Cir. Mar. 14, 2025) (Rushing, J., concurring). That is equally the case here, given that Plaintiffs seek to preclude any implementation of the Order by the Department regardless of the specific grant program at issue.

Ultimately, the Order represents the President instructing a subordinate agency to pause certain funding, to the extent that it has authority to do so, and to the extent such funding implicates the President's energy policies. Such Presidential instructions to subordinate agencies are plainly lawful. "Under our Constitution, the 'executive Power'—all of it—is 'vested in a President,' who must 'take Care that the laws be faithfully executed.'" *Seila Law LLC v. CFPB*, 591 U.S. 197, 203 (2020) (quoting U.S. Const. art. II, § 1, cl. 1; id., § 3). "Because no single person could fulfill that responsibility alone, the Framers expected that the President would rely on subordinate officers for assistance." *Id.* at 203-04. To that end, the President has the authority to exercise "'general administrative control of those executing the law,' throughout the Executive Branch of government, of which he is the head." *Building & Const. Trades Dep't v. Allbaugh*, 295 F.3d 28, 32 (D.C. Cir. 2002) (quoting *Myers v. United States*, 272 U.S. 52, 164 (1926) (citation omitted))).

There should be no dispute that the President may issue policy guidance to federal agencies, including in the form of Orders that direct agency officials in the performance of their duties. Nor

is there doubt that the President can properly exercise this constitutional authority by directing subordinates generally to pause or terminate federal funding programs that do not accord with his policy priorities, to the extent they have authority to do so under governing law. And as discussed further below, federal agencies often have broad discretion to determine how to implement funding programs, including to terminate grants or contracts based on policy preferences. *See infra* § V.A.1, 3. Because agencies may often terminate funding awards for policy-based reasons, so too may the President "control and supervise" agencies' decisions in this area. *Sierra Club v. Costle*, 657 F.2d 298, 406 (D.C. Cir. 1981). The Order is entirely consistent with these principles, and Plaintiffs cannot enjoin agencies' reliance on that Order across all contexts and grant programs.

2.    The APA Permits Challenges Only to Discrete Actions, Not Broad Programmatic Attacks on Overall Agency Programs

Apart from seeking to enjoin the Department's reliance on the Order, to the extent that Plaintiffs' challenge to the "freeze" is intended to challenge various agency directives regarding funding, that is an impermissible programmatic attack on ongoing agency activities—not a claim directed at discrete agency action, as the APA requires. The high-level, ongoing operation of an overall funding program is not the type of discrete, final agency action subject to APA challenge.

The APA permits review only over "final agency action," 5 U.S.C. § 704, which means the action "must mark the consummation of the agency's decisionmaking process," and "must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (citations omitted). Further, these actions must be "circumscribed [and] discrete." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62 (2004). The APA does not allow "general judicial review of [agencies'] day-to-day-operations," *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 899 (1999), like "constructing a building, operating a program, or performing a contract," *Vill. of Bald Head Island v. Army Corps. of Eng'rs*, 714 F.3d 186, 193 (4th

Cir. 2013); *see also Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 427 (D.C. Cir. 2004) ("we have long recognized that the term ['agency action'] is not so all-encompassing as to authorize us to exercise judicial review over everything done by an administrative agency" (cleaned up, quoting *Hearst Radio, Inc. v. FCC*, 167 F.2d 225, 227 (D.C. Cir. 1948))); *Ala.-Coushatta Tribe of Tex. v. United States*, 757 F.3d 484, 490-91 (5th Cir. 2014) ("The Tribe's complaint is structured as a blanket challenge to all of the Government's actions with respect to all permits and leases granted for natural resource extraction on a significantly large amount of land covering several national parks in Texas. The fact that the Tribe is not seeking wholesale reform of every single mineral permit, lease, or sale granted by these agencies but only those related to the lands on which the Tribe claims aboriginal title, does not diminish the scale of the relief sought by the Tribe.").

Plaintiffs "must direct [their] attack against some particular 'agency action' that causes [them] harm." *Lujan*, 497 U.S. at 891. The agency action must be "circumscribed" and "discrete." *Norton*, 542 U.S. at 62. The APA thus does not permit Plaintiffs to "seek wholesale improvement" of agency management "by court decree"—even in the face of allegations of "rampant" violations of law. *Lujan*, 497 U.S. at 891. "Because 'an on-going program or policy is not, in itself, a final agency action under the APA,' [a court's] jurisdiction does not extend to reviewing generalized complaints about agency behavior." *Cobell v. Kempthorne*, 455 F.3d 301, 307 (D.C. Cir. 2006) (citation omitted). "Consequently, as each case only presents the court with a narrow question to resolve, [the court] can have no occasion to order wholesale reform of an agency program." *Id*.

Apart from the Order, Plaintiffs mention OMB Memorandum M-25-11 and an ongoing review by the Department. *See* Am. Compl. ¶¶ 28, 30. These documents, however, reflect over-arching policy initiatives rather than discrete agency actions pertaining to specific funding streams. "Under the terms of the APA, respondent must direct its attack against some particular 'agency

action' that causes it harm." *Nat'l Wildlife Fed'n*, 497 U.S. at 891. And here, Plaintiffs' challenges are "to the way the Government administers these programs and not to a particular and identifiable action taken by the Government." *Ala.-Coushatta Tribe*, 757 F.3d at 491. However, "plaintiffs cannot get 'wholesale' improvement to agency operations under the APA by bundling together a collection of discrete actions, presenting them as facets of a single event, and then challenging that event instead of the individual actions." *Ass'n for Educ. Fin. & Pol'y*, 2025 WL 1568301, at *5.

In this respect, Plaintiffs' challenge—to an undefined "freeze" of funds, spanning across multiple agencies and numerous different funding streams, but untethered to any specific funding decision—is the type of broad, programmatic challenge that the Supreme Court has rejected. *See Nat'l Wildlife Fed'n*, 497 U.S. at 893 ("[T]he flaws in the entire 'program'—consisting principally of the many individual actions referenced in the complaint, and presumably actions yet to be taken as well—cannot be laid before the courts for wholesale correction under the APA"). Just as the challengers in *National Wildlife Federation* could not escape that result by characterizing their challenge as being to a "land withdrawal review program," as that was "simply the name by which petitioners have occasionally referred to the continuing (and thus constantly changing) operations of the [agency]," *id.* at 890, the same is true with respect to the alleged "freeze" that Plaintiffs seek to challenge. There is no singular "freeze;" rather, that is a name Plaintiffs attribute to thousands of individual decisions made about whether particular grants or other funding should be paused.

It is no answer that requiring Plaintiffs to proceed program-by-program, grant-by-grant would make it harder to obtain comprehensive relief. "The case-by-case approach that this requires is understandably frustrating to an organization such as respondent, . . . But this is the traditional, and remains the normal, mode of operation of the courts." *Nat'l Wildlife Fed'n*, 497 U.S. at 894.

Indeed, one of the reasons for requiring Plaintiffs to proceed in this case-by-case manner is to avoid injecting courts into the day-to-day oversight and supervision of agencies' compliance:

> If courts were empowered to enter general orders compelling compliance with broad statutory mandates, they would necessarily be empowered, as well, to determine whether compliance was achieved—which would mean that it would ultimately become the task of the supervising court, rather than the agency, to work out compliance with the broad statutory mandate, injecting the judge into day-to-day agency management.

*Norton*, 542 U.S. at 66-67. That concern is particularly apt here. Given the broad-ranging nature of Plaintiffs' claims, it is impossible for this Court to grant relief without becoming an overseer of a wide swath of the Executive Branch's ongoing funding activities, contrary to what the APA and the separation of powers contemplate. For this reason, as well, Plaintiffs' claims fail.

## V.    **Plaintiffs' Challenges Are Meritless**

On the merits, the Executive Branch's actions here were lawful. As discussed above, *see supra* § IV.B.1, to effectuate his discretion and policy objectives, the President may direct agencies to take actions to pause or freeze funding pursuant to the authority those agencies possess under their organic statutes and regulations. Plaintiffs do not take issue with that proposition, which by itself confirms the legality of the Order and agencies' subsequent actions to implement that Order.

Plaintiffs instead argue that (1) Defendants cannot lawfully pause funding, as they lack statutory authority to do so and such pauses are contrary to the underlying statutes and regulations governing the grants, and (2) Defendants' pauses on funding were arbitrary and capricious. As noted, it is impossible to address or evaluate these claims in the abstract—i.e., based solely on a generalized "freeze" spanning numerous agencies, rather than with reference to specific agency actions or funding decisions. In any event, even were these claims cognizable, they would still fail.

A. **Congress Has Afforded Defendants Broad Discretion Over the Relevant Grant Programs, Which Provides Ample Authority to Temporarily Pause Funding**

Initially, Plaintiffs effectively seek to preclude Defendants from implementing any pause in grant funding appropriated under the Inflation Reduction Act. *See* Am. Compl. at 19 (prayer for relief). But to obtain such sweeping relief, Plaintiffs would have to prevail on a facial challenge—proving there are no circumstances in which Defendants could lawfully pause Inflation Reduction Act-appropriated grant funding. *See Washington State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008) ("[A] plaintiff can only succeed in a facial challenge by establishing that no set of circumstances exists under which the [action] would be valid," or by showing that the action lacks "a plainly legitimate sweep." (cleaned up)). Plaintiffs cannot make that showing here.

Specifically, Plaintiffs contend that there is no statute authorizing Defendants to broadly pause funding, and that any such pause violates the Inflation Reduction Act. But as discussed below, each of the Inflation Reduction Act grant programs identified by Plaintiffs affords Defendants significant discretion over allocating funding among eligible recipients. Plaintiffs fail to identify any statutory language requiring that Defendants fund their particular programs, let alone that Defendants do so on any particular timeline. Thus, Congress vested Defendants with discretion over ensuring the proper allocation and use of federal funds within certain boundaries, and Plaintiffs do not even attempt to identify a single program where Defendants allegedly transgressed a boundary set forth in the Inflation Reduction Act.

1. Defendants Have Broad Authority to Select Recipients Under the Inflation Reduction Act Grant Programs

APA review also is unavailable as the action Plaintiffs challenge is "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). Plaintiffs cite no authority limiting the Department's inherent discretion to make independent decisions about the amount of appropriations to expend during a given time period, whether to award or maintain particular grants, and the number of

grants to award or maintain over a particular time frame. Courts have explained that agency action is "committed to agency discretion by law" when a "statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion," thus rendering "meaningful judicial review . . . impossible." *Steenholdt v. FAA*, 314 F.3d 633, 638 (D.C. Cir. 2003) (quoting *Heckler v. Chaney*, 470 U.S. 821, 830 (1985)). This is true "even where Congress has not affirmatively precluded review." *Heckler*, 470 U.S. at 830. Hallmarks of a decision committed to agency discretion include a statute that puts the onus on the agency, not the courts, to apply a standard, and general criteria that make it difficult for courts to meaningfully second-guess an agency determination. *See id.; see also Webster v. Doe*, 486 U.S. 592, 600 (1988).

Plaintiffs' statutory claims presume that Defendants lack authority to pause grant funding, both in their organic statutes and under the Inflation Reduction Act. But Plaintiffs ignore the discretion that Congress gave the Department in the grant programs themselves. Defendants have ample discretion to select recipients for particular grant funding, including authority to terminate one recipient and select a different recipient that better aligns with the President's priorities. That discretion highlights that Plaintiffs cannot obtain the sweeping relief they seek here against all such pauses in funding.

To start, there can be no dispute that, in the absence of specific Congressional direction, the Executive has broad discretion to determine how best to allocate grant funding. Indeed, in *Lincoln v. Vigil*, 508 U.S. 182, 188-88 (1993), the Executive "discontinued the direct clinical services to Indian children in the Southwest," even though Congress was aware of those services and had previously directed a pilot program for them. But because "the appropriations Acts for the relevant period do not so much as mention the Program," and the organic statutes "speak about Indian health only in general terms," there was no "legally binding obligation[ ]" to continue the

services; thus, "[t]he decision to terminate the Program was committed to the Service's discretion." *Id.* at 193-94. Although it is possible that, for any particular grant program, Congress may have "circumscribe[d] agency discretion to allocate resources by putting restrictions in the operative statutes," absent any such directives, agencies are free to "allocate[] funds . . . to meet permissible statutory objectives" and courts have "no leave to intrude." *Id.* at 193.

Here, even a brief review of the relevant funding frameworks demonstrates that Defendants have ample discretion to decide whether to fund particular grant recipients. For example, Plaintiffs invoke the Urban and Community Forestry Assistance Program, *see* Am. Compl. ¶¶ 23, for which Plaintiffs Faith In Place and GreenLatinos are recipients of Inflation Reduction Act-funded grants, *see id.* ¶¶ 24(b), 24(d), 37, 39. The relevant language governing that program, however, affords the Secretary significant discretion over how to achieve the program's purposes:

> The Secretary is authorized to provide financial, technical, and related assistance to State foresters or equivalent State officials for the purpose of encouraging States to provide information and technical assistance to units of local government and others that will encourage cooperative efforts to plan urban forestry programs and to plant, protect, and maintain, and utilize wood from, trees in open spaces, greenbelts, roadside screens, parks, woodlands, curb areas, and residential developments in urban areas. In providing such assistance, the Secretary is authorized to cooperate with interested members of the public, including nonprofit private organizations.

16 U.S.C. § 2105(c). The relevant Inflation Reduction Act language likewise imposes few constraints on the Secretary, appropriating funds "to provide multiyear, programmatic, competitive grants to a State agency, a local governmental entity, an agency or governmental entity of the District of Columbia, an agency or governmental entity of an insular area . . . , an Indian Tribe, or a nonprofit organization through the Urban and Community Forestry Assistance program established under section 9(c) of the Cooperative Forestry Assistance Act of 1978 (16 U.S.C. 2105(c)) for tree planting and related activities." Pub. L. No. 117-169, § 23003(a)(2), 136 Stat. 1818, 2026 (Aug. 16, 2022). Nothing in this language shows that Plaintiffs are legally entitled to

any of the funding, or that the Secretary would violate any statutory command by terminating their funding and re-directing those funds to new recipients whose activities she believes better promote the President's energy agenda.

The same is true with respect to each of the other programs that Plaintiffs invoke. For each of these programs, the relevant statutory language affords the Secretary discretion over how best to achieve the programs' purposes, does not legally entitle Plaintiffs to any funding, and does not prohibit the Secretary from terminating existing grants and redirecting funding to new recipients whose activities that she believes better promote the President's energy agenda. *See* Am. Comp. § 23; Pub. L. No. 117-169, §§ 21002, 22002, 22007, 23003, 136 Stat. at 2015-19, 2021-23, 2026.

Crucially, none of these statutes require the Department to enter into particular grants, or fund particular grants or a certain number of grants within a given time frame. *See Vt. Yankee Nuclear Power Corp. v. Natural Re. Def. Fund*, 435 U.S. 519, 545 (1978) (explaining that a court may not "dictat[e] to the agency the methods, procedures, and time dimension" to make an agency decision); *see also Sealed v. Sealed*, 332 F.3d 51, 56 (2d Cir. 2003) (distinguishing between a statute that "channels official discretion by mandating a defined administrative outcome" and a statute that "merely authorizes particular actions"). The statute's authorization to fund grants cover broadly drawn topics and guidelines provides no meaningful rubric for judicial review.

### 2. This Statutory Discretion Allows Defendants to Temporarily Pause Funding for Particular Recipients

In all the above examples, the statutory provisions establishing the grant program, and appropriating funding for the grant program, vest the relevant agency with discretion to choose among eligible recipients. To be sure, the above examples contain some constraints on the relevant agency's discretion—e.g., the Urban and Community Forestry Assistance Program must involve planting trees. Within those broad confines, however, the enabling legislation (and the relevant

appropriations laws) themselves afford Defendants broad discretion to decide how the funding should be allocated among eligible recipients. That discretion defeats Plaintiffs' claim that the statutory grant programs and/or Inflation Reduction Act legally foreclose the relevant pauses on funding. As noted, Plaintiffs point to nothing in those statutory frameworks that withdraws agency discretion to select among eligible recipients for funding. And that discretion is what allows agencies to pause ongoing funding and decide whether to redirect the funds to a different eligible recipient.

In evaluating an agency's statutory authority, it makes no difference whether the agency acts categorically or on a case-by-case basis. In both scenarios, an agency acts pursuant to the same authority to pause funding and consider redirecting it elsewhere. *Cf. NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 294 (1974) ("[T]he choice between rulemaking and adjudication lies in the first instance within the [agency's] discretion."); *Allbaugh*, 295 F.3d at 33 (upholding Order in which "the President directs his subordinates how to proceed in administering federally funded projects"). And again, in *Lincoln*, 508 U.S. at 194, the agency acted in a categorical manner—terminating an entire program—which the Supreme Court nonetheless held was lawful and not subject to judicial review: "The decision to terminate the Program was committed to the [agency's] discretion."

There is no need for the Court to search for a statute specifically authorizing Defendants to pause funding and redirect it to a different recipient. That authority is implicit in the grant programs and appropriations laws themselves, as they direct the agencies to administer the grant programs in a manner that accomplishes certain broad objectives but otherwise leave the agencies with complete discretion over how to allocate the funding. In such circumstances, the agencies plainly have statutory authority to pause funding and evaluate whether it is being put to the best use. Indeed, such actions are not only permissible but presumptively unreviewable. *See supra* § V.A.1.

3.    Temporary Pauses in Funding are Historically Common

Plaintiffs' argument—that agencies cannot temporarily pause funds to evaluate whether they are being spent in the best manner—is also contrary to historical practice. The President and agencies have long instituted such pauses to re-evaluate that funding, including for policy reasons.

On the first day of his Administration, for example, President Biden directed agencies to "pause work on each construction project on the southern border wall" and to "pause immediately the obligation of funds related to construction of the southern border wall," pending "consideration of terminating or repurposing contracts with private contractors engaged in wall construction" for other purposes. Procl. No. 10,142, *Termination of Emergency With Respect to the Southern Border of the United States and Redirection of Funds Diverted to Border Wall Construction*, 86 Fed. Reg. 7225 (Jan. 20, 2021), §§ 1(a)(i), (ii), 2. Indeed, President Biden ultimately elected to spend the appropriated funding on other purposes that he determined were consistent with the underlying appropriations laws but more in line with his policy objectives.

Similarly, President Obama directed that certain American Recovery and Reinvestment Act ("Recovery Act") funds should not be spent on particular purposes, even "[w]here executive departments or agencies lack discretion under the Recovery Act to refuse funding" for the projects, the department or agency should nonetheless "delay funding of the project for 30 days." *Ensuring Responsible Spending of Recovery Act Funds*, 74 Fed. Reg. 12531 (Mar. 20, 2009), § 2(d)(i). This direction of agencies' spending decisions, including to pause funding over which the President has policy concerns, is indistinguishable from the types of pause that Plaintiffs challenge here.

Finally, courts and other entities have likewise acknowledged that temporary pauses in obligations or payments of appropriations are quite common. *See City of New Haven v. United States*, 809 F.2d 900, 901 (D.C. Cir. 1987) (explaining how Congress has "acknowledged that 'the executive branch necessarily withholds funds on hundreds of occasions during the course of a

fiscal year' and such delays may result from the 'normal and orderly operation of the government'"

(quoting H.R. Rep. No. 658, 93d Cong., 1st Sess. 41 (1971)). The Government Accountability

Office, itself an entity within the Legislative Branch, likewise has approved of agencies "taking

the steps it reasonably believes are necessary to implement a program efficiently and equitably,

even if the result is that funds temporarily go unobligated." *In re James R. Jones, House of

Representatives*, B-203057 L/M, 1981 WL 23385 (Comp. Gen. Sept. 15, 1981); *see also* Gov't

Accountability Off., *Principles of Federal Appropriations Law* § 2-50 (4th ed. 2016).

Given these authorities, there is nothing unlawful about agencies exercising their discretion

to temporarily pause funding, evaluate whether that funding best promotes the President's agenda,

and, if not, redirect the funding elsewhere. *See also Allbaugh*, 295 F.3d at 32 (subordinate "officers

are duty-bound to give effect to the policies embodied in the President's direction, to the extent

allowed by the law," including in federal grants context). The relevant statutes and appropriations

laws afford Defendants with statutory discretion to select among eligible recipients. Plaintiffs thus

cannot demonstrate that each and every pause involving Inflation Reduction Act funds is

necessarily unlawful.[6]

### B.    A Temporary Pause in Funding Is Not Arbitrary and Capricious

#### 1.    Arbitrary and Capricious Review is Inappropriate

At the threshold, as discussed above, Plaintiffs' claims are not pleaded in a way that would

allow for the Court to engage in arbitrary capricious review. First, Plaintiffs do not direct their

claims at a discrete agency action to be reviewed; instead, they launch an amorphous, broad-based

---

[6]    This case does not involve any impoundment issues, as the Executive has only temporarily
paused certain funding, not declined to spend any appropriated funding. An agency may determine
to "lift" the pause and continue funding the original recipient. Or an agency might decide that its
priorities are better served by directing the remaining funding to a different recipient. But in either
scenario, the Executive would still be spending the full amount appropriated by Congress.

programmatic attack. As a result, it is unclear what the object of the inquiry should be— i.e., the Order, OMB Memo M-25-11, a specific agency directive, or a particular agency decision as to a particular grant (or set of grants). Plaintiffs' claims are simply too unbounded to even allow for a meaningful examination of the relevant "final agency action" under the APA's standards.

Further, many of Plaintiffs' arguments seem to be a backdoor effort to obtain arbitrary and capricious review of the Order. But requiring an agency to articulate a rationale for its action— beyond compliance with the President's directives—would, in essence, subject the President's directive to arbitrary and capricious review, contrary to the rule that the President is not subject to APA review. *See Franklin*, 505 U.S. at 800-01; *cf. Ancient Coin Collectors Guild v. Customs & Border Prot.*, 801 F. Supp. 2d 383, 403 (D. Md. 2011) ("the State Department and Assistant Secretary were acting on behalf of the President, and therefore their actions are not reviewable under the APA"), *aff'd*, 698 F.3d 171 (4th Cir. 2012). Further, such review would require agencies to question and explain the President's reasoning, which is plainly not their role. *See Sherley v. Sebelius*, 689 F.3d 776, 784 (D.C. Cir. 2012) ("[A]s an agency under the direction of the executive branch, it must implement the President's policy directives to the extent permitted by law.").

Last, without knowing the specific agency actions being challenged, it is impossible raise all possible defenses, such as whether an action is "final agency action" under the APA, or even subject to judicial review. As noted, funding decisions typically are not subject to review because they are committed to agency discretion by law, and specific funding instruments may have other remedies available to a dissatisfied grantee. *See supra* § V.A.1; 5 U.S.C. § 704 (authorizing judicial review over final agency action "for which there is no other adequate remedy in a court"). Any of these defenses would preclude the type of arbitrary-and-capricious review that Plaintiffs seek here as to a still-undefined universe of agency actions comprising the purported "freeze."

2.    A Pause on Funding Pending a Decision Whether to Continue That Funding
or Redirect It Elsewhere Is Rational

Despite the lack of clarity as to what it is that the Court is supposed to determine is arbitrary and capricious, whatever Plaintiffs challenge, such actions indeed satisfy such review. Given the finite resources available to agencies disbursing Inflation Reduction Act funds, it is entirely rational to pause funding pending a further determination whether to continue that funding or else redirect it elsewhere. The scope of "arbitrary and capricious" review is "narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). This standard "deems the agency action presumptively valid provided the action meets a minimum rationality standard." *Sierra Club v. EPA*, 353 F.3d 976, 978 (D.C. Cir. 2004).

Section 7 of the Order rationally grounds the pause on funding in particular and wholly appropriate objectives: "prioritiz[ing] cost-effectiveness, American workers and businesses, and the sensible use of taxpayer money, to the greatest extent." Order § 7(b). Those objectives build on the President's earlier declarations of energy policy, *id.* § 2, which all are designed to "unleash America's affordable and reliable energy and natural resources" to "restore American prosperity" and thus "rebuild our Nation's economic and military security, which will deliver peace through strength." *Id.* § 1. To achieve these goals, the President stressed that agencies should "ensure that no Federal funding [is] employed in a manner contrary to the principles outlined in this [Order], unless required by law." *Id.* § 2(i). OMB Memo M-25-11 also rationally implements these goals, stressing the President's requirements while confirming that the only funding that need be paused are funds that may be implicated by the President's declared policies. *See* OMB Memo M-25-11.

It is immaterial whether Defendants could have carried out their review of Inflation Reduction Act spending while allowing financial assistance programs to continue in the ordinary

course. While Defendants could have done this, it was also rational not to; the question under arbitrary and capricious review is not "whether a regulatory decision is the best one possible or even whether it is better than the alternatives." *FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 292 (2016). The Executive Branch reached a policy judgment that safeguarding taxpayer dollars was a higher priority than providing uninterrupted funding to the Inflation Reduction Act recipients. *Cf. State Farm*, 463 U.S. at 59 (Rehnquist, J., concurring in part) ("A change in administration brought about by the people casting their votes is a perfectly reasonable basis for an executive agency's reappraisal of the costs and benefits of its programs and regulations."). Their actions are neither arbitrary nor capricious; pausing funds pending a review for effectiveness and consistency with the President's energy policy is rational and directly relates to saving taxpayer dollars and accomplishing the President's articulated goals.

Plaintiffs' suggested alternative that a review precede any pause also overlooks the obvious problem that government resources, taxpayers' dollars, are finite. Any funds disbursed are unlikely to be recouped and thus cannot be redirected and put to more valuable uses. *Cf. California*, 145 S. Ct. at 968-69 (irreparable harm to government likely absent a stay as "respondents have not refuted the Government's representation that it is unlikely to recover the grant funds once they are disbursed"). Weighing the costs of a temporary funding pause versus the benefits of redirecting funding to purposes the Administration believes better serve the public is a judgment entrusted to the Executive, not courts. *Cf. Off. of Commc'n of United Church of Christ v. FCC*, 707 F.2d 1413, 1437 (D.C. Cir. 1983) ("When the Commission reaches such predictive conclusions about what would best be in the public interest, it is entitled to substantial judicial deference").

Plaintiffs' contention that Defendants failed to properly account for grantees' reliance interests in their continued receipt of funding is meritless. Those reliance interests are contrary to

the very objectives articulated by the President and his subordinates—i.e., ensuring that every dollar spent achieves maximum value for American taxpayers, consistent with the President's broader energy policies. And in any event, none of the policies here commanded an unequivocal pause for all funding; they all contained exceptions at least for funding required by law to continue. There is nothing irrational about articulating broad policy goals, then deferring to agencies and individual program offices within those agencies to implement those policies to the maximum extent possible, as consistent with law and any reliance interests identified as to particular grants.

Ultimately, Plaintiffs' arbitrary and capricious arguments fail, even assuming that they are properly before the Court. They cannot subject the Order to APA review, nor can they disregard the rationality of pausing spending, pending a determination about whether such funding could be redirected to a purpose more consistent with the President's policies. Plaintiffs may prefer to continue receiving funding while that review is ongoing, but it was certainly rational for the President and his subordinates to conclude that it better conserved taxpayer dollars to pause funding pending that review. Thus, Plaintiffs' claims all fail on the merits.

### C.    Plaintiffs' Constitutional Claims Are Equally Meritless

Finally, Plaintiffs' constitutional claims rest upon, and indeed, are wholly derivative of, their statutory claims, and thus fail for two reasons. First, as the Supreme Court has explained, not "every action by the President, or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution." *Dalton v. Specter*, 511 U.S. 462, 472 (1994). "On the contrary, [courts] have often distinguished between claims of constitutional violations and claims that an official has acted in excess of his statutory authority." *Id.*" If all executive actions in excess of statutory authority were ipso facto unconstitutional, . . . there would [be little need for] specifying unconstitutional and ultra vires conduct as separate categories." *Id.*; *see also Glob. Health Council*, 2025 WL 2326021, at *6 (same). Second, the premise of Plaintiff's constitutional

claims is that the challenged action(s) violate the Constitution because they violate statute. Because there is no statutory violation, however, there likewise is no constitutional violation.

Plaintiffs' Appropriations Clause argument also fails for another reason. The limited cases involving successful Appropriations Clause challenges have involved attempts to spend funds not appropriated by Congress, *see Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 432 (1990), or a refusal to spend appropriated funds where the relevant statutes required that the funds be spent, *see Train v. City of N.Y.*, 420 U.S. 35, 42-45 (1975). Neither of those circumstances exists here. Defendants have not attempted to spend any funds not appropriated to it, and Defendants can re-obligate the funds toward projects consistent with the President's current priorities.

## CONCLUSION

For the foregoing reasons, this Court should grant Defendants summary judgment and deny Plaintiffs' motion for summary judgment.

Dated: August 17, 2025             Respectfully submitted,

                                   JEANINE FERRIS PIRRO
                                   United States Attorney

                                   By:      */s/ Bradley G. Silverman*
                                   _____
                                        BRADLEY G. SILVERMAN, D.C. Bar #1531664
                                        Assistant United States Attorney
                                        601 D Street, NW
                                        Washington, DC 20530
                                        (202) 252-2575
                                        bradley.silverman@usdoj.gov

                                   *Attorneys for the United States of America*