**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CULTIVATE KC, et al.,       )<br>            *Plaintiffs*,   )<br>                  )<br>      v.                  )<br>                  )<br> UNITED STATES DEPARTMENT OF   )<br> AGRICULTURE, et al.,       )<br>            *Defendants*.   )<br>                  ) | Civil Action No. 1:25-cv-00737-RC |

**<u>PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND
OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT</u>**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ......................................................................................................... ii

INTRODUCTION ...................................................................................................................... 1

ARGUMENT ............................................................................................................................. 2

    I.   THIS COURT HAS JURISDICTION OVER PLAINTIFFS' CLAIMS ........................... 2

    II.  THE PRESIDENT IS A PROPER DEFENDANT ..................................................... 9

    III. PLAINTIFFS CHALLENGE A DISCRETE AND COGNIZABLE FINAL AGENCY
         ACTION ........................................................................................................... 11

    IV. PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON THE MERITS ..... 15

         A.  Defendants Lack Discretion to Freeze Grant Funding ............................... 15

         B.  Agency Defendants' Action is Arbitrary and Capricious ........................... 21

CONCLUSION ....................................................................................................................... 25

# TABLE OF AUTHORITIES

**CASES**                                                                      **PAGE(S)**

*AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*,
  --- F. Supp. 3d ---, 2025 WL 2537200 (D.D.C. 2025) (appeal docketed) ..............................23

*Am. Ctr. for Int'l Lab. Solidarity v. Chavez-Deremer*,
  No. 25-1128, 2025 WL 1795090 (D.D.C. June 30, 2025).......................................................3

*Bennett v. Spear*,
  520 U.S. 154 (1997)......................................................................................................12

*Bowen v. Massachusetts*,
  487 U.S. 879 (1988).................................................................................................3, 4, 5

*City & Cnty. of San Francisco v. Trump*,
  897 F.3d 1225 (9th Cir. 2018) .....................................................................................10

*Clinton v. Jones*,
  520 U.S. 681 (1997).......................................................................................................9

*Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*,
  38 F.4th 1099 (D.C. Cir. 2022)......................................................................................6

*Data Mktg. P'ship, LP v. U.S. Dep't of Lab.*,
  45 F.4th 846 (5th Cir. 2022) ........................................................................................13

*Dep't of Educ. v. California*,
  604 U.S. 650 (2025) (per curiam)..............................................................................3, 4, 5

*Elev8 Baltimore, Inc. v. Corp. for Nat'l and Cmty. Serv.*,
  Civ. No. MJM-25-1458, 2025 WL 1865971 (D. Ma. July 7, 2025)........................................18

*Encino Motorcars, LLC v. Navarro*,
  579 U.S. 211 (2016)......................................................................................................23

*Fed. Educ. Ass'n v. Trump*,
  --- F. Supp. 3d ---, 2025 WL 2355747 (D.D.C. Aug. 14, 2025)............................................8

*Gen. Land Office v. Biden*,
  722 F. Supp. 3d 710 (S.D. Tex. 2024) ..........................................................................20

*Glob. Health Council v. Trump*,
  --- F.4th ---, 2025 WL 2480618 (D.C. Cir. Aug. 28, 2025) .................................................9

*Great-West Life & Annuity Ins. Co. v. Knudson*,
  534 U.S. 204 (2002)...................................................................................................3, 4

*Kidwell v. Dep't of Army*,
56 F.3d 279 (D.C. Cir. 1995) ...................................................................................7

*League of United Latin Am. Citizens v. Exec. Off. of the President*,
780 F. Supp. 3d 135 (D.D.C. 2025) ...............................................................9, 10, 11

*Lincoln v. Vigil*,
508 U.S. 182 (1993) ...................................................................................18, 19

*Louisiana v. Biden*,
622 F. Supp. 3d 267 (W.D. La. 2022) .....................................................................13

*Lujan v. Nat'l Wildlife Fed'n*,
497 U.S. 871 (1990) .........................................................................................15

*Mach Mining, LLC v. EEOC*,
575 U.S. 480 (2015) .........................................................................................11

*Marin Audubon Soc'y v. Fed. Aviation Admin.*,
121 F.4th 902 (D.C. Cir. 2024) .............................................................................22

*Megapulse, Inc. v. Lewis*,
672 F.2d 959 (D.C. Cir. 1982) ...............................................................................6

*Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*,
417 F.3d 1272 (D.C. Cir. 2005) .............................................................................12

*Nat'l Council of Nonprofits v. OMB*,
775 F. Supp. 3d 100 (D.D.C. 2025) (appeal docketed) ...............................................13, 20, 21

*Nat'l Treasury Emps. Union v. Nixon*,
492 F.2d 587 (D.C. Cir. 1974) ...............................................................................9

*Nat'l Treasury Emps. Union v. Trump*,
780 F. Supp. 3d 237 (D.D.C. 2025) (appeal docketed) .....................................................10

*Nat'l Institutes of Health v. Am. Pub. Health Ass'n*,
606 U.S. ---, 145 S. Ct. 2658 (2025) .......................................................................5

*Perry Cap. LLC v. Mnuchin*,
864 F.3d 591 (D.C. Cir. 2017) ...............................................................................6

*Pol'y & Rsch., LLC v. U.S. Dep't of Health & Hum. Servs.*,
313 F. Supp. 3d 62 (D.D.C. 2018) .......................................................................17, 18

*President and Fellows of Harvard Coll. v. U.S. Dep't of Health and Hum. Servs.*,
--- F. Supp. 3d ---, 2025 WL 2528380 (D. Mass. Sept. 3, 2025) ...............................8, 19, 23, 24

iii

*Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Noem*,
    --- F.Supp.3d ---, 2025 WL 1825431 (D.D.C. July 2, 2025) .................................................9

*Spirit Airlines, Inc. v. U.S. Dep't of Transp.*,
    997 F.3d 1247 (D.C. Cir. 2021) ...............................................................................24

*Urb. Sustainability Dirs. Network v. USDA*,
    No. 25-1775, 2025 WL 2374528 (D.D.C. Aug. 14, 2025) ...................................4, 6, 7, 15, 24

*Washington v. U.S. Dep't of Transp.*,
    --- F. Supp. 3d ---, 2025 WL 1742893 (W.D. Wash. June 24, 2025) ...............................13, 14

*Woonasquatucket River Watershed Council v. USDA*,
    778 F. Supp. 3d 440 (D.R.I. 2025) (appeal docketed) .................................................13, 14, 17

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952) ........................................................................................8

## STATUTES

5 U.S.C. § 702 ..................................................................................................2, 7

5 U.S.C. § 706(2)(A) .............................................................................................7

28 U.S.C. § 1491(a)(1) ............................................................................................6

## LEGISLATIVE HISTORY

H.R. 5376 § 21002, 117th Cong. (2022) ........................................................................17

H.R. 5376 § 22007, 117th Cong. (2022) ........................................................................17

H.R. 5376 § 23003, 117th Cong. (2022) ........................................................................17

## FEDERAL REGISTER

65 Fed. Reg. 57,548 (Sept. 25, 2000) ...........................................................................18

74 Fed. Reg. 12,531 (Mar. 20, 2009) ...........................................................................20

87 Fed. Reg. 10,938 (Feb. 28, 2022) ...........................................................................18

90 Fed. Reg. 8353 (Jan. 29, 2025) ...........................................................................1, 11, 16, 20

## O<span style="font-variant:small-caps">THER</span> A<span style="font-variant:small-caps">UTHORITIES</span>

Camilio Montoya-Galvez and Nicole Sganga, *Biden returns $2 billion in funds Trump had diverted from Pentagon to use for border wall*, CBS News (Jun. 11, 2021), https://www.cbsnews.com/news/biden-returns-border-wall-funds-pentagon/..................................................................................................................20

Colleen Long, *Biden says he had to use Trump-era funds for the border wall. Asked if barriers work, he says 'No'*, AP News (Oct. 6, 2023), https://apnews.com/article/biden-us-mexico-border-wall-immigration-texas-f99fd10257292a898618236df3613979.................................................................20

National Headquarters, *Forest Service Handbook: Grants, Cooperative Agreements, and Other Agreements Handbook*, USDA (Nov. 18, 2020) .............................18

## INTRODUCTION

On his first day in office, the President of the United States issued an edict directing agencies to halt the disbursement of funds appropriated by Congress in the Inflation Reduction Act ("IRA"). Pursuant to this directive—the sole purpose of which is to "[t]erminat[e] the Green New Deal"—agencies across the federal government immediately froze payments of congressionally appropriated funds simply because they came from a statute designed to mitigate climate change and encourage the adoption of reliable, renewable energy. *Unleashing American Energy*, Exec. Order No. 14,154, 90 Fed. Reg. 8353, 8357 (Jan. 29, 2025). This immediate and categorical freeze is unlawful for two reasons.

*First*, through this Order, the President attempted to usurp Congress's power of the purse by directing executive agencies to ignore Congress's explicit statutory instructions to disburse funds for specific mandated purposes. This runs afoul of separation of powers principles that are the bedrock of our Constitution.

*Second*, in implementing this unlawful directive, Agency Defendants U.S. Department of Agriculture ("USDA") and USDA Secretary Brooke Rollins categorically and indefinitely cut off already obligated funds, leading to immediate legal consequences for Plaintiffs and other grantees subject to this freeze. In doing so, they acted arbitrarily and capriciously and contrary to law, halting disbursements without any consideration of statutory requirements or reliance interests, evaluation of alternatives, or explanation as to why an immediate, categorical, and indefinite freeze was reasonable. Thus, this final agency action is unlawful under the Administrative Procedure Act ("APA").

Accordingly, Plaintiffs respectfully request this Court—which has jurisdiction to address these claims seeking declaratory and injunctive relief of constitutional and APA violations—to

declare Section 7 of the *Unleashing American Energy* EO unlawful, enjoin Agency Defendants from implementing it, vacate Agency Defendants' categorical and indefinite freeze of IRA-appropriated funds, and permanently enjoin Agency Defendants from implementing, giving effect to, or reinstating the freeze.

## ARGUMENT

## I.    THIS COURT HAS JURISDICTION OVER PLAINTIFFS' CLAIMS

Defendants' arguments that this Court lacks jurisdiction over Plaintiffs' claims rest on a mischaracterization of those claims as arising under contract and seeking monetary damages. To the contrary, Plaintiffs raise statutory, constitutional, and *ultra vires* claims that challenge an unlawful executive policy, and they seek to have that policy declared unlawful and set aside. Defendants' jurisdictional arguments lack merit, for three reasons.

*First*, contrary to Defendants' argument, Defendants' Memorandum in Support of Cross-Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Summary Judgment, Dkt. No. 25-1 ("Defs.' Br.") at 3–19, sovereign immunity does not bar Plaintiffs' statutory claims under the APA. As Defendants recognize, Defs.' Br. at 4, the APA waives sovereign immunity for actions "seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority," provided that no "other statute that grants consent to suit expressly or impliedly forbids the relief which is sought," 5 U.S.C. § 702. That waiver applies in full force here because Plaintiffs' challenge satisfies these conditions.

Although Defendants argue that Plaintiffs seek "money damages," Defs.' Br. at 4–10, that is untrue. Rather, Plaintiffs challenge Defendants' "unlawful and indefinite freeze" of funds and ask for that freeze to be lifted. Compl. ¶ 1. From the outset of this litigation, Plaintiffs have

addressed not sums of money due under particular awards, but rather an executive policy mandating the freeze of IRA funds across the board. *See, e.g.*, *id*. ¶ 1 (describing the lawsuit as an effort to get Defendants to "lift their unlawful and indefinite freeze…"); *id*. ¶ 6 (noting that "[t]he indefinite and indiscriminate funding freeze" is unlawful); *id*. ¶ 8 (seeking "declaratory and injunctive relief ending the unlawful funding freeze…"); *id*. ¶¶ 64, 68 (describing Defendants' unlawful action as a "categorical freeze"). And they ask for equitable relief declaring the policy unlawful, vacating it and setting it aside, and enjoining Defendants from implementing and maintaining the freeze. *See id*. at 18–19. Unlike money damages, which "are given to the plaintiff to substitute for a suffered loss," the forms of relief Plaintiffs seek are "specific remedies" that "are not substitute remedies at all, but attempt to give the plaintiff[s] the very thing to which [they are] entitled." *Bowen v. Massachusetts*, 487 U.S. 879, 895 (1988). Contrary to Defendants' arguments, "[t]he fact that such relief, if granted, might result in the government paying money to plaintiffs does not change the character of the relief sought." *Am. Ctr. for Int'l Lab. Solidarity v. Chavez-Deremer*, No. 25-1128, 2025 WL 1795090, at *18 (D.D.C. June 30, 2025); *see also Dep't of Educ. v. California*, 604 U.S. 650, 651 (2025) (per curiam) ("[A] district court's jurisdiction is not barred by the possibility that an order setting aside an agency's action may result in the disbursement of funds." (cleaned up)).

The cases upon which Defendants rely to support their contention that Plaintiffs seek money damages are inapposite. For example, in *Great-West Life & Annuity Insurance Company v. Knudson*, 534 U.S. 204 (2002)—which Defendants cite no less than 20 times in their brief— the jurisdictional decision relied in large part on the fact that the plaintiff sought only "an injunction to enforce a contractual obligation to pay money *past due*." *Id*. at 212 (emphases added). For this reason, *Knudson* differs from—and does not overrule, *see contra* Defs.' Br. at

8—*Bowen*, where the plaintiff sought an injunction "not merely for *past* due sums," but also "to correct the method of calculating payments going forward," *Knudson*, 534 U.S. at 212 (emphasis in original). *Knudson* is distinguishable from this case for the same reason: Plaintiffs, like the plaintiff in *Bowen*, seek *forward-looking* relief that ends an ongoing, unlawful practice, not merely backwards-looking relief to compensate for harms that have already accrued.

Likewise, in *California*—upon which Defendants also rely—the Court's jurisdictional finding was predicated on the fact that the district court order in that case "require[d] the Government to pay out past-due grant obligations" as well as to comply with ongoing contractual obligations "as they accrue." 604 U.S. at 650. Based on the fact that the district court's order focused solely on payments related to compliance with contractional obligations, the Court held that the district court had exceeded its jurisdiction because "the APA's limited waiver of immunity does not extend to orders 'to enforce a contractual obligation to pay money' along the lines of what the District Court ordered." *Id.* at 651. Thus, in both *Knudson* and *California*, the Court relied on the fact that the remedy at issue consisted of monetary damages based on noncompliance with contractual obligations, not equitable relief that instead requires the government to enjoin the future continuation of an unlawful policy.

Here, unlike in *Knudson* and *California*, Plaintiffs seek equitable relief to set aside an unlawful policy—the categorical freeze of grant funds—so they can carry out program obligations *going forward*, rather than seeking to enforce contractual obligations to pay money *past due*. *See Urb. Sustainability Dirs. Network v. USDA*, 2025 WL 2374528, at *19 (D.D.C. Aug. 14, 2025) ("*USDN*") (explaining that because plaintiffs in grant termination case did not ask for an order compelling the defendants to pay money damages, the claims belong in district court). In fact, the Court in *California* explicitly distinguishes the type of relief Plaintiffs seek,

citing *Bowen* for the proposition that "a district court's jurisdiction is 'not barred by the possibility' that an order setting aside an agency's action may result in the disbursement of funds," 604 U.S. at 651 (citing *Bowen*, 487 U.S. at 910). Not only does this further demonstrate that *Bowen* is still good law, but it also shows how Plaintiffs' claims differ from those in *California*.

Indeed, Justice Barrett's controlling concurrence in *National Institutes of Health v. American Public Health Association*, 606 U.S. ----, 145 S. Ct. 2658 (2025), further supports this distinction, making clear that claims like Plaintiffs' belong in federal district court. *Id.* at 2661 (Barrett, J., concurring) (holding government not entitled to stay "insofar as [the decisions below] vacate [agency] guidance documents"); *id*. at 2671 (Jackson, J.) (noting that "[f]ive Members of the Court" hold that "district courts may still exercise jurisdiction over—and vacate—grant-related policies that contravene federal law"); *see also id*. at 2661 (Barrett, J., concurring) ("Plaintiffs frequently seek vacatur of internal agency guidance on arbitrary-and-capricious grounds in district court or directly in the D. C. Circuit.") (citing cases). Simply put, federal district courts have jurisdiction under the APA to review and vacate unlawful agency policy-level decisions—such as a decision to implement an across-the-board policy of suspending IRA grants based on a policy disagreement with congressional objectives in the IRA.

For similar reasons, Defendants are also wrong to contend that the APA's waiver of sovereign immunity is inapplicable because another statute—namely, the Tucker Act—impliedly forbids the APA relief that Plaintiffs seek. Defs.' Br. at 10–20. This argument too lacks merit. The Tucker Act confers exclusive jurisdiction on the Court of Federal Claims only over certain claims "against the United States founded . . . upon any express or implied contract with the

United States," 28 U.S.C. § 1491(a)(1), but Plaintiffs do not raise contract claims against the United States.

In evaluating whether a claim is a contract claim within the Court of Federal Claims' exclusive jurisdiction, this Court must "make rational distinctions between actions sounding genuinely in contract and those based on [] *independent legal grounds.*" *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 969–70 (D.C. Cir. 1982) (emphasis added). Factors include whether "the plaintiff's asserted rights and the government's purported authority arise from statute, whether the plaintiff's rights exist prior to and apart from rights created under the contract, and whether the plaintiff seeks to enforce any duty imposed upon the government by the relevant contracts to which the government is a party." *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1107 (D.C. Cir. 2022) (cleaned up).

Despite Defendants' contrary contentions, Plaintiffs raise claims based not on the terms of their grants, but rather on independent statutory, regulatory, and constitutional requirements for agency decisionmaking. Thus, even assuming that the grants are contractual,[1] claims against the government that do not seek to enforce any contract terms but rather rest on independent legal grounds by definition are not contractual in nature. *See, e.g.*, *Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 619 (D.C. Cir. 2017) (explaining that the matter was not contractual in nature because "[t]he class plaintiffs do not contend Treasury breached the terms of the [relevant] Agreements nor otherwise invoke them"). This Court thus has jurisdiction to hear these claims.

---

[1] Even if the rights at issue were based on Plaintiffs' grants, "not all grant agreements are contracts," and those at issue in this case "lack consideration to constitute contracts for Court of Federal Claims jurisdiction." *See USDN*, 2005 WL 2374528, at *16. For this reason too, Plaintiffs' claims do not arise under contract, *see generally* Pls.' MSJ Br., and the cases on which Defendants' rely, *see* Defs.' Br. at 11–12, do not prove otherwise.

Defendants accuse Plaintiffs of "artful pleading," maintaining that Plaintiffs' "choice to style their claims as arising under the APA rather than as a contract claim is irrelevant" to the jurisdictional analysis. Defs.' Br. at 13–14 (citing *Kidwell v. Dep't of Army*, 56 F.3d 279, 284 (D.C. Cir. 1995)). However, Defendants mischaracterize Plaintiffs' claims. Plaintiffs do not present contract claims in disguise, but rather challenge Defendants' funding freeze policy (not a contract claim) and seek to vacate that unlawful policy (not a contract remedy). To be sure, the fact that Plaintiffs have grant agreements is the reason why Defendants' policy has injured them and why Plaintiffs have standing to challenge it. The cause of action pursuant to which Plaintiffs challenge the policy, however, derives not from Plaintiffs' grant agreements but from the APA, which prohibits arbitrary, capricious, or unlawful agency action, 5 U.S.C. § 706(2)(A), and entitles any party "adversely affected or aggrieved by [such] agency action" to seek judicial review, *id.* § 702. Simply put, Plaintiffs' complaint "does not implicate the Tucker Act" because it is not based on contract rights and does not "request monetary relief," and "[t]he district court therefore ha[s] subject matter jurisdiction over the complaint." *Kidwell*, 56 F.3d at 286; *see also USDN*, 2025 WL 2374528, at *19 (finding that defendants' "concern that all plaintiffs will simply start to plead their contract claims as constitutional violations to get into district court is unfounded").

*Second*, and for similar reasons, Defendants' efforts to cast aside Plaintiffs' constitutional claims as foreclosed by Congress and the Tucker Act, Defs.' Br. at 20–22, do not survive scrutiny. As an initial matter, to the extent this argument is predicated on the flawed assumption that Plaintiffs' claims are based in contract and seek money damages, *see* Defs.' Br. at 20, as discussed *supra* and in Plaintiffs' Memorandum in Support of their Motion for Summary Judgment, Dkt. No. 22-1 ("Pls.' MSJ Br."), they are not and do not. And to the extent this

argument is predicated on Defendants' belief that Plaintiffs' constitutional claims "simply flow from allegations that the Executive Branch has failed to abide by governing congressional statutes," Defs.' Br. at 21, this contention is misplaced. Here, Plaintiffs challenge executive action that does not simply "fail[] to abide" by congressional mandates, but that instead directly contravenes Congress's intent in the IRA to fund projects that are designed to reduce climate impacts from agriculture. *See* Am. Compl. Counts 1 and 2. By freezing grant funds that Congress expressly authorized, Defendants' actions are "incompatible with the expressed or implied will of Congress," and therefore beyond the executive's constitutional powers unless the executive can point to inherent Article II authority for its action—something that Defendants here have made no attempt to do. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring). Accordingly, this Court has jurisdiction to adjudicate Plaintiffs' constitutional claims. *See, e.g.*, *President and Fellows of Harvard Coll. v. U.S. Dep't of Health and Hum. Servs.*, --- F. Supp. 3d ---, 2025 WL 2528380, at *14 (D. Mass. Sept. 3, 2025) ("The resolution of these claims might result in money changing hands, but what is fundamentally at issue is a bedrock constitutional principle rather than the interpretation of contract terms.").

*Third*, Plaintiffs' *ultra vires* claims provide a separate basis for jurisdiction. Once again, Defendants' contrary contention that "the Tucker Act offers Plaintiffs a meaningful and adequate opportunity for judicial review," Defs.' Br. at 22, is contingent upon their argument that these claims are based upon contract and seek money damages, neither of which is true. And though Plaintiffs acknowledge that *ultra vires* claims have an "extremely limited scope," "[w]hen an executive acts *ultra vires*, courts are normally available to reestablish the limits on his authority." *Fed. Educ. Ass'n v. Trump*, --- F. Supp. 3d ---, 2025 WL 2355747, at *7–9 (D.D.C. Aug. 14, 2025) (quoting *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996)). Thus,

"*ultra vires* review remains available to test [executive] action alleged to violate any spending or other statute, provided that plaintiffs can plausibly allege action contrary to a clear and mandatory statutory prohibition." *Glob. Health Council v. Trump*, --- F.4th ---, 2025 WL 2480618, at *8 n.14 (D.C. Cir. Aug. 28, 2025); *see also Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Noem*, --- F.Supp.3d ---, 2025 WL 1825431, at *30 (D.D.C. July 2, 2025). That is precisely what Plaintiffs have done here: they have alleged that Defendants have contravened clear mandates in the IRA requiring the executive to spend grant money to advance the statute's purposes. For these reasons, their *ultra vires* claims are properly before this Court.

In sum, this Court has jurisdiction to enjoin Defendants' unlawful policy freezing IRA grant funding. The Court does not somehow lose this jurisdiction simply because the injunctive relief Plaintiffs seek affects their grants and may result in the payment of funds going forward.

## II.  THE PRESIDENT IS A PROPER DEFENDANT.

Defendants are also wrong to contend that the President is not a proper defendant in this case. Courts have authority to provide declaratory relief against unlawful presidential actions that injure plaintiffs. *See, e.g.*, *Nat'l Treasury Emps. Union v. Nixon*, 492 F.2d 587, 603 (D.C. Cir. 1974) (entering declaratory relief against the President and recognizing availability of mandamus). "[W]hen the President takes official action, the Court has the authority to determine whether he has acted within the law." *Clinton v. Jones*, 520 U.S. 681, 703 (1997); *see also League of United Latin Am. Citizens v. Exec. Off. of the President*, 780 F. Supp. 3d 135, 172 (D.D.C. 2025) (noting that "[t]he D.C. Circuit has recognized that plaintiffs 'are entitled to bring a non-statutory cause of action questioning the legality of [an] Executive Order.'") (quoting *Reich*, 74 F.3d at 1327). Numerous courts have recognized that the kind of presidential action that Plaintiffs challenge here—a section of an executive order—is judicially reviewable. *See, e.g.*, *Nat'l Treasury Emps. Union v. Trump*, 780 F. Supp. 3d 237, 248, 269 (D.D.C. 2025)

9

(appeal docketed) (finding Plaintiffs likely to succeed in their challenge to Section 2 of Executive Order 14251 as *ultra vires* and seeking preliminary injunctive relief enjoining agencies from implementing the order); *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1232 (9th Cir. 2018) (affirming that a section of the executive order at issue is unconstitutional); *League of United Latin Am. Citizens*, 780 F. Supp. at 221–24 (holding sections of an executive order *ultra vires* and unable to be lawfully implemented and preliminarily enjoining subordinates from implementing them). Accordingly, it was appropriate for Plaintiffs to bring a challenge against the President seeking declaratory judgment that Section 7 of the Executive Order is unlawful.

Separate from this Court's authority to provide declaratory relief against unlawful presidential actions, this Court also has inherent equitable power to enjoin subordinate officials from implementing an unlawful executive order. "'Review of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive . . . just as unlawful legislative action can be reviewed . . . by enjoining those congressional (or executive) agents who carry out Congress's directive.'" *League of United Latin Am. Citizens*, 780 F. Supp. 3d at 172–73 (quoting *Franklin v. Mass.*, 505 U.S. 788, 828–29 (1992) (Scalia, J., concurring in part) (citations omitted) and noting the power of the courts to enjoin executive branch subordinates from carrying out unlawful executive orders). Those forms of relief, however—declaratory relief from Presidential action and injunctive relief from subordinate officials—are distinct and Plaintiffs are entitled to both in this case.

To the extent Agency Defendants point to the Executive Order as an excuse for their own unlawful conduct, such reliance is unavailing. Incorporating standard savings clause language such as that an order must be implemented "in a manner consistent with applicable law," 90 Fed.

Reg. at 8359, does not preclude judicial review of the order, *League of United Latin Am.*

*Citizens*, 780 F. Supp. at 176 ("If the executive order cannot possibly be implemented consistent

with applicable law, a command to do so in a saving clause is meaningless.").

Thus, the Court can and should review the President's Order and grant declaratory relief

against the President and then provide Plaintiffs complete relief with an injunction setting aside

the Agency Defendants' funding freeze which implemented that order.

### III. PLAINTIFFS CHALLENGE A DISCRETE AND COGNIZABLE FINAL AGENCY ACTION

Defendants argue Plaintiffs have not challenged a discrete, reviewable agency action, but

rather "many different actions by multiple actors." Defs.' Br. at 25. Defendants are wrong:

Plaintiffs challenge Agency Defendants' decision to adopt a policy of immediately and

indefinitely freezing all grant funds appropriated by Congress in the IRA. The actions that

implement Agency Defendants' policy, such as the "many different actions" to which

Defendants refer (*i.e.*, Plaintiffs' losing access to payment portals and USDA's refusing to

process invoices, canceling check-in meetings, and refusing to provide information on the status

of grants) are simply the consequences of the discrete final agency action that Plaintiffs actually

challenge—again, the policy of freezing IRA-funded grants. The Supreme Court has recognized

a "strong presumption favoring judicial review of administrative action" and agencies "bear[] a

heavy burden in attempting to show that Congress prohibited" such review. *Mach Mining, LLC

v. EEOC*, 575 U.S. 480, 486 (2015) (cleaned up). Agency Defendants have not met this burden.

The record is replete with evidence that Agency Defendants adopted an across-the-board

policy of freezing IRA grant funds. In an email to Plaintiff Red Fire Farm, USDA explained that

"On January 20, 2025, President Trump signed an Executive Order that placed a freeze on

spending authorized by the Inflation Reduction Act (IRA) of 2022 . . . . This includes payments

under . . . conservation program contracts that are funded through the IRA." Pls.' MSJ Br., Ex. 6-B. *See also* Pls.' MSJ Br., Ex. 6-C ("[W]e are experiencing a federal pause for all obligations and reimbursement funded through the Inflation Reduction Act."). Other Plaintiffs were told IRA funds were "in a holding pattern," Pls.' MSJ Br., Ex. 2, ¶ 11 and Exs. 2-B, 2-C, and 2-D, and that invoices and reimbursements were "not able to be acted on currently," Ex. 3, ¶ 14, Ex. 3-B. USDA staff noted they were "following the current directions from the USDA" in withholding payments, Ex. 3-C, and "can't give any guidance" to grantees, Ex. 4-B. And in a declaration submitted before the Federal District Court of Rhode Island, the USDA's Director of the Transparency and Accountability Reporting Division of the Office of the Chief Financial Officer attested that the Acting Secretary of the USDA issued a "moratorium on the execution of new grants, cooperative agreements, and contracts to conform to all applicable policies of the new Administration" on January 21, 2025. Decl. of Tyson Whitney at 1, *Woonasquatucket River Watershed Council v. USDA*, No. 25-cv-00097 (D.R.I. Apr. 25, 2025), Dkt. No. 56-2.

Not only is Agency Defendants' policy of indefinitely and categorically freezing all IRA-appropriated funds a discrete agency action, but it is also a final one. The finality question is a "pragmatic" and "flexible" inquiry. *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 417 F.3d 1272, 1279 (D.C. Cir. 2005). Agency Defendants' decision to categorically and indefinitely freeze IRA funds constitutes a final agency action reviewable by this Court because it "mark[ed] the consummation of the agency's decisionmaking process" and determined "rights or obligations . . . from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997).

Numerous courts have "characterized decisions that have resulted in categorical funding freezes as the consummation of an agency's decisionmaking process to comply with the

President's executive order," including the USDA's decision to freeze funding pursuant to this EO. *Washington v. U.S. Dep't of Transp.*, --- F. Supp. 3d ---, 2025 WL 1742893, at *17 (W.D. Wash. June 24, 2025) (cleaned up) (quoting *New York v. Trump*, 769 F. Supp. 3d 119, 136 (D.R.I. 2025))) (appeal docketed); *see Woonasquatucket River Watershed Council v. USDA*, 778 F. Supp. 3d 440, 467 (D.R.I. 2025) (appeal docketed) (finding that the USDA decision was final agency action and noting that "[a] breadth of caselaw supports this conclusion." (citing *Louisiana v. Biden*, 622 F. Supp. 3d 267, 291–92 (W.D. La. 2022) for its collection of over a dozen cases where temporary stops and pauses constituted final agency action). Where, as here, there were "no further steps [Defendants] need to take to determine whether they will freeze that funding," the action is the consummation of the agency's decisionmaking process. *Woonasquatucket*, 778 F. Supp. at 467; *see also Trump*, 769 F. Supp. at 137 (finding that "the implementation of . . . IRA funding pauses likely marked the consummation of each agency's decision to comply with the *Unleashing* EO, the *Unleashing* Guidance, or both"); *Nat'l Council of Nonprofits v. OMB*, 775 F. Supp. 3d 100, 123–24 (D.D.C. 2025) (appeal docketed) (finding that the OMB Pause Memorandum constituted final agency action). Likewise, the possibility that Agency Defendants may lift the freeze at some point in the future does not make the action any less final. *Data Mktg. P'ship, LP v. U.S. Dep't of Lab.*, 45 F.4th 846, 853–54 (5th Cir. 2022) ("An action is either final or not, and the mere fact that the agency could—or actually does—reverse course in the future does not change that fact."); *Louisiana v. Biden*, 622 F. Supp. at 292 ("[A] 'final agency action' does not have to be defined as permanent to be considered final.").

Plaintiffs were severely harmed by Agency Defendants' decision to freeze their funds, and the uncertainty of future payments continues to impact their operations and the ability to proceed with their projects. Defendants acknowledge that the freeze remains in place, noting that

13

they are currently disbursing some funds only because another federal district court has ordered them to do so for the time being. Defs.' Br. at 2 ("Due to a preliminary injunction in the District of Rhode Island, Defendants presently are processing and paying invoices and advance requests from Inflation Reduction Act grant recipients, including Plaintiffs."). However, this court-ordered reprieve does not provide lasting relief nor impact this Court's analysis on the merits of this case.

Legal consequences have clearly flowed from this sweeping decision to halt the payment and processing of funds, "given that grant recipients [could not] access previously awarded funds." *Woonasquatucket*, 778 F. Supp. at 467. Payments stopped, leading to halted or scaled-back projects, budget revisions, lost access to land, layoffs, lost program participants, lost sub-contractors, increased debt, and delays and losses to planting seasons, among other consequences. Pls.' MSJ Br., Exs. 1–8. Although Defendants dismiss the concrete impact that their action has had, courts have found exactly these sorts of "budgetary reshuffling, cancelation and delay . . ., and scrapping" of plans to be the type of practical consequences that characterize finality. *Washington*, 2025 WL 1742893, at *18.

Defendants further argue that Plaintiffs' claims are not cognizable because they "cannot directly challenge the Order, which plainly is lawful" and the challenge is "tantamount to impermissibly broad, programmatic challenges to entire agency operations." Defs.' Br. at 26–27. This argument likewise fails. As discussed *supra*, Section II, courts have recognized that Executive Orders are reviewable and boilerplate language regarding complying with statutes does not make an order lawful where, as here, implementing the order as written would conflict with statutory or constitutional law. Defendants' claim that the Order "does not impose a categorical pause on all Inflation Reduction Act-appropriated funding" is belied by the Agency

14

Defendants' action. Defs.' Br. at 27. Agency Defendants immediately and categorically halted all disbursements of IRA-appropriated funds, directly telling grant recipients that the Order froze all spending authorized by the IRA. Pls.' MSJ Br., Ex. 6-B. Defendants have provided no evidence that Agency Defendants assessed whether such a categorical freeze was lawful; they simply implemented the President's directive. And while it is certainly true that Plaintiffs must identify a "particular" and "concrete" agency action to challenge, that is precisely what they have done in this case. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990). As judges in this district have found, "plaintiffs can challenge specific policies or rules implemented by the agencies," including the adoption of a "categorical" policy of halting or terminating funds *en masse* "without individualized consideration or reasoned review," such as happened here. *USDN*, 2025 WL 2374528, at *27. Such a challenge is not the kind of "programmatic" challenge requesting the review of day-to-day implementation of a program that *Lujan* precludes but rather a challenge to a discrete agency policy decision that has immediate and ongoing consequences. Thus, Plaintiffs challenge a discrete and final agency action reviewable by this court.

## IV. PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON THE MERITS

### A. Defendants Lack Discretion to Freeze Grant Funding

In an effort to undermine the merits of Plaintiffs' arguments, Defendants first try to shield themselves from legal challenge by hiding behind their "broad discretion" over grant programs. Defs.' Br. at 33. Specifically, they maintain that they have "inherent discretion" to make decisions "to select recipients" for grant funding, "to terminate one recipient and select a different recipient" for grant funding, and "how best to allocate grant funding." *Id*. at 33–34. These contentions are a red herring. As a threshold matter, Defendants' discretion to make these sorts of decisions simply is not at issue in this case.

Instead, Plaintiffs maintain that Defendants' action is unlawful because it froze funds post-allocation to recipients to whom the Agency Defendants had already guaranteed funding—an action that Congress, through the IRA, granted the executive branch no discretion to take. Indeed, Defendants admit that no "statute specifically authorizing [them] to pause funding and redirect it to a different recipient" exists. *Id.* at 37. Instead, Defendants focus on their discretion to *allocate* rather than *freeze*—a sleight of hand that renders their argument beside the point.

Additionally, Defendants' characterization of the funding freeze as nothing more than "paus[ing] funding and evaluat[ing] whether it is being put to the best use," *id.*, does not conform to the evidence. The available evidence demonstrates that Defendants viewed the freeze as indefinite and indiscriminate. The Executive Order Defendants rely on to justify the freeze includes a section titled "Terminating the Green New Deal," and directs an immediate and indefinite freeze on disbursements of IRA funds. 90 Fed. Reg. at 8357. The OMB Memo, issued in response to that Executive Order, directs agencies to halt "appropriations for objectives that contravene the [Order's] policies." OMB, Memorandum, M-25-11, "Guidance Regarding Section 7 of the Executive Order *Unleashing American Energy*," from Matthew Vaeth, Acting Director (Jan. 21, 2025). In a declaration submitted to the federal district court of Rhode Island, USDA attested that the Acting Secretary of USDA issued a "moratorium on the execution of new grants, cooperative agreements, and contracts to conform to all applicable policies of the new Administration." Decl. of Tyson Whitney at 1, *Woonasquatucket*, No. 25-cv-00097 (D.R.I. Apr. 25, 2025), Dkt. No. 56-2. *See also* Pls.' MSJ Memo, Ex. 6-B (email to Plaintiff Red Fire Farm stating that the "Executive Order . . . placed a freeze on spending authorized by the Inflation Reduction Act"); *id.*, Ex. 6-C ("[W]e are experiencing a federal pause for all obligations and reimbursement funded through the Inflation Reduction Act."). Nowhere have

Defendants provided evidence that the funding freeze at issue in this case was anything but indefinite. And payments to Plaintiffs began again only after a preliminary injunction in a separate case ordered Defendants to release the funds, as Defendants themselves admit. *Woonasquatucket*, 778 F. Supp. at 479; Defs.' Br. at 2. Agency Defendants have presented no evidence that they intend to reallocate IRA-appropriated grant funds within the programs they froze to different grantees in accordance with the statutory directives for the programs delineated in the IRA.

Regardless of Defendants' aim with the freeze, however, the text of the IRA and this Circuit's and the Supreme Court's case law make clear that Defendants lack discretion to freeze IRA funds as they did here. As then-Judge Jackson explained, the APA's exclusion from review of discretionary action is "very narrow" and exists only where "a court would have no meaningful standard against which to judge the agency's" action. *Pol'y & Rsch., LLC v. U.S. Dep't of Health & Hum. Servs.*, 313 F. Supp. 3d 62, 73 (D.D.C. 2018). The IRA provides that standard, and Agency Defendants' action violated it, for multiple reasons.

*First*, the IRA requires USDA to use these funds in specific ways, including for programs that among other things, "provide conservation technical assistance," H.R. 5376 § 21002, "provide grants and loans to eligible entities . . . to improve land access . . . for underserved farmers, ranchers, and forest landowners," *id.* § 22007, and fund "tree planting and related activities," *id.* § 23003; *see also* Am. Compl. ¶ 23. While the IRA gives the agency discretion on how to implement the mandate, it provides no discretion on whether it must fulfill the mandate— that is, whether or not it must use the appropriated funds for the enumerated purposes, including whether or not it can categorically freeze all funding, indefinitely, for policy reasons.

*Second*, Agency Defendants' own regulations and internal guidance "provide meaningful standards for a court to employ when reviewing agency decisions under the APA." *Pol'y & Rsch.*, 313 F. Supp. 3d at 76. Tellingly, USDA's internal policies do not allow or even contemplate freezing all funds for policy reasons. *See, e.g.*, Urban and Community Forestry Assistance Program, 65 Fed. Reg. 57,548 (Sept. 25, 2000); Rural Energy for America Program, 87 Fed. Reg. 10,938 (Feb. 28, 2022); National Headquarters, *Forest Service Handbook: Grants, Cooperative Agreements, and Other Agreements Handbook*, USDA (Nov. 18, 2020) (the "Handbook"), 57–59. *See* Handbook at 56–63 (allowing pausing or withholding funds only due to grantee's noncompliance with grant terms).

Thus, the APA's exclusion from review of action committed to agency discretion by law does not apply in cases like this, where the authorizing statute itself provides a meaningful standard, and the agency "cabin[s its] own discretionary funding determinations by generating formal regulations or other binding policies that provide meaningful standards for a court to employ when reviewing agency decisions under the APA." *Pol'y & Rsch.*, 313 F. Supp. at 76; *see also Elev8 Baltimore, Inc. v. Corp. for Nat'l and Cmty. Serv.*, Civ. No. MJM-25-1458, 2025 WL 1865971, at *21 (D. Ma. July 7, 2025) ("[E]ven where action is committed to absolute agency discretion by law, courts have assumed the power to review allegations that an agency exceeded its legal authority, acted unconstitutionally, or failed to follow its own regulations.").

Case law further demonstrates that this funding freeze is reviewable. Courts have found appropriations decisions to be committed to agency discretion only where Congress granted lump-sum funding to an agency for a broad, unspecified purpose. *See Lincoln v. Vigil*, 508 U.S. 182, 187 (1993) (finding funding decision committed to agency discretion where "Congress never authorized or appropriated moneys expressly for the Program"). Moreover, *Lincoln* dealt

with the question of how to allocate funding, not whether an agency can abruptly cut off funding after Congress has appropriated it. *Id.* at 192–93. And, unlike here, there was no discussion of failure to consider reliance interests or agency action based on the Executive Branch's disagreement with Congressional funding priorities. *See generally id.*

In this case, Congress delineated clear purposes and committed specific amounts of funding to achieve those goals. *See* Am. Compl. ¶¶ 22–23. Unlike in *Lincoln*, there is no need to delve into "indicia in committee reports" to attempt to ascertain Congress's aim—it is clear from the statute itself. 508 U.S. at 183; *see* H.R. 5376, 117th Cong. (2022). And the other narrow circumstances courts have found committed to agency discretion, such as an agency's decision not to institute enforcement proceedings or refusal to grant reconsideration of an action due to material error, lie clearly outside the realm of this case. *See Lincoln*, 508 U.S. at 191–92 (citing *Heckler v. Cheney*, 470 U.S. 821, 831 (1985), and *ICC v. Locomotive Eng'rs*, 482 U.S. 270, 282 (1987)). While the *Lincoln* court thought it "hardly need[ed] to note that an agency's decision to ignore congressional expectations may expose it to grave political consequences," *id.* at 193, that reminder warrants attention here. *See also Harvard Coll.*, 2025 WL 2528380 at, *19 n.14 (the "narrow exception" committing "certain allocations of funds from lump-sum appropriations" to agency discretion "does not 'typically' or 'presumptively' extend to all allocations of appropriated funds") (quoting *Planned Parenthood of N.Y.C., Inc. v. HHS*, 337 F. Supp. 3d 308, 324 (S.D.N.Y. 2018)).

Finally, despite Defendants' arguments otherwise, President Biden's end of border wall funding and President Obama's pause of American Recovery and Reinvestment Act ("ARRA") funds do not support Defendants' freeze of Congressionally-mandated funds. In fact, President Biden's attempt to refuse to spend the $1.4 billion specifically appropriated by Congress for

border wall construction was blocked by a federal district court. *Gen. Land Office v. Biden*, 722 F. Supp. 3d 710, 745 (S.D. Tex. 2024). "'The money was appropriated [],' Biden said. 'I can't stop that.'" Colleen Long, *Biden says he had to use Trump-era funds for the border wall. Asked if barriers work, he says 'No'*, AP News (Oct. 6, 2023), https://apnews.com/article/biden-us-mexico-border-wall-immigration-texas-f99fd10257292a898618236df3613979. The money President Biden refused to spend on the border wall came from funds President Trump had diverted from the general military budget—not funding appropriated by Congress. *See* Camilio Montoya-Galvez and Nicole Sganga, *Biden returns $2 billion in funds Trump had diverted from Pentagon to use for border wall*, CBS News (Jun. 11, 2021), https://www.cbsnews.com/news/biden-returns-border-wall-funds-pentagon/. President Obama's Executive Order never faced legal challenge and may not have survived litigation. Even assuming its legality, the order delayed ARRA funding by a specified amount of time—no more than 30 days—in order to "ensure adequate opportunity for public scrutiny of the project prior to commitment of funds," and reiterated the importance of funding projects that "further the job creation, economic recovery, and other purposes of the Recovery Act." *Ensuring Responsible Spending of Recovery Act Funds*, 74 Fed. Reg. 12,531, 12,531–32 (Mar. 20, 2009).

Notably, these actions are a far cry from the *Unleashing American Energy* Executive Order, which contains no time limit and states explicitly that one of its aims is to "[t]erminat[e] the Green New Deal." 90 Fed. Reg. at 8357. One court has already considered and rightly rejected these attempted comparisons. *See Nat'l Council of Nonprofits v. OMB*, 775 F. Supp. 3d 100, n.10 (D.D.C. 2025) (appeal docketed) ("[T]he court is unpersuaded that targeted pauses of funding for specific projects through an executive order are at all comparable to . . . nationwide suspension of *all* federal financial assistance. Again, the court disagrees with Defendants' . . .

characterization of the pause in this case as 'targeted' and 'discrete' when the language of the memorandum applied to the 'disbursement of all Federal funds under all open awards.'"). This Court should do the same.

### B. Agency Defendants' Action is Arbitrary and Capricious

Despite their best efforts, Defendants cannot overcome Plaintiffs' arguments that the funding freeze is arbitrary and capricious and thus a violation of the APA. Defendants' contentions fall short, for several reasons. *First*, though they argue that the challenged action is not justiciable, that is plainly untrue, as Plaintiffs challenge a discrete agency action. *Second*, their contention that they plan to redirect funding is both unsupported and contrary to the evidence. *Third*, their claim that the APA cannot apply to the President, or to Agency Defendants acting under an executive order from the President, is misplaced. *Fourth*, a change in administration does not exonerate agencies from acting in an arbitrary and capricious manner. And *fifth*, Defendants acted without considering the consequences of the directed freeze, without considering its impact on congressional objectives, without considering reasonable alternatives to freezing the funds, and without providing a reasoned explanation for its rejection of such alternatives.

*First*, as discussed *supra*, Section III, Defendants' characterization of the challenged action here as "too unbounded" to be justiciable, Defs.' Br. at 40, is plainly false. Plaintiffs challenge a discrete agency action—the decision to immediately and indefinitely freeze all payments and processing of funds appropriated by the IRA to implement Section 7 of the *Unleashing American Energy* EO and OMB's guidance regarding the EO.

*Second*, Defendants' contentions that Plaintiffs' APA claims cannot be heard because the APA does not apply to the President and because the Agency Defendants were acting pursuant to

the President's Executive Order, Defs.' Br. at 40, both lack merit. As discussed *supra*, Section II, the President is an appropriate defendant in a case challenging an executive order and where, as here, plaintiffs seek to enjoin unlawful action taken pursuant to the President's order. And Agency Defendants' action here is subject to APA review even when implementing Presidential directives. It is a fundamental hallmark of our constitutional structure that agencies "literally ha[ve] no power to act" except where authorized by Congress. *Marin Audubon Soc'y v. Fed. Aviation Admin.*, 121 F.4th 902, 912 (D.C. Cir. 2024) (quoting *FEC v. Ted Cruz for Senate*, 596 U.S. 289, 301 (2022)). This authorization cannot come from executive orders, which are "not 'law' within the meaning of the Constitution." *Id.* at 908 (D.C. Cir. 2024) (quoting *California v. EPA*, 72 F.4th 308, 318 (2023)). For this reason, even in cases Defendants cite, courts have engaged in APA review of agency action implementing presidential directives. *See, e.g.*, Defs.' Br. at 40 (citing *Sherley v. Sebelius*, 689 F.3d 776, 780 (D.C. Cir. 2012) (analyzing the agency's action implementing an executive order under the APA)). Defendants' attempt to evade judicial rule on these bases thus fall flat.

*Third*, Defendants' claim that the funding freeze was not arbitrary and capricious but instead was implemented to allow time to decide "whether to continue that funding or redirect it elsewhere," Defs.' Br. at 41, is made of whole cloth and finds no support in the record. *See supra*, Sec. IV(A).

*Fourth*, Defendants cannot point to a change in presidential administration as a valid justification. The Supreme Court has held that a mere administration change is insufficient to justify a change in agency approach under the APA—regardless of who is in the White House, agencies must give "good reasons" when implementing a new policy, *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 223 (2016) (citation modified), including "a reasoned explanation . . . for

disregarding facts and circumstances that underlay or were engendered by the prior policy," *Fox*, 556 U.S. at 515–16. *See also Harvard Coll.*, 2025 WL 2528380, at *30 ("Even an indisputably worthy goal . . . does not allow Defendants to change course on decades of federal funding for critical research without providing a reasoned explanation as to how the agency determined that freezing funding would advance that goal.").

Indeed, recent court decisions regarding other funding terminations and freezes by this Administration confirm that federal agencies lack the authority to freeze or terminate funds without reasoned explanation. In *AIDS Vaccine Advocacy Coalition v. U.S. Department of State*, --- F. Supp. 3d ---, 2025 WL 2537200, at *12 (D.D.C. 2025) (appeal docketed), following the D.C. Circuit Court's remand, the District Court found that plaintiffs were likely to succeed on the merits of their claim that agency defendants "acted arbitrarily and capriciously in unilaterally withholding billions in appropriated funds without explanation or consideration of reliance interests." As in this case, defendants there "failed to provide a rational connection between the facts found and the choice made to impose an immediate and wholesale suspension of [Congressionally-appropriated funds] in order to review programs. And nothing in the record suggested that Defendants considered and had a rational reason for disregarding the massive reliance interests of businesses and organizations that would have to shutter programs or close their doors altogether." *Id.* (internal quotation marks and citation omitted). Likewise, *Harvard College* found the Trump Administration's freeze of university grant funds arbitrary and capricious because Defendants "[did] not point[] to a single document . . . that indicates that they weighed the value of the research funded by a particular grant against the [stated] goal," gathered "essentially no information . . . before issuing the Freeze Orders," failed to consider "the

potential societal costs" of the funding freeze, and failed to address reliance interests. 2025 WL 2528380, at *31, 33.

Defendants' challenged action suffers from the same fatal flaws. Just as in those cases, "[i]t is difficult if not impossible to conclude that Defendants considered all important aspects of the problem where the record reveals that they cancelled this broad swath of critical [grant funding] without any consideration as to whether there were less restrictive alternatives or alternatives that would preserve the value and continuity of [work] already in progress." *Id.* at *33. *See also USDN*, 2025 WL 2374528, at *35 (finding grant terminations likely arbitrary and capricious for purposes of preliminary injunction where agency established no "rational connection" between "newly adopted USDA priorit[ies]" and the terminated grants). As in these cases, Defendants' stated reasons for the freeze of Plaintiffs' grants in this case bear no rational relationship to their action, and lack the reasoned explanation required by the APA.

*Fifth*, as explained in Plaintiffs' Memorandum in Support of their Motion for Summary Judgment, Pls.' MSJ Br. at 25–28, Defendants' freeze of these federal funds also runs afoul of the APA because they failed to consider important aspects of the consequences of such a freeze, including but not limited to: grantees' reliance interests and the harm to grantees and the communities they serve; the funding freeze's impact on the primary goals of the Inflation Reduction Act; and "responsible alternatives to its chosen policy." *Spirit Airlines, Inc. v. U.S. Dep't of Transp.*, 997 F.3d 1247, 1255 (D.C. Cir. 2021). Defendants also failed "to give a reasoned explanation for its rejection of such alternatives," such as continuing payments during review of grants or giving grantees the opportunity to adjust their projects to align with new priorities. *Id.*

Any one of these violations would be sufficient to support granting Plaintiff's Motion for Summary Judgment.

## CONCLUSION

Plaintiffs respectfully ask this Court to grant their Motion for Summary Judgment and deny Defendants' Cross-Motion.

Dated: October 10, 2025                    Respectfully submitted,

*/s/ Hana V. Vizcarra*
Hana V. Vizcarra (D.C. Bar No. 1011750)
Carrie Apfel (D.C. Bar No. 974342)
Deena Tumeh (D.C. Bar No. 1741543)
Molly Prothero (D.C. Bar No. 1779237)
EARTHJUSTICE
1001 G Street NW, Suite 1000
Washington, DC 20001
(202) 667-4500
hvizcarra@earthjustice.org
capfel@earthjustice.org
dtumeh@earthjustice.org
mprothero@earthjustice.org

*Attorneys for Plaintiffs*